UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

YAACOV APELBAUM and XRVISION, LTD.,

Plaintiffs/ Counter Defendants,

v.

JORDAN ARTHUR BLOOM,

Defendant/ Counter Claimaint.

Civil Action No. 1:25-cv-00147-MSN-WBP

October 31, 2025
9:58 a.m. - 11:03 a.m.

# TRANSCRIPT OF MOTION PROCEEDINGS BEFORE THE HONORABLE WILLIAM B. PORTER, UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs/ Counter Claim Defendants: HYLAND LAW PLLC
Timothy Brooks Hyland, Esquire
11710 Plaza America Drive
Suite 160
Reston, VA 20190

For the Defendant/ Counter Claim Plaintiff: Jordan Arthur Bloom, *Pro Se*
3315 N. Brandywine Street
Arlington, VA 22207

Court Reporter: Diane Salters, B.S., CSR, RPR, RCR
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, VA 22314
Email: Dianesalters.edva@gmail.com
Telephone: (301) 338-8033

Proceedings reported by machine shorthand from an FTR Gold recording. Transcript produced by computer-aided transcription.

THE COURTROOM DEPUTY: Calling civil action matter Number 25-cv-147, *Yaacov Apelbaum v. Bloom*. Parties, please state your name for the record.

MR. HYLAND: Good morning, Your Honor. Timothy Hyland for Yaacov Apelbaum and XRVision, Ltd.

THE COURT: Good morning.

MR. HYLAND: Good morning.

MR. BLOOM: Jordan Bloom, defendant *pro se*.

THE COURT: Good morning.

All right. We have a number of motions today. We have three motions: a motion to quash, a motion for a protective order, and a motion to compel. I just want to start with a couple of comments, and then we'll start working our way through the motions. Just sort of procedurally, you all, both of you, when you have filed, I think, almost all of your motions, you've waived oral argument on those hearings, which you're welcome to do, but I just want to make sure you all understand the implication of doing that. If you look at the 16(b) order, the time for resolving those motions is significantly slower when you waive oral argument. There is an opposition that's due two weeks after the filing and then some time for a reply. So when we're up against a discovery deadline, like we are now, filing motions and waiving oral arguments is not necessarily the most efficient way to go if we want to get issues resolved. So I just command that to your

attention to make sure that you're aware of that.

The other piece of it, of course, is when you waive oral argument, it means not only a longer briefing process, but sometimes a longer period of time to get a decision versus ruling from the bench, which keeps things moving. And, again, I think discovery closes two weeks from today, and there's very little chance that date is going to get moved.

The next piece is another administrative piece, is courtesy copies. We are reliant on counsel to make sure we're getting courtesy copies of your papers within one business day of filing them. GSA has instructed us we're not to be printing things out, and there's only so much we can do on the computer, especially when there are attachments that number in the hundreds of pages like there were for these motions, so that's part of our local rules. You need to make sure that you're complying with that to make sure we're getting copies of your briefs so we can be adequately prepared for your hearings.

Also, communications with chambers, they should be at a minimum, and when people do contact chambers, they should make sure that they either have the express permission of the other side or the other side is on the phone.

Mr. Bloom, I know you were calling earlier this week to find out what was going on with the motions and whether we would move them and the like, but I don't know if you spoke with Mr. Hyland before doing that, but you need to make sure

that if you're communicating with chambers, we're doing it in a way that doesn't violate the rules on *ex parte* communications.

And, lastly, before we get to the motions, have there been any settlement discussions here? Would this case benefit from a settlement conference, Mr. Hyland?

MR. HYLAND: Your Honor, in fairness, Mr. Burns, who's the out-of-state counsel, has had the bulk of the communications. My understanding, however -- and Mr. Bloom can disabuse me of this notion -- is that there's been no substantive settlement discussions, and I think the reasons for that will bear themselves out in the course of the remainder of today. That's the short answer. Do I believe that it would be beneficial? To answer your question more directly, I always believe that that's a good idea except in -- I suppose there's a hypothetical case where it wouldn't be useful, but I would defer to Mr. Bloom in that regard.

THE COURT: All right. Mr. Bloom, do you think in any way a settlement conference would be useful in this case?

When you're in this court, you need stand. When you're approaching the Court and when you're addressing the Court, speak from the podium, please.

MR. BLOOM: I have not had any conversations like that. I'm certainly open to it.

THE COURT: Well, I encourage the parties to talk to one another to see if something like that would be fruitful. I

don't want to do it for the sake of getting together and not settling the case. Parties need to come to a settlement conference with an understanding that they're both willing to settle the case and whatever that may mean.

Let's start with the motion for a protective order. Mr. Hyland, this is your motion, and while it's a motion that maybe is typically granted, I did have some concerns with this motion for a protective order. A couple of things, and a theme you may hear from me throughout the course of today is, it strikes me -- and this is reflective in the motion for a protective order as well -- that the discovery and the information that's sought to be protected by the protective order seems to be well beyond the scope of this case. This case, as I understand it, is a 13-page complaint for defamation relating to, I think it's three or four statements. The upshot of all of them is that -- your allegation is that Mr. Bloom alleged that your clients were spies, Israeli spies. There may be some nuance to that, but I think that's the upshot of it.

MR. HYLAND: Yes.

THE COURT: And I'm having a hard time understanding why trade secrets are going to be involved in this case. Certainly, a protective order can be useful, but the motion for a protective order and the relief it seeks suggests that you're trying to protect personal records with personal identifying information, which makes sense to me. Confidential business

information, proprietary technical data, trade secrets, and other sensitive material, I don't see that as what we're doing here.

MR. HYLAND: Well, from a damages perspective, however, certainly, the business strategy, slash, financial records would be part of that.

THE COURT: In what way? Tell me how.

MR. HYLAND: Well, to the extent that -- again, looking at it hypothetically -- that the claim is that as a result of the statements made by Mr. Bloom, XRVision lost business, a customer, a contract, what have you. That sort of sensitive business information would be implicated as part of the information that we would be --

THE COURT: Have you designated an expert to talk about those things?

MR. HYLAND: We have not.

