UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

----------------------------------x

YAACOV APELBAUM, et al., : Civil Action No.: 1:25-cv-147

Plaintiffs,

v.

JORDAN ARTHUR BLOOM, : January 2, 2026

Defendant.

----------------------------------x

TRANSCRIPT OF MOTION TO COMPEL
BEFORE THE HONORABLE WILLIAM B. PORTER,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFFS: JONATHAN C. BURNS, ESQ.
John Burns
P.O. Box 191250
St. Louis, MO 63119

TIMOTHY B. HYLAND, ESQ.
Hyland Law PLLC
11710 Plaza America Drive
Suite 160
Reston, VA 20190

FOR THE DEFENDANT: JORDAN A. BLOOM, PRO SE
3315 North Brandywine Street
Arlington, VA 22207

(Proceedings recorded by electronic sound recording transcript produced by computerized transcription.)

OFFICIAL TRANSCRIBER: MS. TONIA M. HARRIS, RPR
United States District Court
401 Courthouse Square
Tenth Floor
Alexandria, VA 22314

**P R O C E E D I N G S**

(Court proceedings commenced at 9:55 a.m.)

THE COURTROOM CLERK: Civil action No. 1:25-cv-147. Apelbaum, et al. versus Bloom.

Counsel, will you please note your appearances for the record.

MR. HYLAND: Good morning, Your Honor. Tim Hyland for the plaintiff.

THE COURT: Good morning.

MR. BURNS: Your Honor, Jonathan Burns, also for the plaintiff.

THE COURT: Good morning.

MR. BLOOM: Jordan Bloom, appearing pro se.

THE COURT: Good morning.

We're here today on plaintiffs' motion to compel. Who is arguing today for the plaintiffs?

MR. BURNS: I will, Your Honor.

THE COURT: All right. Let me start with just a couple of general questions, Mr. Burns.

Why are we here almost two months after the course of discovery on these motions to compel. This is not how we typically operate on these cases in this court.

MR. BURNS: So, Your Honor, issues didn't really come to a head until right upon the close of discovery.

THE COURT: But that's a problem of your own making, not the Court. We're here two months after discovery closed. Why are we here on a motion to compel two months after discovery is closed?

MR. BURNS: Well, I apologize to the Court, Your Honor. It wasn't my intention to offend the Court. I'm a solo practitioner, and I did the best I could.

THE COURT: Well, we're here every Friday. You can have a motion on the docket that's within a week's notice to resolve some of these issues. But I'm not so sure that two months after the close of discovery is the time to be dealing with these issues. We're not going to reopen discovery in this case.

MR. BURNS: I understand that, Your Honor. What I would say though, is that given the volume of the different objections, the carte blanche objections that the defendant has made, it has actually increased the workload for us to try to address each one of these different issues competently.

THE COURT: Well you took his deposition. You had the opportunity to take his deposition, and you didn't use your full set of hours. It strikes me that any of the outstanding issues and any of these discovery requests, could have, should have, may have been handled during the course of the deposition.

MR. BURNS: Well, Your Honor, I would slightly

disagree, because for example, the Court ordered Mr. Bloom to provide supplemental responses with -- in regards to our first set of discovery. He was supposed to have provided that in advance to the deposition. He didn't do that. I was unable to question him about -- question him about those things.

THE COURT: You can ask any question you want. You could question him about it and you could have followed up with some of those issues in a deposition. You don't need a written answer to a discovery request as a predicate to asking the questions in the deposition.

MR. BURNS: I could have, Your Honor, but I've handled a number of cases where I've had different defendants who I believe to be a good -- who have operated in less than good faith. And I would rather have a written discovery in front of me first so that I could question, because a lot of times when people are trying to conceal documents, you know, just confronting them at deposition without having the benefit of any production that was provided, is almost impossible to demonstrate bad faith.

THE COURT: Okay. Well, let's talk about your second set of discovery requests. They are attached to your motion that they are unsigned. They have no certificate of service. When were they served? Were they signed? Was there a certificate of service?

MR. BURNS: I mean they were served on

approximately -- I mean --

THE COURT: You say in your papers it was October 23rd. Did you sign these discovery requests when you served them?

MR. BURNS: I believe so.

THE COURT: The copies you provided to me are unsigned and the certificate of service is blank.

MR. BURNS: Well, okay I apologize about that. If they were served --

THE COURT: Okay.

MR. BURNS: -- unless Mr. Bloom objects, they were served on or about October 23rd.

THE COURT: All right. So if they were served on October 23rd, when were they due?

MR. BURNS: It would have been due 30 days later.

THE COURT: Right. Which is approximately what?

It's November 24th. I'll do the math for you because it would have fallen on a Saturday, which would have rolled to a Monday, which is November 24th.

When was the discovery cutoff?

MR. BURNS: November 14th.

THE COURT: So how is any of that discovery valid?

MR. BURNS: Well, I mean I think that was -- that was Mr. Bloom's objection to make.

THE COURT: So you believe that you can serve

discovery that's due well on the time and the other side just has to answer it, and if they don't object to it -- you know, the joint discovery plan is clear that says that all discovery needs to be completed on the discovery cutoff.

Nowhere in your motion did you explain to me that the second set of discovery that you served would have been due out of time. And to me -- to me that is a glaring omission. I had to go back and look at all the documents from the timeline to realize that the second set of discovery, interrogatories and document requests would have come due two weeks after the discovery closed. You didn't highlight that for me.

I had to figure that out on my own. Why is it that you think you can serve discovery that's due well outside the discovery period and then move to compel on it? Am I missing something?

MR. BURNS: I guess the first thing I would say, Your Honor, is that we had -- we brought our motion to compel, our first motion to compel on October 31st.

THE COURT: It was heard on October 31st.

MR. BURNS: That's what I meant, Your Honor.