THE COURT: So how is any of that information going to come in in evidence? And how is -- again, let's get back to the relevance piece. If you don't have an expert and you're not going to have an expert testify as to these damages, how is any of this information related to the defamation claim?

MR. HYLAND: Well, I can imagine a scenario where you could do that same thing without an expert. I'll just make up a scenario because I'm not prepared to give a particular one. But the scenario would be Company Y decided that it was not --

that it was going to withdraw from a contract that was somehow not terminable at will, but said because you're now labeled as a spy, we're not going to do this contract anymore. My guy can get up and say they were going to -- here's the contract; it was $100,000; our profit on that contract would have been 75,000. That's a $75,000 damage, and I don't need an expert to prove that.

THE COURT: I take your point. And I'm not trying to micromanage your damages assessment or evidence; it just struck me that the scope of this protective order was broader than it needed to be. And fundamentally to my primary point is I don't think an attorney's-eyes-only designation is necessary. And if you look at the proposed protective order, the definition of counsel's only material is wildly broad.

MR. HYLAND: I have to say that I'm not -- I don't think pushing the AEO issue, particularly when you have a *pro se* party on the other side, is --

THE COURT: That's my follow-up question, is how would you envision this to work?

MR. HYLAND: I'm not going to die on that hill. I don't think the AEO is -- perhaps that may be -- it's probably excessive, I'll grant you that.

THE COURT: Right. I mean, it strikes me that if one were looking at this skeptically, you could say that it's used to produce but not produce information to a party who can't

review it.

MR. HYLAND: And that's not the intention, so I don't think -- I take your point on the AEO, and I don't think that that's a terribly useful provision in this particular -- under the circumstances that are here. I mean --

THE COURT: I appreciate that, but I also want you to focus on the definition of confidential information, which is designed as information that the producing party reasonably believes is of such nature and character that the unauthorized disclosure of such information is likely to irreparably or seriously injure the producing party. That's close, but it's a little broader than I think it should be. And, of course, you know, you're going to have a local Rule 5 problem when it comes to introducing any of this material if you're, in fact, going to use it at trial, but I recognize this is discovery.

MR. HYLAND: That would be a motion that would follow, of course.

THE COURT: Yeah. And I just wanted to get a sense from you, what information has Mr. Bloom requested of you that you are inclined to produce that needs to be protected by this protective order?

MR. HYLAND: If I can get my cheat sheet because that's --

THE COURT: I have not seen his request to you, and I thought I read somewhere -- and I could be misremembering --

that he either didn't issue you any discovery or he withdrew it or something like that, but I'll give Mr. Bloom an opportunity to speak for himself.

MR. HYLAND: His discovery is -- he has asked for various communications with government officials which are in the course of the business of XRVision's business, communications regarding doing business with the United States government and various parties there.

THE COURT: I assume you asserted relevance objections to those?

MR. HYLAND: There were, yes.

THE COURT: So to my point, focus on the information that you intend to produce that needs to be protected.

MR. HYLAND: And that would be the business information and the customer information, the customer identities.

THE COURT: How is that relevant?

MR. HYLAND: Well --

THE COURT: Maybe it is and I just don't understand it.

MR. HYLAND: I mean, I don't know that it's relevant. It's probably discoverable --

THE COURT: Okay.

MR. HYLAND: -- from the damages perspective for the same reasons that I discussed earlier.

THE COURT: Okay.

MR. HYLAND: That's more or less it, is anything -- what we're really worried about is financial stuff and customer information and contact stuff --

THE COURT: Okay.

MR. HYLAND: -- some of which is sensitive information. It deals with three other agencies and what have you, so I'm just trying to be circumspect.

THE COURT: I understand. And like I said, I think a protective order is appropriate. I just wanted to get a sense for what information you were actually looking to produce because, like I said, I thought that the protective order as drafted was broader than necessary and covered information that may or may not be protected. The information you described certainly seems to be something that would fit within the confines of a protective order.

MR. HYLAND: Sure. I want to say this is language -- frankly, this is cribbed from what I used in a different case.

THE COURT: That's what I figured.

MR. HYLAND: And, you know, the guardrail on the concern that Your Honor is expressing is that, of course, if we overdo it, he has a challenge right under the way the order is done. Now, I know the response to that is, of course, well, you're just going to over-designate everything and --

THE COURT: We're not doing that.

MR. HYLAND: Well, exactly. And so on some level, the good faith language is there for a reason, and that is you can't just mark everything confidential. I've seen this happen -- I'm sure Your Honor has as well -- where you just mark everything -- go through electronically and mark everything confidential and say, There you go, now it's on you. I think that's probably going to create problems for us, and that's not what I'm interested in having happen.

THE COURT: Well, I want to hear from Mr. Bloom before I give you a formal ruling, but what I'm going to likely do is ask you to strike the attorneys'-eyes-only language from the protective order and to take a more circumspect look at the definition of confidentiality to make sure that we're protecting only information that is actually business sensitive and commercially sensitive as well such that we don't have an overly broad confidentiality designation situation.

MR. HYLAND: Thank you, Your Honor.

THE COURT: Mr. Bloom, would you like to be heard on this?

MR. BLOOM: Yes, just --

THE COURT: Let me start by making a comment, then I'll give you an opportunity to, perhaps, respond to it. I did read your opposition, which appears to be, in sum and substance, that you don't want the plaintiffs to produce to you any information that you can't publish.

MR. BLOOM: That's right.

THE COURT: And I need to make sure you're aware that that's absolutely not the standard. You're in litigation now, and I understand that you're a writer or publisher or you're in that field, but when you're in litigation, there are things that people have to produce to one another that are not typically available and open in the public forum. And if you ask information of the plaintiffs that they feel they need to produce, they're entitled to some protection. So your remedy or your options are you need to abide by the terms of the protective order so if information is produced to you that's designated as confidential, you need to keep it as confidential. You have the right to challenge that designation under the language of the protective order, but those are your options with respect to that, or, alternatively, you could tell the plaintiff you don't want any information from them, which you seem to have said in one of your papers, maybe a little short-sided considering that you need to mount a defense in this case, but it is absolutely not the case that whatever information gets produced to you, you have the right to publish. If it is designated as confidential subject to a protective order, then if you violate that protective order, you could be subject to contempt or sanctions. And I just want to make sure you're aware of that because litigation is very different than whatever you may do on a daily basis to develop

information that you may want to publish.