THE COURT: Yes. How does that bear on this issue?

MR. BURNS: Well, I mean I think that basically some of these different -- we had been expecting a fulsome discovery prior to production, prior to that, and that not

having been achieved, we were left with no other option than to attempt to serve a second round of discovery.

THE COURT: Well, that doesn't answer my question.

MR. BURNS: Well, I mean, you know.

THE COURT: You have the discovery time that you have. How you choose to use it is up to you. I don't remember when you first served your initial discovery requests, but the discovery window is at least usually 90 to 100 days, usually well close to 120 days. The fact that you served a second set of discovery within days before the discovery cutoff is a problem of your own making.

I'm just a little frustrated that I'm here today asked to look at two sets of discovery requests that became due long after the discovery window, and there's not even a mention of it in your papers.

MR. BURNS: It was not my intention to try to pull the wool over the Court, I'm sorry, Your Honor.

THE COURT: Well, I still haven't heard from you an explanation for how you think you have the right to compel discovery responses that were served in such a way. And it didn't help that, at least the copies that I had, were unsigned, with no certificate of service, included on it. Now I'm supposed to address those today, and then you've moved to compel on them when the original responses would have come due long after the discovery cutoff.

MR. BURNS: Well, the other thing, Your Honor, is that I didn't see a local rule that would have prohibited this.

THE COURT: Is that what we need? We need local rules to prohibit, you know, is a discovery cutoff day not clear enough? You need a local rule that says that you have to follow the orders of the Court?

MR. BURNS: Your Honor, I mean, there was no bad faith intended on our part.

THE COURT: Well, I will tell you to file discovery that's due long after the discovery window and not even highlight that in your papers that it was due long after the discovery window, which is a standard basis for not responding to discovery, because it's due outside of the discovery window, to me it's not open and forthcoming with the Court.

MR. BURNS: Well --

THE COURT: Is it a regular practice of yours to serve discovery that comes due well outside the discovery cutoff?

MR. BURNS: It's not my normal experience to -- I would say this, it's not my normal experience -- well, I've never operated in the rocket docket.

THE COURT: Well, you have Mr. Hyland here, who is here to help you with that.

MR. BURNS: Well, you're asking me --

(Audio interruption.)

THE COURT: No, I'm asking you a hard question because I'm frustrated with the fact that you served discovery that was due well after the deadline and then your response to that is there's no local rule that prevents it.

MR. BURNS: Well, I mean normally, Your Honor, when you have -- when you have a defendant who is operating this way that the Courts generally allow some little bit of leeway. That's been my experience.

THE COURT: Well, that's not how we operate here. And I understand that you're a guest in this Court and you may not understand that, but I'm not happy with that. Let me just start with that. So I'm going to deny all parts of your motion to compel that deal with your second requests of production of documents and interrogatories because they were served too late.

MR. BURNS: Okay.

THE COURT: So let's start with the remaining issues here. How do you want to address this?

MR. BURNS: One moment, Your Honor.

So, Your Honor, I guess what I would start with is whether or not Mr. Bloom should be compelled to sit for the remainder of his deposition.

THE COURT: As I understand your argument there, and as I understand the colloquy you had on the record, you

suggested something along the lines, and you're welcome to correct me if you think I'm wrong or misstated or misunderstood, is that you say something to him along the lines of well your responses to the second set of discovery isn't due until some time later, so I assume you're going to come back for a deposition.

MR. BURNS: If I may make a small correction.

THE COURT: Sure.

MR. BURNS: I opened the deposition and I closed the deposition in the same way. And I said, and I flagged for Mr. Bloom, that his responses -- in response to the Court's order, regarding our first set of discovery and the first motion to compel, had been due in advance of the deposition. And since he had not provided those documents, I was going to have to leave the deposition open until after he could provide those documents, and then at the close of the deposition, you know, I asked him for his ability and if he was agreeable to that and he said sure.

THE COURT: Okay. Well, you knew -- I would think that or understood that the discovery cutoff was not Friday. The Friday the same week you took the deposition.

MR. BURNS: Yes, sir, Your Honor.

THE COURT: Did you ever file a motion with the Court seeking the need to take a deposition outside the discovery window?

MR. BURNS: Well, I mean, we're not really so much asking for a second deposition, Your Honor, we're just asking for the completion of the --

THE COURT: You're asking for discovery outside the discovery window. And, again, the joint discovery plan is clear that agreement among counsel is insufficient. You need to seek leave of court to get discovery outside the discovery window.

MR. BURNS: Well --

THE COURT: And here we are again two months, post the deposition. If you think that questions weren't answered, you should have filed a motion that week and we would have addressed the issue and perhaps reopened the deposition.

All right. I'm going to put that issue to the side. Let's talk about the individual discovery requests and see how we handle those before we discuss the deposition issue.

MR. BURNS: Yes, Your Honor.

THE COURT: I'm using your chart, is that what you would like to use?

MR. BURNS: Yes, sir. Yes, sir, Your Honor.

THE COURT: That's what I have in front of me.

MR. BURNS: So the first issue would be the -- or the second issue would be the identification of sources. Our Interrogatory No. 3, where Mr. Bloom was compelled to answer, actually encompasses this and then at his deposition --

THE COURT: Give me a second. I want to make sure that I get the documents in front of me.

Okay. Is the best source of his responses to the interrogatories a document that I have identified as defendant's supplemental answer to interrogatories pursuant to Judge Porter's motion to compel?

MR. BURNS: It should be the --

THE COURT: I haven't pulled them. There were too many things. That's the document that I have.

MR. BURNS: Yes, sir.

THE COURT: Okay. So Interrogatory No. 3 we're talking about? No. 3 asked him to identify all sources upon which he relied in making statements about plaintiff and XRVision contained in the articles.