MR. BLOOM: Understood.

THE COURT: You're entitled through the litigation process to get access to information you otherwise would not be entitled to get, and because of that, the litigants, you included, are entitled to some level of protection. Are we clear?

MR. BLOOM: Understood.

THE COURT: All right.

MR. BLOOM: With respect to that, what I did say is if there are things that the plaintiffs want to put under a protective order, I'm happy to forego that. As you say, I think the scope of this is much more narrow than is indicated in the initial complaint; and in my conversation with Mr. Burns, the plaintiffs' other attorney, he also, the reason for the protective order, had stated to me was trade secrets, business stuff. None of that seems all that relevant except in terms of Mr. Burns said it's relevant to demonstrating damages. And the thing that I would say about that is, what they've alleged is an active per se defamation, in other words, a thing that's obviously defamatory, and damages don't need to be shown.

THE COURT: Well, but there is a big distinction between whether or not damages need to be shown and whether or not damages can be shown, and in this case, the per se

defamation standard is one that makes their job easier to prove defamation because the alleged defamation in this case goes to their character, their job fitness, and the like, but that's just a quality or a category of defamation. It doesn't mean that they're only entitled to nominal damages. They're entitled to whatever damages they can prove were caused by what they believe to be defamatory statements, so they're not limited nominal or per se damages. To the extent that they have documents, business arrangements, contracts, and the like that demonstrate that they have been damaged, they're allowed to put that information on and make a claim for that.

MR. BLOOM: Understood.

THE COURT: All right. What I just said seems to be different than the argument you were making. Am I missing your point?

MR. BLOOM: I don't think so. Just that, you know, whether the truth or falsity of what I've said is not relevant to whether they've incurred damages. I guess that's --

THE COURT: Well, there are different elements. There's the truth or falsity of the statement to prove that it was defamatory, and if it was defamatory, what were their damages. It's a multistep inquiry.

MR. BLOOM: Right.

THE COURT: So there's the truth or falsity aspect of it that goes to liability, and then there's the damages piece

of it which relates to, perhaps, these contracts or other things that they may intend to produce to show that they lost work as a result of statements you allegedly made that allegedly were defamatory and, therefore, they've suffered damages.

MR. BLOOM: Understood.

THE COURT: Anything else you would like to tell me?

MR. BLOOM: No.

THE COURT: On the motion for entry of a protective order, I'm going to grant it in part and deny it in part. Actually, I think what I'm going to do is I'm going to deny the motion without prejudice to Mr. Hyland, your right to file a revised motion for a protective order. Obviously, show it to Mr. Bloom in advance and, hopefully, the two of you can submit it as a consent order that I can quickly enter versus having to hear argument on it, but I think a standard order, and I think Mr. Bloom has indicated that he might be acceptable to a protective order that covers just the business-sensitive information that you've described here today, Mr. Hyland. There may be some other categories or documents. I'm not handcuffing you in that respect, but I just want to make sure that it doesn't contain an attorneys'-eyes-only provision and that it is reasonably tailored to the issues in this case such that we don't have over-confidentiality designations. Make sense?

MR. HYLAND: Very well. Thank you, Your Honor.

THE COURT: Let's move, then, to the motion to quash next. Give me one second.

All right. Mr. Bloom, this is your motion.

MR. BLOOM: Yes. I got an email from somebody who knew about this a couple of weeks ago, and it was completely news to me and seems totally extraneous to what's going on.

THE COURT: How did you find out about the subpoena?

MR. BLOOM: I got an email.

THE COURT: From whom?

MR. BLOOM: From an account whose identity I don't know.

THE COURT: I'm sorry, from a what?

MR. BLOOM: An email account whose identity I don't know.

THE COURT: Okay. And somehow informed you about the subpoena?

MR. BLOOM: That's correct.

THE COURT: All right.

MR. BLOOM: And I have nothing to do with any of these domains. I guess, as best I can tell, the plaintiffs' inference is that I read about Mr. Caray (phonetic) on that website and, therefore, it's become germane, but Mr. Caray has been written about in Writers (phonetic) and a number of other places that are very well known.

THE COURT: Okay. Anything else you want to tell me?

MR. BLOOM: No. I think that's it.

THE COURT: Mr. Hyland.

MR. HYLAND: Good morning again, Your Honor.

THE COURT: You didn't file an opposition to this motion, or did you? I did not see one.

MR. HYLAND: It was encompassed within the --

THE COURT: I know after it was filed, I asked you all to meet and confer to see if you could reach some resolution on it, but I didn't see an opposition. And before we get to the substance of it, I have some procedural issues or questions about it. It looks to me like this subpoena is dated October 14th, and it was served on a Cloudflare registered agent also on October 14th. How was the defendant provided notice of it? I didn't see a certificate of service on it, and I certainly didn't see any compliance with Rule 45(a)(4).

MR. HYLAND: I have to -- I'll be candid, Your Honor. When Mr. Bloom indicated that he was surprised by it, I reached out. I was unaware of it.

THE COURT: Of the subpoena?

MR. HYLAND: I was, and I made my --

THE COURT: Does Mr. Burns have authority to sign subpoenas in this case?

MR. HYLAND: I don't know the answer to that.

THE COURT: I don't think he does. Its an E.D. Va.

subpoena.

MR. HYLAND: I was not pleased at the surprise and, in fact -- and I think Mr. Bloom will tell you this -- just yesterday, and I was, like, Make sure he has the subpoenas, because there's more than one; there are others out there, evidently. I was unaware of these and less than happy about that, but it is what it is.

THE COURT: Well, I just want to start by telling you that I think that it's a violation of the local rule for him to sign these subpoenas. These are not subpoenas that are issued by the Court in Sacramento where, perhaps, the deposition was scheduled; instead, they sent a rule change --

(Simultaneous crosstalk.)