So it's my understanding that at the deposition testimony that you attached to the motion to compel that Mr. Bloom testified that the source was not someone he relied upon in support of the articles that he wrote.

Isn't that what Interrogatory No. 3 addresses?

MR. BURNS: So I would say I think it was ambiguous. I think his response was highly ambiguous, and, you know, actual balance requires examining the defendant's state of mind.

THE COURT: You're creeping into a different issue. I think there's two different issues here. There's the issue

of what you asked in the interrogatory, and there's the issue of what happened in the deposition and whether or not it was a fair answer that he gave to the requests.

It strikes me that the information you're seeking, with respect to the source, falls outside the interrogatory. Would you agree with that based on his testimony that he didn't rely on that? Instead what you're really asking is for him to compel the answer that you asked in the interrogatory, excuse me, in the deposition for the -- of the source and to overturn or to overrule the confidential source of the action.

MR. BURNS: I guess I would be asking for both.

THE COURT: Tell me where in Interrogatory No. 3 it says that he needs to disclose the names of people that he talked to that didn't relate to the article. The interrogatory asks, again, identify all sources upon which you relied in making the statements.

Didn't he testify that he didn't rely on the statement?

MR. BURNS: Well, in the colloquy that we were discussing, you know, the basis of his knowledge for whether or not Mr. Apelbaum was a spy, right, he offered that up. So he offered up the information that --

THE COURT: In his deposition?

MR. BURNS: In his deposition. He offered up, you know, that -- for example, he offered up the fact, well, his

purported fact that Mr. Apelbaum was on the general staff, he actually listed a very technical term for it.

THE COURT: Just because I'm not enmeshed in these details like you are, what does it mean to be on the general staff, in your mind?

MR. BURNS: Well, in Mr. Bloom's mind it means that he is -- he was on some level a spy.

THE COURT: How does that relate to general staff? Again, I'm asking for my own edification.

MR. BURNS: I don't know. When I asked him the basis for why he thought Mr. Apelbaum was a spy, that went into an extended discussion and he said well, and for example, you know, he was, you know, on the general staff, as an intelligence officer. Right.

THE COURT: At least in the deposition transcript that I read, the two of you seemed to understand that that meant something, and it didn't mean anything to me, which is why I'm asking the question.

MR. BURNS: Well, Mr. Bloom offered a very technical term for it, like, Sayeret, it's Hebrew, right. Sayeret Matkal or Matkal or something like that. And had suggested that that was an indicator that Mr. Apelbaum was, and may still be, a spy for the Israeli government. And so, I asked -- I probed that a little bit further, including asking him well how do you know this, and he said well I have a good

source. And I asked him who the source was, and he refused to identify the source.

THE COURT: All right. Give me a second. Okay. Move on to the next point. I want to hear from Mr. Bloom on that one.

MR. BURNS: Okay.

MR. BLOOM: Um.

THE COURT: No, move on to your next point.

MR. BURNS: Oh, okay, I'm sorry.

The next one, Your Honor, is first interrogatory number --

THE COURT: 2.

MR. BURNS: 2.

THE COURT: In your position portion of that you said adding hyperlinks doesn't cure the deficiency. I didn't see a hyperlinks in the interim, and I wondered if I was looking -- the answer that I had for that in the supplemental answers, it gives a narrative response. I didn't see any hyperlinks. I just wanted to make sure that I understood what --

MR. BURNS: I believe.

THE COURT: -- what you were saying.

MR. BURNS: Yes, sir. If you would just give me one moment.

THE COURT: Yup.

MR. BURNS: I believe so ultimately --

THE COURT: If you would, sorry, I know you're a guest here. Maybe you haven't been in this court before, but we're a court of record by recording, so I need you to speak from the podium so the mic picks it up.

MR. BURNS: I'm sorry.

THE COURT: That's all right.

MR. BURNS: The hyperlinks that he provides for -- related were a response to it, related request for production.

THE COURT: Okay. All right. I just wanted to clear that up. All right. I understand your position on No. 2.

No. 3 we've covered, correct?

MR. BURNS: I'm sorry, sir.

THE COURT: The next one, first Interrogatory No. 3, we covered.

MR. BURNS: Yes, Interrogatory No. 3, sir.

THE COURT: Hold on.

MR. BURNS: Yes, sir.

THE COURT: Interrogatory No. 7.

MR. BURNS: No. 7.

THE COURT: This has to do with his standards, ethics, fact-checks and procedures he says he maintains none.

What more can we hope to accomplish from that?

MR. BURNS: Okay, so, even though he might not -- he

made -- he made a very technical point for example in his deposition to the second extent, however, he also mentioned that he did -- he did in fact have standards. Well, he doesn't have a specific formal style guide, you know, such as like the AP style guide or the New York Times internal style guide. He does have his own personal code of how he addresses particular articles. And so, what we were seeking here is just for him to simply enumerate those particular standards.

THE COURT: He said he asked -- that was asked and it was answered in the November 11th deposition.

Was there some element of this request interrogatory that you think he did not answer in his deposition?

MR. BURNS: Yeah, I don't think --

THE COURT: Or was this an exercise of just taking the information from the deposition and putting it in the interrogatory answer?

MR. BURNS: Well, I don't think that he sufficiently enumerated his procedure.

THE COURT: In the deposition?

MR. BURNS: Yes, both.

THE COURT: And when you were asking him questions, did he refuse to answer your questions or did you not follow up sufficiently?

MR. BURNS: Well, I mean -- he was very evasive, Your Honor.

THE COURT: For example?

MR. BURNS: I would have to go to the transcript.

THE COURT: All right. Here is the sort of global point I have is a lot of the things you're quarrelling about, I think, and this is just a general comment, nothing specific, it strikes me that some information was provided in an interrogatory and traditionally what happens is in a deposition you can follow up and you can get whatever additional information you need. And this shouldn't be a ticky-tacky thing where we're looking to take information that you could have asked in the deposition or you did ask in the deposition, and just have someone drop it in an interrogatory answer if the answer has already been provided.