MR. HYLAND: Correct.

THE COURT: -- subpoenas issued by this Court. He's not allowed to sign pleadings. And also, Rule 45(a)(4) is clear, although it seems like a lot of lawyers don't know about that rule, which requires notice of the subpoena before it is served on the third party.

MR. HYLAND: I understand the rules entirely, Your Honor, and I don't have -- I don't have a -- I can't defend the indefensible.

THE COURT: The other issue that I had, at least on the version that was filed in connection with your status report as Exhibit 4, there was no, in my version, categories of

information that were the subject of the proposed deposition. It said see attached Exhibit A, but I didn't have an Exhibit A, and I couldn't evaluate the quality of the subpoena or the --

MR. HYLAND: It's there, in my version anyway, where the documents to be produced are.

THE COURT: On the version that was filed with the Court?

MR. HYLAND: I believe so.

THE COURT: I will look for it. I did not see it. Maybe you can point me to the page number.

MR. HYLAND: Well, I think the testimony box is incorrectly checked. It was the production. I'm sorry.

THE COURT: Okay.

MR. HYLAND: It was intended for production.

THE COURT: Well, that's what I thought until I saw page 21 of 22, which is Schedule B, notice of deposition, and it says the subject matter described in Schedule A in Exhibit 1.

So let me just raise a couple other points, and I understand that you didn't have anything to do with this, but you're responsible for it.

MR. HYLAND: I understand.

THE COURT: But Mr. Burns seems to be practicing in this court without the appropriate authority, and I would like to think that if he had run these by you, you would not

have authorized him to issue them. And when I look at Schedule A, for example, that contains what I think is a wildly overbroad statement as to what he purports to command the third party to do with respect to a privilege log, is not required by any rule, it's not required by case law. It's an improper burden, I think. And then when I looked at the Schedule B, which purports to notice a deposition, it says that Cloudflare is directed to contact undersigned plaintiffs' counsel to coordinate a deposition location, is also not appropriate.

MR. HYLAND: This is not -- I would just -- I'm responsible for it, Your Honor, and I apologize to Mr. Bloom, and I apologize to the Court. I'll ensure -- I think the motion should be -- I would ask that the motion be granted -- the motion to quash be granted without prejudice, and I'll fix it.

THE COURT: Well, what's the relevance of any of this information?

MR. HYLAND: Well, what's the relevance? The relevance of it -- firstly, before I get to relevance, he, Mr. Bloom, has no standing under the case law to even challenge the subpoena.

THE COURT: I don't agree with that.

MR. HYLAND: Oh, I think the case law --

THE COURT: No. A party always has the right to challenge the scope of the subpoena if it's seeking information

that's irrelevant or outside the scope of the case.

MR. HYLAND: There's actually a lot of case law that says otherwise, but --

THE COURT: I disagree.

MR. HYLAND: I take your point. Again, I know --

THE COURT: The parties to litigation are not required to sit by and let an opposing party issue any subpoena they want, whether they think it's relevant or not. It's not up to the third party. It can be a burden on the third party. And as I read the rules, they have the express right to appear and challenge the subpoena.

MR. HYLAND: Okay. But, again, that becomes irrelevant. But the -- it has to do with two items. Firstly, directly -- and I know it hasn't been granted yet or it hasn't even been adjudicated yet -- but we filed a motion for leave to file an amended complaint; it goes directly to that.

THE COURT: Not in play.

MR. HYLAND: Understood.

THE COURT: And, you know, that's a motion that is now scheduled to be adjudicated after the discovery cutoff, which is going to create a significant prejudice issue.

MR. HYLAND: Sure.

And then while it goes directly to that, less directly, but still in a discoverable fashion, it goes to the malice, the proof of malice in this case, and I'll tell you

why. This is an oddity that I've come across more often than I'd like to tell the Court recently and involving budding journalists and others in the influence game, and that is the following scenario, and that's -- that is -- I'm trying to describe this in noninflammatory terms: A party will tell a story in one forum -- and I'm not referring to judicial forums; I'm talking about maybe on their blog, maybe in an on op-ed somewhere, what have you -- and then they'll tell the same story -- false story, incidentally -- in a pleading somewhere, and then they'll tell the same false story as a source for another journalist or blogger, and then when confronted with having said it, the defense becomes, Everybody's saying it; look, everybody's saying it. But they're the seed. And that's what we have here.

THE COURT: But in a defamation case where you, presumably, will put on evidence that this is a false statement, and the defendant, Mr. Bloom, will be required to bear his burden of proving that it was a true statement, I don't see how that makes this information relevant. In the statements that you've included in your complaint, I don't see any suggestion that he's relying on a third party having said something. There's no attribution defense that he says, It's not my statement, it's someone else's, and he can stand behind that. Instead, the statements are statements putatively of him.

MR. HYLAND: But if they are statements that -- if they are the fruit of statements that Mr. Bloom is perpetuating out there, which we believe they are, then that goes to show his malicious intent even setting those statements aside as not. Let's assume that those are not a subject of the defamation claim. If he's out making other false statements and perpetuating other false statements about my clients, that goes directly -- or not directly -- it's certainly evidentiary of his malicious intent.

THE COURT: What proffer can you offer me that he had anything to do with these domains, offshorereview.com and the financescam.com? And Cloudflare, I take it, is just the ISP?

MR. HYLAND: Yes. It's -- well, Cloudflare is -- to call it an ISP is probably slightly inaccurate. Cloudflare is a funny thing. It's a DNS provider. It does manage DNS, so all of these various sites sort of flow through that.

THE COURT: But they're not responsible for content?

MR. HYLAND: They aren't responsible for content, but they have the information.

THE COURT: They have what information?

MR. HYLAND: The information as to the users.

THE COURT: Who owns the site and --

MR. HYLAND: Who's --

THE COURT: That's a simple question. That's not what I seem to think that this is asking for.

MR. HYLAND: It's asking for the account holder information and what have you.

THE COURT: Okay.