MR. BURNS: Fair enough, Your Honor.

THE COURT: Okay. That's it for the interrogatories; is that right?

MR. BURNS: Yes, sir, Your Honor.

THE COURT: Document request No. 2; is that right?

MR. BURNS: Yes, sir, Your Honor.

THE COURT: What is it that you think you don't have that you're entitled to?

This one, again, you refer to links, and I didn't see any links in this answer.

MR. BURNS: Okay, so, this is documents and communications relating to investigations, researching, or

fact-checking. This, again, kind of implicates the potential source, but I'm also kind of concerned about him -- the extent of the service that he conducted. You know, no relevant records suggest that there could be -- that he's making a relevance determination.

THE COURT: Well, this is a perfect example where in the deposition you could ask questions like: Where did you look? Did you look in your computers? I understand there's an issue about that for you. Did you do this? Did you do that? Did you do the other thing? The information that you're requesting in your plaintiffs' position portion of your chart seems to me, one, it's not requested by the actual requests; and two, it's something that could have satisfactorily been answered in a deposition.

Did you not ask him about his search for documents in this case?

MR. BURNS: Well, I was anticipating him having -- I was anticipating his responses, and so I didn't want to -- in other words, I didn't want to make assumptions and then argue against myself.

THE COURT: I don't know what that means. But it strikes me that the best way to answer the questions that you're looking for in your plaintiffs' position portion, which I don't necessarily think is encompassed by the request itself, is to have asked those at a deposition.

MR. BURNS: Yes, Your Honor.

THE COURT: Okay. 15 is next.

MR. BURNS: I believe we're at 14, Your Honor.

THE COURT: Okay. I was referring to 14 the last time around, maybe I got ahead of myself.

MR. BURNS: We were just on request No. 2, for production No. 2.

THE COURT: This is -- I'm sorry, let me go back to 2 for a second. Please produce all documentation or communications relating to his investigation fact-checking, correct.

MR. BURNS: Yes, sir, Your Honor.

THE COURT: And it says, "He has 'no' under his notes." And you say, the links doesn't satisfy the requirement. Again, I didn't see the links, but you say in your position defendant must produce notes, drafts, source of communications, research material, and verification attempts. He says he's given you the requested information in different ways.

Okay. Give me a second.

(A pause in the proceedings.)

THE COURT: All right. I'm good on 2. Let's move to 14. 14 is perhaps related to the discussion we just had. Produce all documents and communications you relied upon, making the statements about plaintiff contained in the

articles. So he has identified certain things there.

What is it that you --

MR. BURNS: So, Your Honor, is the answer is really deceptively narrow. It says that -- he has not exchanged communications with any competitor. A competitor company about XRVision. The request also encompasses the other plaintiff, Mr. Apelbaum. And he admitted at his deposition that he had exchanged communications with Charles Johnson, who was a cofounder of a competitor of XRVision, Clearview AI.

Mr. Johnson also is, you know -- we have no way of knowing, you know, Mr. Johnson himself has submitted court filings in another case in Texas that he owns $30 million in Clearview AI stock. So it is our contention that Mr. Bloom should have answered that given his relationship with Mr. Johnson and his admission that he had communicated with Mr. Johnson about my clients.

THE COURT: Well, I think he says -- where do you have that information? My recollection is his response, with respect to Johnson, was that he has not talked to him about the plaintiffs.

MR. BURNS: Sorry, in the deposition transcript there is an extended multipage discussion where he talks about his relationship with Johnson, his communication with Johnson about plaintiffs, and in fact this specific case.

THE COURT: Okay. Perhaps when I'm asking Mr. Bloom

you can find that portion of the deposition transcript. If I saw it, I don't remember where it was, but I would like to see that.

Give me a second.

(A pause in the proceedings.)

THE COURT: And just back to 14, I'm sorry, for a moment.

MR. BURNS: Yes, Your Honor.

THE COURT: Because the argument in your papers seems a little askew from the actual request itself. How does 14 relate to Johnson? He's not a competitor of XRVision. I mean your argument is that he's an investor in that company. So theoretically any investors in the company that Mr. Apelbaum spoke with he would have to produce all his communications with them?

MR. BURNS: Well, no, Your Honor. I'm just saying this is not just anybody. This is one of the cofounders of the company. And he's also somebody that Mr. Bloom has had extensive -- and extensive relationship with and is actually cited to in at least one of the lawsuits as being a confidant or collaborator.

THE COURT: Okay. 15 is next.

MR. BURNS: Yes, Your Honor.

THE COURT: Is your position roughly the same for 15?

MR. BURNS: Roughly the same. But -- one moment, Your Honor.

(A pause in the proceedings.)

MR. BURNS: Yes, so I would say this, it is roughly the same.

THE COURT: If Johnson didn't fit in 14, he would fit in 15?

MR. BURNS: Right.

THE COURT: I agree with that. All right.

MR. BURNS: This next one would be No. 17. So --

THE COURT: So this is the one that asks, if I remember, this is the one that asked for -- I think the request itself -- let me go back here.

Engagements with third parties to write about facial recognition. And he says, "I haven't had any such engagements." And you say, "Well, you wrote an article for Newsweek," I think it was, right?

MR. BURNS: That's correct, Your Honor.

THE COURT: He answers the question by saying, he has no such record because he's never been so engaged.

The question, at least the way that I remember thinking about it, No. 17 at the first motion to compel, on this was that it was looking for information where he had been paid by a third party to write about facial recognition technology. And this is an op-ed for Newsweek, and I think

what he's saying is he has no records -- he's not been engaged, which I took to mean that no one engaged him to write that article for Newsweek.