MR. HYLAND: But you asked for a proffer. My proffer is that this -- the whole thing about this individual is out of the blue, just it does not exist. It's a wildly just made-up story about some random guy who is allegedly mixed up with my clients. It comes out of nowhere. Mr. Bloom is reporting -- Mr. Bloom is the only non-anonymous person who is reporting it. I think it's a fair inference to believe that Mr. Bloom is the source of all of this. It's not -- so can I proffer that I have the goods? No. But that's what discovery is all about. I have enough reason to believe it that we believe the subpoena is, in that regard, fair.

THE COURT: I'm going to grant the motion to quash for a number of reasons. One, procedurally, I don't think that this -- one, I think it's defective. I don't think Burns has the right to sign the subpoena. Second, the required notice under 45(a)(4) was not given. And, substantively, this issue is not yet before the Court. I understand it may be the subject of a motion to amend the complaint, but it's not currently before the Court. And I also think it's highly speculative based on your proffer.

I think this case is much more narrow than the discovery being sought. This relates to, again, alleged false

statements and damages that flow.

All right. Let's turn to the motion to compel. I'm happy to address this in any way that you think may be efficient. Maybe the only way to do it is to go through the individual discovery requests.

And, Mr. Hyland, I certainly appreciate and understand your argument about the lateness of the objections, and general boilerplate objections are not permitted in this court anyway, and my 16(b) order made that point plain if it wasn't otherwise plain. That said, there are a number of issues that I have with some of this discovery that is just wildly overbroad to the point that I don't think one can answer it in its current form in a way that would be acceptable. So --

MR. HYLAND: Well if I may, Your Honor, let me start with the low-hanging fruit, and that is -- and this is a little bit sort of jumping ahead -- part of the motion to compel also deals with Mr. Bloom's deposition.

THE COURT: So my question on that is, have you noticed it?

MR. HYLAND: It was noticed.

THE COURT: And so the deposition has been noticed, and it's your understanding in having conversations with him that he may or may not appear?

MR. HYLAND: He has stated unequivocally that he won't appear because, quote -- paraphrased quote, we already have all

the information we need. That's --

THE COURT: All right. Let me talk with Mr. Bloom about that.

MR. HYLAND: Okay. Thank you.

THE COURT: Mr. Bloom, could you please come to the podium.

Sir, I understand that your deposition has been noticed for November 11, 2025; do you understand that?

MR. BLOOM: That's correct.

THE COURT: And do you understand that you have an obligation to appear for that deposition?

MR. HYLAND: Yes.

THE COURT: Mr. Hyland has just indicated that you have told his side that you don't intend to appear, and I did read your opposition. I think it suggested something similar to what he described to me today, that you don't think -- I don't want to say they don't have the right to depose you, but that the information is not relevant or something. And I can't remember exactly what your response was, and I will give you an opportunity to tell me.

MR. BLOOM: Yes. During the meet-and-confer with Mr. Burns, I said to him that you should raise this to -- you know, you should put that in your motion to compel to raise this because I think I've already answered, I've given you pretty much everything you need.

THE COURT: Well, that's not how this works, though, right? And you have not given any sworn statements to the plaintiffs in this case, have you?

MR. BLOOM: The answers to interrogatories.

THE COURT: Okay. I accept that. But there are a number of different discovery devices that one is allowed to pursue under the Federal Rules of Criminal Procedure, including taking the deposition of a party; and party depositions are not only standard, they happen in, I would figure, every single case, and it's not a valid objection for you to say, I don't think I have any more information to give you. They have the right to come in to ask you questions that relate to this case, and if it's properly noticed and if you don't appear, there are significant sanctions that are outlined in the federal rules that you should be aware of if you decide not to attend your deposition, including entry of a default judgment against you.

MR. BLOOM: Understood.

THE COURT: So what's your basis for not appearing?

MR. BLOOM: I didn't say I wouldn't appear.

THE COURT: Is it your intent to appear for the deposition on November 11, 2025?

MR. BLOOM: Yes.

THE COURT: Excellent.

Mr. Hyland, does that resolve the issue?

MR. HYLAND: Seems to, yes.

THE COURT: So with respect to your request on your motion to compel to require Mr. Bloom to appear for his deposition, I'm going to deny that without prejudice, and I think it's premature. If for some reason he does not appear for his deposition as to notice -- Mr. Bloom, you're required to appear on that day. The notice of deposition is a court order, and failure to obey that court order subjects you to certain penalties, including sanctions. If he does not appear, the remedy for that is outlined in the rules; and, Mr. Hyland, I would expect you would quickly file a motion.

MR. HYLAND: That would likely be the outcome, yes.

THE COURT: Yes, sir.

MR. HYLAND: So as to the other requests, do you wish me to go through them one by one, or are there ones that you would like to address specifically to shortcut this? Because I think some are pretty clearly okay, and some --

THE COURT: Okay. Let me go through what I have, and I'll give you all -- I'd like to do this efficiently. Let's start with Interrogatory No. 1. That interrogatory, as I read it, asks the defendant to identify all individuals who have knowledge of the facts and circumstances relating in any way to any allegation in the complaint. That is wildly overbroad. There are many allegations in the complaint that relate to things that aren't even at issue in this case, including where people live and where they work. This is an issue that lawyers

have all the time, and I'm sure I had myself, but my rule was if I can't go to my client and explain to them exactly what information is being requested, it's not a fair interrogatory to ask. And I understand that there's some what one may think is limiting language. "Including, but not limited to" is not necessarily limiting language, but then it goes on to say about your article. And, again, that could involve any number of things, including whether they read the article, when it was published, whether they knew about it. I think that's too broad. I think the appropriate interrogatory would have been something along the lines of identifying individualized facts relating to your alleged defamatory statement, the actual issue in this case. So I'm going to deny the motion to compel with respect to Interrogatory No. 1.

MR. HYLAND: Okay.

THE COURT: With respect to Interrogatory No. 2, there may be some things that we get into as we go through this. Why is the investigations, research, or fact-checking before publishing the article, why is that relevant? I mean, the statement is defamatory or not based on its words regardless of what background was done, isn't it?

MR. HYLAND: Unless he's asserting some sort of press privilege or a *New York Times* type defense.