MR. BURNS: I can see, you know, that's a perfectly fine interpretation, Your Honor. My intention was to have been a little bit more broad than that. Oftentimes, you know, editorial boards and different publications will reach out to different journalist and specifically ask them -- because they have a particular competencies in that particular area, they'll reach out to them and ask them -- they will solicit a an op-ed, and that's what I was driving at.

THE COURT: Okay. But I think that's perhaps not what you asked. Okay. You're saying that your use of the term "engagement" didn't necessarily mean for money?

MR. BURNS: Correct, Judge.

THE COURT: Okay, all right. The next one, which I think is the last one, is 19.

MR. BURNS: Yes.

THE COURT: Is that right?

MR. BURNS: Yes, Your Honor.

THE COURT: Give me one second, because I want to look at something on that.

MR. BURNS: Yes.

(A pause in the proceedings.)

THE COURT: Go ahead.

MR. BURNS: Yes, Your Honor. This is -- one moment. This, again, would encompass Mr. Johnson.

THE COURT: Here is the problem I have when I reviewed this and I did go back just so I can check now to check my order to see if that was one where I had ordered a further response, because it's not limited to about plaintiff -- plaintiffs, which is overbroad, unless you think I'm reading that too generally.

MR. BURNS: One moment.

(A pause in the proceedings.)

MR. BURNS: That's fair.

THE COURT: Okay. You agree that any limitation would be as it relates to plaintiffs?

MR. BURNS: I guess to sculpt it and to better tailor it, it would be expressing it had been -- in which he is -- I guess my difficulty, Your Honor, is that he is -- he's implicitly holding himself out in his articles as having some level of expertise in these areas. Right. And he's using that, you know, implicit expertise to view XRVision and Mr. Apelbaum. So what the thrust of that particular request is seeking is kind of the basis for his expertise. And if he's communicating with these companies --

THE COURT: I think it is broad unless it is limited to the issues in this case.

MR. BURNS: Yes, Your Honor.

THE COURT: All right. Mr. Bloom.

All right, sir. Let's -- well, I'll give you a chance to respond in any way you like. You want to say anything before we start talking about these individually?

MR. BLOOM: Sure. With respect to the source identification what I would simply say is that the claim that source made to me is not used in the article. Therefore, it's not -- the way that this started was it was actually Mr. Burns that suggested first did you know he was in a reconnaissance unit during the deposition. And so, I said, is it Sayeret Matkal, which is the General Staff Reconnaissance Unit with the IDF. And he said he didn't know. But prior to that, he had already said he was in a different one. And Mr. Burns held a whole line of questioning about just because he's in a reconnaissance unit does that make him a spy, and that's not really what the issue is. By that point, he had already said I was an IDF intelligence officer in a different unit.

THE COURT: Well, I understand their position to be that you made a comment about Mr. Apelbaum being in general services or whatever the term is that's used that somehow would implicate or suggest that Mr. Apelbaum served as a spy, and so at some point you suggested that you had some confidential source.

What makes that source confidential?

MR. BLOOM: It's --

THE COURT: I take it -- well, let's start with the premise, someone told you that Mr. Apelbaum was in the general services unit, if I'm using that term correct; is that right?

MR. BLOOM: General staff.

THE COURT: General staff. And to you that indicates some suggestion that Mr. Apelbaum may have been involved in espionage or spying?

MR. BLOOM: What I said in my answer to plaintiffs that there's plenty of things --

THE COURT: Answer my question.

MR. BLOOM: He is an intelligence officer.

THE COURT: Answer my question.

MR. BLOOM: That could be an indication of that, yes.

THE COURT: And at that point you said something along the lines of, if I'm remembering the deposition you're welcome to correct me at this point if you like, that you had some confidential source that told you that information; is that right, sir, you're alleging that a confidential source told you that Mr. Apelbaum was a member of the general staff?

MR. BLOOM: Yes.

THE COURT: And you believe that that is some indication that Mr. Apelbaum may have been a spy?

MR. BLOOM: It would support that notion, yes.

THE COURT: So what makes your source confidential?

MR. BLOOM: Um, via assumption of the conversation that it was off the record.

THE COURT: Okay. Anything more?

MR. BLOOM: Also I was told that after I published the article so it's not -- and the claim that person made to me is not made in the article, which is alleged in the interrogatory.

THE COURT: I understand your point that you did not -- in your option, I think you argue opposition, along the lines that you didn't necessarily believe what that person had told you, so you didn't include the statement in the article.

MR. BLOOM: That's right.

THE COURT: That's right, which has been sort of been consistent with what you just said.

But the law -- I think, relatively clear, that you don't have to necessarily use the statement in order to make it subject to discovery in a defamation case related to these types of issues. You have anything you want to tell me about that? Any reason to dispute that?

MR. BLOOM: No.

THE COURT: All right. Let's move on then to Interrogatory 2. Describe in detail all investigations, research or fact-checking conducted before publishing the article. Any response you want to make to Mr. Burns's argument about that?

MR. BLOOM: Yes. I would say that I provided everything I've written about the subject and I provided the places where I got the claims that are made in the article. And most of it, and I said this in the deposition, almost every specific claim in the article the support for it is directly cited therein.

THE COURT: Okay. I'm going to order you to supplement Interrogatory No. 2. I think your answer is ambiguous. It is unclear whether or not you provided a complete response there. The question is straightforward. Describe in detail, all investigations, research or fact-checking, you conducted before publishing your articles about plaintiff, including steps taken to verify the accuracy. I don't see anything about most of those topics of the interrogatory. Start with most factual claims which suggest that you're not describing all, and you sort of look at the answer to the interrogatory that's not asked. I'm going to order you to supplement Interrogatory No. 2 to answer specifically the questions that is asked.

All right. Interrogatory No. 3, that relates to really the confidential source. I think that's the only issue there. I want to come back to that.