THE COURT: I haven't seen that, have you? That has not been pleaded.

MR. HYLAND: It's hard to say, but part of the problem when we're situated like this -- but he seems to have -- well, not just seems to -- Mr. Bloom has suggested, at least in other context, that his defense --

THE COURT: Isn't the simple question, What's the factual basis for your statement?

MR. HYLAND: Well, that's one subset of this, certainly.

THE COURT: Isn't that the issue in play?

MR. HYLAND: It is an issue in play. However --

THE COURT: A lot of this, like I said before, seems to be a lot broader than it needs to be, and I'm not describing any improper motive to anyone, but it seems to be a lot broader than it needs to be, and I don't know if it's because it's a *pro se* defendant or for some other reason, but we've got to keep this case limited to the issues that are before the Court; otherwise, it's going to become unwieldy. And it's become a case about discovery on discovery, and I don't want to get into that quagmire if this information doesn't relate to the claims.

MR. HYLAND: But, Your Honor, here's the thing: Mr. Bloom has, again, in any number of different contexts, every time -- and you see it throughout his comments on his portion of the grid, we'll call it -- his defense seems to be -- this goes back to what I said a moment ago -- everybody's saying it.

THE COURT: But that's not a defense of being defamatory. It's either a false statement or it's not.

MR. HYLAND: Well, it certainly goes to the negligence, slash, malice aspect of it.

THE COURT: But you don't need to meet a malice standard here. Your guy is not a protected individual. You don't have *New York Times* malice requirement here.

MR. HYLAND: No, not really, but that seems to be what he's arguing.

THE COURT: But it doesn't apply, and that really relates to your burden to demonstrate actual malice.

MR. HYLAND: But so long as he's making the argument, we're sort of hamstrung if we just let it lie, then don't do discovery on it, then we're -- he gets --

THE COURT: Mr. Bloom, can you come to the podium, please. Are you making the argument or do you assert the defense in this case that the plaintiff is a public figure for which *The New York Times* malice standard applies?

MR. BLOOM: Yes. In my first motion prior to answering the complaint, I said that he should be construed as a -- or considered a limited purpose public figure because of -- you know, as pertains to his involvement in the Hunter Biden files.

THE COURT: There are consequences for that, but I understand your position. You can have a seat. I'm going to

grant the motion to compel with respect to Interrogatory No. 2.

I'm going to grant the motion to compel with respect to Interrogatory No. 3. I think the objection and the answer is nonresponsive.

With respect to Interrogatory No. 5, I'm going to deny the motion to compel. I think it's really broad and almost impossible to answer in that it asks the defendant to identify all documents and communications relating to plaintiff and/or XRVision. I don't view the language that comes after that as limiting. I view it to be including but not limited to, which makes that interrogatory wildly overbroad in my view.

Interrogatory No. 6, I'm going to grant the motion to compel. The answer there states that it's based on information in the public domain. That's a nonresponsive response. Mr. Bloom, you're required to identify what that information in the public domain is if you believe that it's in the public domain.

I'm going to grant the interrogatory with respect to interrogatory -- I'm going to grant the motion for Interrogatory No. 7. I don't think the objection is well taken, and I think it's too late anyway. Your chart included Interrogatory 8 and 9 and 10, but it's actually not in your motion, so I'm not going to address that.

Interrogatory No. 11 asks to identify all individuals or entities with whom you have communicated about Plaintiff

XRVision, the Hunter Biden laptop for the articles. I think that's too broad. Asking the defendant to identify any person he's ever communicated with about Plaintiff writ large, just as one example, is overly broad. I'm going to deny the motion to compel with respect to Interrogatory No. 11.

Interrogatory Nos. 12, 13, 14, 15, and 16 may have been part of your chart or not in play, but they're not in your motion, so they're not before the Court.

Interrogatory No. 17: Identify all documents and communications you have had with any competitor of XRVision or any company in the facial recognition, AI analytics, or cybersecurity industry regarding Plaintiff or the corporate defendants. Why is that relevant?

MR. HYLAND: That goes to -- it goes back to what I was talking about earlier, is on the malice end, and the aggravating factors is Mr. Bloom's use or dealings with other folks in that space, including -- I could name an individual in this instance --

THE COURT: I'm going to deny it. I think it's too broad. You know, if you want clear answers, you've got to ask clear questions.

MR. HYLAND: Okay.

THE COURT: Interrogatory No. 18, why is it relevant whether he received any compensation or benefit?

MR. HYLAND: Same reason as I was just trying to spit

out. Mr. Bloom -- we believe that Mr. Bloom is working with other individuals, including a gentleman by the name of Charles Johnson with whom I've been in other litigation with. This is all part of a thing to harm our clients -- my clients here, Mr. Apelbaum and XRVision -- in conjunction with some of their competition.

THE COURT: Well, maybe that's a conspiracy claim or something else, but, again, we're talking about a defamation claim and whether these statements are provably false.

MR. HYLAND: It is, but it's an aggravating factor. Certainly, it would go, for instance, to punitives, just to pick an easy one, but it certainly goes to aggravation and motive and those sorts of things, which would go to damages, not to liability, but certainly to damages.

THE COURT: All right. What's deficient about the response? He says he hasn't.

MR. HYLAND: Well, are we talking about 18?

THE COURT: Yes.

MR. HYLAND: His response is it's not relevant to whether they've maliciously defamed them, but he's leaving out -- that's not damages. That's sort of my point.

THE COURT: The question asks if he received any compensation, benefits, or consideration, and he says I have not been compensated in any way.

MR. HYLAND: That's not what my -- that's not what his

response -- oh, I'm sorry, I'm looking at the chart, but --

THE COURT: I'm looking at the response, the actual response.

MR. HYLAND: Okay. Well, I mean if that's the answer --

THE COURT: The response is, The defendant has not been compensated in any way by a facial recognition or cybersecurity company.

MR. HYLAND: Then --

THE COURT: I'm going to deny the motion to compel Interrogatory No. 18.

Interrogatory 19, again, that seems to me to be very broad, and how is it relevant?