Interrogatory No. 7. Anything you want to add to Mr. Burns's argument about that?

You say that Interrogatory 7 deals with -- asks you

to identify any journalist standards ethics or fact-checking procedures you follow, and you say you maintain no formal style or ethics guide, which is not a complete answer to that interrogatory.

MR. BLOOM: Yes. I think for something like this in order to make -- generally speaking, you want one or two sources for a controversial claim. But in this instance, it doesn't even really seem all that controversial.

THE COURT: See, this is the problem that I have with some of your answers is you're trying to justify your decision not to answer based on your view of the case. That's not what discovery is about. Discovery is an exercise where each side gets to learn information about one another that relates to the case. And certainly, your journalistic standards, your ethics, your fact-checking procedures are relevant to this case. And you sort of -- your answers, oftentimes, border on flippant, and that doesn't help your cause much. And what this did a minute ago is sort of indicative of my reaction to a lot of your discovery answers, which is you try to explain away why you don't think it's relevant. I'm telling you I think it is a relevant question, and I don't think you've identified your journalistic standards, your ethics, your fact-checking procedures that you followed, and it sounds to me like you do have some that you follow. Is that fair?

MR. BLOOM: Yes.

THE COURT: Okay. Then you need to answer the question. I'm going to order supplementation of Interrogatory No. 7 to answer the question that's asked.

Let's move to request for a Document No. 2. Give me one second. I'm going to look at my notes.

Okay. Anything you want to tell me about Mr. Burns's argument to request for a production of Document No. 2?

MR. BLOOM: Simply that I don't have -- so when I was first reporting off of the drive, I was working at other places that owned the devices that I would have been working on. And I gave them back when I stopped working there. So I don't have them.

Okay.

THE COURT: Okay, what the question asks is for you to provide all documentation or communications relating to the information or research or fact-checking you conducted before publishing the article. So that's a fairly specific question. And your answer, again, is sort of a justification. You give an interrogatory answer to a request for production, when what you're required to do is to produce or identify the information relating to your investigation or research.

Are you telling me, standing here today, that you have no information, no notes, no communications, no

documents, that relate to the article that you wrote?

MR. BLOOM: Um.

THE COURT: That involved the research that led up to the article that you wrote?

MR. BLOOM: They are cited in the article. I mean the incorporation documents.

THE COURT: This is a justification, right, that we just talked about. You're justifying your decision not to answer the request. You need to answer the request. If the answer to the request is in the article, that may be -- that may be true, I don't know if it is or if it isn't, but you need to answer the question. I'm going to order you to respond to Request for Production No. 2 with an accurate and full and complete response which asks you to identify the documentation, all document, all communications, relating to your investigation, your research, and your fact-checking before publishing the articles. That would include any articles that you looked at, any notes that you took, any communications that you may have had with third parties.

I don't know if Johnson was a part of this or not. I'm not suggesting that he was , but, for example, if you communicated with him in some fashion or anyone else about these articles, you need to produce those documents. That includes -- it is just not articles that you've read; it involves what you did related to this article. If you emailed

with people, if you text with people, if you Signal chat, or Telegrammed, whatever the form of communication was, if you took notes, you need to identify those things and produce them. Clear?

MR. BLOOM: Yes.

THE COURT: All right. Request for Production No. 14. All right. This is similar, one might think that this would be subsumed also by Request for Production No. 2, but all documents and communication to have sent from my competitor of XRVision, relating to plaintiffs. Your answer is drafted in a way that would suggest to someone that it's incomplete. You've never communicated with a competitor company about XRVision. Is that accurate?

MR. BLOOM: That's accurate.

THE COURT: You've never had a text message with anybody about XRVision.

MR. BLOOM: That's correct. Well, not with another facial recognition company.

THE COURT: Okay. You've not had a -- let's limit it to a text, Signal or Telegram message. Anything, any type of communication, digital, written, or otherwise about XRVision.

MR. BLOOM: Not with a competitor, no.

THE COURT: Okay. And how did you define the term "competitor" for the purposes of responding to this request?

MR. BLOOM: It seems to me -- I guess what the plaintiffs are getting at is they believe Charles Johnson is actually a competitor. And it seems to me that he is not. The company exercised a share buyback in May 2021, and so he no longer has any investment with them.

THE COURT: We can talk about Johnson when we talk about 15 in a second, because I think that's not tied to competitor language. Let's focus on 14 for a second.

There's no documents of any variety, digital, written, or otherwise, that you have or communications from any competitor of XRVision.

MR. BLOOM: That's correct.

THE COURT: And what you left out is the same question with respect to plaintiff. Same question.

MR. BLOOM: XRVision is the plaintiff.

THE COURT: No, the plaintiff is also Mr. Apelbaum.

MR. BLOOM: Yes.

THE COURT: They are two different --

MR. BLOOM: Oh, I have never communicated with a competitor in that space about Mr. Apelbaum.

THE COURT: Okay. I'm going to order you to supplement your response to request for production of documents No. 14 to have that complete response that you just provided, which is that you've not communicated with a competitor about XRVision or plaintiff, if that is in fact

true.

All right. 15 is a similar question, but it's not tied to a competitor. So this would include Mr. Johnson. So the fact that he's an investor or anything else, it doesn't matter to me what he is.

Do you have communications with him in any format about XRVision's business?

MR. BLOOM: No.

THE COURT: So the plaintiff has suggested that you have had many communications with him. That you were evasive in your deposition when you were asked if you had any emails with him. And you said, no. And they later learned allegedly, I wasn't there, and I haven't seen the whole transcript, that you suggested that maybe you had some Signal or Telegram communication with him, and you were differentiating between those two forms of communication.

MR. BLOOM: I think that was with respect to Tucker Carlson, but the --

THE COURT: You may be right. You may be right about that.