MR. HYLAND: Well, I'm going to go back to the same argument that seems to not be working, but I believe it goes to the damages and to the --

THE COURT: I think it's too broad. I'm going to deny 18. I mean, it's not limited to these statements. It's with respect to XRVision's business writ large.

MR. HYLAND: But these statements are made as part of that -- I hate to use the word -- scheme.

THE COURT: But then the interrogatory needs to be related to the scheme. Again, bad questions. It's not a -- it asks too much, identify all sources who provided you with information about XRVision's business, is one way of reading

it. That's too broad. I'm going to deny 19.

THE COURT: Same with 20, how is that relevant, describe any research you've done regarding facial recognition industry?

MR. HYLAND: Given the Court's ruling, I --

THE COURT: Denied, 20.

21 and 22 were not part of the motion to compel.

Interrogatory No. 23, how is that relevant, XRV's competitors?

MR. HYLAND: Same, same basis as I stated for the previous ones, Your Honor.

THE COURT: I'm going to deny 23.

Interrogatory No. 25, identify all documents and communications related to your statement that XRVision is a competitor to American facial recognition technology companies. If you were telling a client where to look for that information, what would you tell them they were looking for?

MR. HYLAND: Communications about XRVision and --

THE COURT: Writ large?

MR. HYLAND: Well --

THE COURT: Run a Google search through your files; anytime XRVision pops up --

MR. HYLAND: Well, that would be a starting point for the search, but then, frankly, there's not going to be -- this isn't like a hundred-thousand-page issue. I mean --

THE COURT: And how does it relate to the case?

MR. HYLAND: Same reason. It goes to the damages for the same reasons I've stated before.

THE COURT: How, though? How does this go to the damages? How do communications he had with competitors of XRVision go to damages? I mean, he's allowed to have communications with competitors.

MR. HYLAND: He is, but those communications would theoretically show -- I use the word "scheme," and I don't mean it in a -- I don't mean it in a -- I'm not trying to make a RICO case here. I mean, the dealings with these other folks who are trying to sink my client, and that goes to -- it's an aggravating factor for why he made the other statements.

THE COURT: I'm going to deny it.

Mr. Bloom, is there anything you wanted to say with respect to the interrogatories at this point?

MR. BLOOM: No, I don't think so.

THE COURT: All right. Moving on to the document requests. Request for Production No. 1 is not in the motion.

Request for Production No. 2 -- if I could talk to Mr. Bloom for a moment.

Mr. Bloom, for a number of your responses to document requests, you say you have no relevant records. That is a low determinant. It seems to me to be evasive.

MR. BLOOM: It's not my intent to be evasive. My

first point of contact with Mr. Apelbaum was in, I believe, late 2020 -- or early 2020 in relation to the Hunter Biden stuff. I've had several jobs since then, had different computers, and I've gotten rid of them. They belonged to my employers. And so I had -- I probably did. I mean, they're asking for every communication I ever had.

THE COURT: But let's talk about Request No. 2 specifically. It asks for documents or communications relating to your investigation, research, or fact-checking you did before publishing the article. That, to me, seems like a question that is right on point related to this case. Do you have those documents or do you not have those documents?

MR. BLOOM: I have the final product of writing about --

THE COURT: That's not what I asked you. That's an evasive answer. I want an answer to my question. Do you have documents that cover those topics?

MR. BLOOM: No.

THE COURT: You never had them?

MR. BLOOM: There are probably some notes somewhere, but this was several years ago with a previous employer.

THE COURT: So is the answer to the question, No, I don't have any, or --

MR. BLOOM: That's correct, yeah.

THE COURT: That's not what you said. I mean, you

said you have no relevant records, which, to me, sounds like an evasive answer because you're making a relevance determination.

MR. BLOOM: I see.

THE COURT: And you've waived that right, even though I've given you a little bit of grace today in the interrogatory answers on that score because I think, ultimately, at the end of the day, people have to understand the question and be able to answer the question. And with respect to the interrogatories, I denied the motion with respect to interrogatories that I thought, regardless of any objection, they couldn't be fairly answered. This is not one of those. This is one that I think is directly on point related to this case, and I view this as an evasive answer.

MR. BLOOM: I can perform a search on everything that I have, every account, and look for those notes.

THE COURT: I would have thought you would have already done that.

MR. BLOOM: I did.

THE COURT: All right. What I'm going to ask you to do with respect to any document request that I grant the motion to compel is to go back and to restate your answers to be clear and precise about whether you have documents or not.

MR. BLOOM: Understood.

THE COURT: If you have responsive documents, you need to produce them. If you don't have them, you need to say

"none."

MR. BLOOM: Understood.

THE COURT: If there's some other answer -- maybe there's one that I haven't thought of -- but Defendant has no relevant records is a loaded answer that seems to be evasive because you're making a judgment determination as to what you think may be relevant, and the time for making that objection as to discovery that is narrowly tailored to the issues in this case has past.

MR. BLOOM: Understood.

THE COURT: All right. So I'm going to grant the motion with respect to 2 and require a new response be provided by Mr. Bloom.

Same for Request for Production No. 3, I'm going to grant that, and Mr. Bloom can do whatever search he needs to do and then restate his answer.

Request No. 5, Mr. Hyland, this is another one that all documents relating to Plaintiff --

MR. HYLAND: Yeah. That will be denied, I imagine.

THE COURT: Yes. I think that's overly broad and that's denied.

6 is not part of the motion.

7 is not part of the motion.

8 seems to be answered. Would you agree with that? Do you have the answers?

MR. HYLAND: 8. Yeah, I have them, but if 8 has been answered, then --

THE COURT: The response is, Defendant maintains no style guide or ethics manual as an independent journalist.

MR. HYLAND: That's fine.

THE COURT: I'm going to deny 8, then.

MR. HYLAND: Very good.

THE COURT: 9 also seemed to be answered. Response: The entire concept of Start-up Nation is to move America tech innovation to Israel. Defendant maintains no records relative to this.

MR. HYLAND: Well, that's a little on the evasive side. I mean --

THE COURT: Well, this is different than the other ones, I thought. He says he has no records related to that topic versus a relevance judgment.