MR. BLOOM: I have told Charles, who is now jailed in Texas, that I was being sued by the plaintiffs. And, yeah, I've been writing about these -- these are unusual situations. He knows that I'm being sued. I know about his case.

THE COURT: Have you had any communications with

him, nonoral communications, anything that wasn't simply an oral communication with him about plaintiffs?

MR. BLOOM: No.

THE COURT: Okay. All right. Request for Production No. 17.

So the question there is whether or not you've been engaged to do any writing with respect to facial recognition technology. And you say, You have no records because you've never been so engaged.

The question as plaintiffs understand is -- and I'm going to ask you this question, Has anyone engaged you to write an article relating to facial recognition technology or cybersecurity companies?

MR. BLOOM: No.

THE COURT: So what was the context of the Newsweek article?

MR. BLOOM: It's all over the news and offering an opinion about it, I'm an opinion journalist.

THE COURT: I understand that. Did anyone ask you to write that article?

MR. BLOOM: No.

THE COURT: You did that solely, entirely on your own?

MR. BLOOM: Yes. I pitched the idea to the editorial page editor.

THE COURT: All right. 19. Produce all documents and communications between yourself and XRVision competitors and I would limit that to, related to plaintiff or -- to both of the plaintiffs. And your answer seems a bit cagey, for lack of a better word. You have not communicated with any employees or executives at any facial recognition firm. That this does not seem to be a full response.

Have you communicated with anyone about plaintiffs?

MR. BLOOM: What I would say is "no." I understand what the plaintiffs are driving at. They believe that Johnson actually is an investor, but I would say no, because I don't think he is.

THE COURT: We'll resolve the Johnson issue in a couple of requests --

MR. BLOOM: So let me answer.

THE COURT: You are saying that you have no written communications, no nonoral communications with Johnson about plaintiffs at all?

MR. BLOOM: That's right.

THE COURT: Okay. All right. Anything else you want to tell me?

MR. BLOOM: No.

THE COURT: All right. Mr. Burns, you want to respond?

MR. BURNS: No, Your Honor.

THE COURT: Anything further you want to add with respect to Mr. Bloom's response that he has none of these documents? Anything that I missed there that you think is not complete?

MR. BURNS: None that I can prove, Your Honor.

THE COURT: Okay. Here is what we're going to do. I've made some specific rulings on some of the discovery. I am going to leave as a deposition continuation in just a moment.

Well, let's talk about that now, I guess. I want to talk about that in connection with the identification of the source, because I don't think that the interrogatory answer necessarily covers that specific source. It may, but I'm not so sure that it does.

So, Mr. Bloom, if you could come to the podium. I'm going to give you an option with respect to identification. I am going to order you to identify the source, and we're going to do it one or two ways, since I don't think it necessarily may fall within Interrogatory No. 3. I'm going to give you the option of either supplementing Interrogatory No. 3 to include the identification of the source, or I'm going to give, if you'd rather do it in a deposition testimony, I'm going to give you the opportunity to continue your deposition to answer that question, because I think that at least is something that I identified in the deposition as to the

question that I think you should have answered.

I don't think that -- you haven't provided, to me at least, any information that I think is sufficient to categorize your use of the confidential source privilege as a confidential communication. And there's plenty of case law on when it applies or when it doesn't apply, and I don't think you've met that standard for it and it's your burden to do so.

So I'm going to order you to identify the source. And you can either do it in response to Interrogatory No. 3, meaning supplement Interrogatory No. 3 to add that information, or I'm going to give the plaintiffs an opportunity to take a short deposition of you to answer those questions.

What's your decision?

MR. BLOOM: I'll answer the interrogatory.

THE COURT: All right. So I'm going to deny the request to continue the deposition. I think it both comes late and out of time. I do think that that was a fair question. The identification of a source was a fair question during the deposition and I'm going to order that information to be provided by Mr. Bloom by supplementing Interrogatory No. 3 to include that information.

I've already ruled, I think, as to the first Interrogatory No. 2. Mr. Bloom needs to supplement that. First Interrogatory No. 3, we just discussed. Mr. Bloom has

decided to supplement his interrogatory to include the identification of the source.

Interrogatory No. 7, I've ruled on that. I have to ask Mr. Bloom to provide a complete response to the interrogatory that has been asked. Request for Production No. 2, I've also ruled on that and asked Mr. Bloom to identify it in his answer specifically what he has provided. I want you to provide exactly what you think you've provided in response to that Request for Production No. 2. Your answer suggested that you've given everything. I want you to identify what you contend you've given them. Understood?

MR. BLOOM: Yes.

THE COURT: Okay. Request for Production of No. 14 and 15, and 17, and 19, I believe you have said that you've provided all the information that you have; is that right? Or that -- or there is no information to provide; is that right?

MR. BLOOM: Yes.

THE COURT: So for -- here is what I want to do as well. I want you to provide supplemental interrogatories and document request, as I've ordered today. Take notes on this. I want to make sure you understand your obligations. You can sit at the table if you'd like.

Within one week from today, so due next Friday, I'm going to order you to supplement your discovery, as we've discussed today. I'm also reminding you of your obligation

that you have a continuing duty to supplement discovery that may be inaccurate, incorrect, or incomplete. So I'm asking you to take a look at all of your discovery -- your answers to discovery that have been issued in this case, verify that they are complete. I didn't see in any of the discovery that I -- that were attached to the motion, sworn responses verifying that they are true and accurate to the best of your information and belief under penalty of perjury.

So I'm going to order you to supplement all of your discovery requests, and include both for your interrogatories and your document requests an affirmation that you confirm that all the information that you provided, so to the extent that you've told us today that you don't have any communications with Mr. Johnson, just as a hypothetical example, you're verifying under penalty of perjury that that answer is correct. Understood? Yes?