MR. HYLAND: Okay. I misunderstood.

THE COURT: I mean, ultimately, at the end of the day, isn't it true that if he needs to prove that the statement is false --

Mr. Bloom, you need to understand that. If you don't have any documents, and I take you at your word that you don't have any documents to some of these requests, but you still bear a burden in this case with respect to falsity or truth of the statement, and you're not going to be able to introduce at

trial any documents that weren't produced in this case; you understand that?

MR. BLOOM: Yes, I understand.

THE COURT: All right. Thank you, sir.

Then I'm going to deny 9 and 12.

10 is not part of the motion.

11 is not part of the motion; neither is 12 or 13.

14, I'm going to grant, and this relates to restating your answer. This is one with the answer of "no relevant records." I want you to go back for both 14 and 15, to go back and look at those and make an appropriate search, and respond either that you have records or you have no records.

Same ruling for the rest of them, for all of those, it's the possess no relevant records. That's 16, 17, 18, 19, 20, 21. And then 22 is different. So I'm granting as stated for those.

For 22, Please produce all documents and communications relating to your statement that XRVision is a competitor to American facial recognition technology companies. Is that relevant?

MR. HYLAND: It is. It's one of the statements in his article. It's -- bear in mind --

THE COURT: Is that defamatory?

MR. HYLAND: It's not defamatory, but we're allowed to -- anytime you're -- I don't need to tell Your Honor --

anytime you're dealing with a defamatory -- a defamation claim, the jury or the Court looks to the context, the full context of the article --

THE COURT: Agreed.

MR. HYLAND: -- and any such --

THE COURT: Of the article, which is the statement, not things outside of the statement or the article.

MR. HYLAND: However -- yes. We're on the same page, but you have to look at the article writ whole. I had this very argument in a different context in another case recently, and that is, the statement, as it were -- put it on a piece of paper, the statement -- where the statement had some claims that were plainly defamatory; in other words, there's false claims and then there's -- to be defamatory, it has to be false and defamatory.

THE COURT: Right.

MR. HYLAND: So there's the false part, there's the defamatory part. The existence of other falsehoods that are not necessarily defamatory certainly goes to show the whole context that -- you know, the argument would be from standing and talking to the jury is, This guy made everything up, even stuff that didn't matter, he made it up. And that's why this sort of thing -- as an example of why this sort of thing is pertinent.

THE COURT: It just seems to me to be an innocuous

statement that XRVision is a competitor to American facial recognition technology companies. I mean, by definition, all companies are competitors to other companies in the same field.

MR. HYLAND: Well, that's assuming that they're in the same field, but it is arguably another falsehood built in. I'm repeating myself.

THE COURT: I'm going to deny 22.

Is there anything else from the motion to compel? First, let me ask Mr. Bloom. Mr. Bloom, anything you want to tell me with respect to the request for production of documents?

MR. BLOOM: No, I don't think so.

THE COURT: Do you understand my rulings today?

MR. BLOOM: Yes.

THE COURT: Mr. Hyland, is there anything I have missed from the motion to compel? We've talked about the deposition, we've talked about the interrogatories, and we've talked about the document requests.

MR. HYLAND: I think we've covered the field.

THE COURT: Okay. The only thing I meant to say earlier, with a motion to quash, it's my reading of the rules and the requirements that when third-party subpoenas are served or issued, they have to be filed with the Court.

MR. HYLAND: A Rule 45 subpoena has to be filed with the Court?

THE COURT: Yes.

MR. HYLAND: Really? Okay. That part is news to me. The other parts are not news to me, but the other concerns that the Court expressed --

THE COURT: My concern here is that you mentioned that there are a lot of other subpoenas out there.

MR. HYLAND: There are.

THE COURT: And, certainly, there's a requirement that any subpoena that has been served needs to be returned and filed with the Court. I've not seen any of these subpoenas, including one that has been served, filed with the Court. The only time this subpoena that was the subject of the motion to quash was filed with the Court was as Exhibit 4 to your statement of your status report.

MR. HYLAND: Your Honor, the concern that I expressed to the Court earlier -- and I understand, this is on me, I'm the local counsel -- is none of these -- given the Court's ruling earlier, none of these subpoenas are any good.

THE COURT: I think that's right.

MR. HYLAND: So we need to fix that. So that's -- again, I recognize my responsibility for that, and I will assure the Court that it did come as a surprise to me.

THE COURT: Perhaps nothing other than my opinion, but when I practiced in this court, when I served subpoenas, my attempt to satisfy the requirements of Rule 45 and the

pre-notice before service requirement was to file a notice with the Court saying I, on behalf of my client, intend to serve the following subpoenas to these people, and attach them, which has the benefit of both having them on the record so everyone knows they're there and satisfies the requirement of pre-service notice. So I'm not saying that's necessarily the standard, but --

MR. HYLAND: I'm duly informed.

THE COURT: I'll have to go back and look at the rule, but it's my recollection at least that all Rule 45 subpoenas need to be served with the Court; otherwise, you have court orders that are circulating around the United States that the Court may have no notice of.

MR. HYLAND: Again, that's news to me, but I will abide by that on a go-forward basis.

THE COURT: All right. Anything further we can do today?

MR. HYLAND: No, sir.

THE COURT: Anything further from the defendant?

MR. BLOOM: No.

THE COURT: Just back to revisit the issue of settlement, this certainly seems like a case that may be hard to settle, but I think that there is a fair amount of work that needs to be done. I'd like to think that there's always a business resolution to any dispute, but that may not be the

case here, but, I stand ready and willing to help you all to the extent you think that a settlement conference might be productive. Otherwise, Court stands in recess.

* * * * *

CERTIFICATE OF REPORTER

I, Diane Salters, hereby certify that the foregoing transcript of proceedings was prepared from an FTR Gold audio recording of proceedings in the above-entitled matter and was produced to the best of my ability. Indiscernible indications in the transcript indicate that the audio captured was not clear enough to attest to its accuracy.

/s/ Diane Salters
______________________________
Diane Salters, CSR, RCR, RPR
Official Court Reporter