MR. BLOOM: Yes.

THE COURT: All right. Any questions?

MR. BLOOM: No.

THE COURT: Anything further from the plaintiffs?

MR. BURNS: No, sir, Your Honor.

THE COURT: All right. Let me ask you a question here about how you all are communicating, because, again, just relating to timing here, and, Mr. Burns, you have made an argument about objections being late and the like. My best

understanding is Mr. Bloom, despite my requests that he signed up for e-noticing, you're still not receiving things. You have not signed up for pro se e-noticing; is that right?

MR. BLOOM: I've tried and it didn't work.

THE COURT: How did you try and why didn't it work?

MR. BLOOM: On Pacer, I signed up, and it didn't work.

THE COURT: What you need to do is you need to fill out that form and you need to submit it to the Court, and if you do that, you send an email to my chambers. I will get that entered to make sure that you get e-noticing.

MR. BLOOM: Okay.

THE COURT: You all are missing deadlines, talking past one another. It's not clear to me what applies here because I've not seen any indication that you've signed up for that. I've also not seen any indication that you've agreed to be served by email.

Have you agreed to receive discovery in the pleadings and the like by email in this case?

MR. BLOOM: I've never --

(Audio interruption.)

THE COURT: Mr. Burns, do you have any reason to doubt what Mr. Bloom has just told us? At the microphone, please.

MR. BURNS: I'm not sure if he has signed an

agreement as such. But we were --

(Audio interruption.)

MR. BURNS: We were certainly taking him at his word.

THE COURT: I don't know what that means, but the rules say that you can serve people by email if they consent to it. And if they don't, then --

(Audio interruption.)

THE COURT: -- days from it. And a lot of your calculations don't seem to deal with that or address this issue that he's got three additional days if there's no electronic service that's been agreed to. We're at the end of the process here and to the lawyers probably doesn't make any difference, but to the extent that motions are going to be filed, that pleadings are going to be exchanged, it strikes me that you two ought to have an agreement to serve things by electronic mail.

Would you agree?

MR. BLOOM: Judge, I couldn't hear.

(Audio interruption.)

THE COURT: Do you agree?

MR. BLOOM: Yes, Your Honor.

THE COURT: Mr. Burns, do you have any objections to receiving and serving things to the other side by email?

Stand up and come to the mic, please.

MR. BURNS: No.

THE COURT: No. Okay. Based on the agreement that at least we've reached today, you all may now serve each other electronically. That means that the three days for mailing no longer applies. Understood?

And, Mr. Bloom, if you would fill out that form and submit it to my chambers, I will honor it and make sure that you get signed up for pro se e-noticing. Understood?

MR. BLOOM: Okay.

THE COURT: Last point, we have a settlement conference scheduled for a little later this month; is that right?

MR. BLOOM: Yes, Your Honor.

MR. BURNS: Yes, Your Honor.

THE COURT: Everyone understand their obligations to provide me with information?

MR. BURNS: Yes, Your Honor.

THE COURT: Mr. Bloom, you understand that as well, yes?

MR. BLOOM: Yes.

THE COURT: Okay. Do you intend to represent yourself at that settlement conference or do you want to bring anyone to help you with that? Thank you.

MR. BLOOM: I intend to represent myself.

THE COURT: All right. Anything we can talk about

today that might help us move forward with that? Have you all discussed potential methods, options, ways, structures, what a settlement could possibly look like in this case?

MR. BLOOM: Yes. I've mentioned a possible one to them.

THE COURT: Okay. What is that?

MR. BLOOM: I would be happy to append the statement of their choosing to the article.

THE COURT: Okay. Mr. Burns, anything you would like to tell me.

I want to make sure. I put a lot of time in preparing for a settlement agreement or a settlement conference. I want to make sure that the parties are really actually coming to the Court with an idea that we can both practically settle this and we're willing to engage the time and effort in doing so.

Mr. Burns, you want to be heard?

MR. BURNS: Sure, Your Honor. I would just point out that -- I'm not really certain about the likelihood of settlement to your question.

THE COURT: Were you ordered to settlement or have you requested it?

MR. BURNS: We were ordered.

THE COURT: By Judge Nachmanoff.

MR. BURNS: Yes, yes, Your Honor. I would say that

Mr. Bloom has made monetary demands and suggested -- and basically threatened, you know, subject to litigation.

THE COURT: Okay. Well, that helps me, at least, with the context of how we're proceeding. I encourage all sides to come to the settlement conference with the idea that we can get this settled and be --

(Audio interruption.)

THE COURT: -- creative in ways we might be able to get it settled. But I expect, Mr. Burns, that if you're going to ask Mr. Bloom for millions of dollars, he probably doesn't have millions of dollars to give you. And so, I'm asking you both to be -- both sides, to be creative about how you might find resolution here if you really want resolution.

If you just want to fight, well then, I can't help you. But if you really think you can settle this case, I ask you to be creative about that. All right.

Anything further we can do to advance the cause of this case?

MR. BURNS: No, sir.

THE COURT: From your perspective, Mr. Bloom?

MR. BLOOM: No.

THE COURT: All right. Happy New Year to you all. Thank you for being here on the day after New Year's, and I will see you in a couple of weeks.

**(Proceedings adjourned at 10:58 a.m.)**

CERTIFICATE OF REPORTER

I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported from the Court's FTR recording, in my official capacity, the proceedings had and testimony adduced upon the Motion hearing in the case of the **YAACOV APELBAUM, et al. versus JORDAN ARTHUR BLOOM**, Civil Action No.: 1:25-cv-147, in said court on the 2nd day of January, 2026.

I further certify that the foregoing 47 pages constitute the official transcript of said proceedings.

In witness whereof, I have hereto subscribed my name, this January 6, 2026.

Tonia M. Harris, RPR
Official Court Reporter