# EXHIBIT B

# EXHIBIT B

In the Matter of:

# Yaacov Apelbaum, et al.

*vs*

# Jordan Arthur Bloom

Deposition of:

# JORDAN ARTHUR BLOOM

November 11, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

\- - - - - - - - - - - - - - - - x

YAACOV APELBAUM :

and :

XRVISION, LTD., :

Plaintiffs, :

vs. : Case No.
: 1:25-CV-147-MHN-WBP

JORDAN ARTHUR BLOOM, :

Defendant. :

\- - - - - - - - - - - - - - - - x

RESTON, VIRGINIA

TUESDAY, NOVEMBER 11, 2025

AUDIO-VISUAL DEPOSITION OF

JORDAN ARTHUR BLOOM

called for examination by counsel for Plaintiffs, pursuant to notice, at the offices of Hyland Law, PLLC, 11710 Plaza America Drive, Suite 160; Reston, Virginia, 20190-4756, conducted from 10:14 a.m. to 2:51 p.m., before Kirk A. Sturges, a Notary Public in and for the Commonwealth of Virginia at Large.

Page 2

A P P E A R A N C E S:

ON BEHALF OF PLAINTIFFS:
JONATHAN C. BURNS, ESQ.
The Burns Law Group
P.O. Box 191250
Saint Louis, MO 63119
314-329-5040
john@burns-law-firm.com

ON BEHALF OF DEFENDANT:
JORDAN ARTHUR BLOOM, PRO SE
3315 Brandywine Street, North
Arlington, VA 22207
571-317-9823
arthuriana89@gmail.com

ALSO PRESENT:
Jon Rasson, Legal Video Specialist
Evident Videography

Page 3

C O N T E N T S

WITNESS: JORDAN ARTHUR BLOOM


| EXAMINATION BY COUNSEL FOR PLAINTIFFS | PAGE |
|---|---|
| BY MR. BURNS . . . . . . . . . . . . . . . . . . | 5 |


E X H I B I T S


| BLOOM NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2 | The Role of Yaacov Apelbaum in the Hunter Biden Drama | 82 |
| 4 | Yaacov Apelbaum and XRVision's Case Collapses 10/1/2025 | 160 |
| 10-9 | What Russian-Israeli Transnational Repression Against a Journalist Looks Like 2/18/2025 | 171 |
| 13 | Response to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment 9/22/2025 | 161 |


(EXHIBIT NUMBERS OMITTED ABOVE NOT REFERENCED.)
(THE EXHIBITS ARE ATTACHED TO THE TRANSCRIPT.)

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. Here begins clip one in the video deposition of Jordan Arthur Bloom taken in the matter of Yaacov Apelbaum, et al., versus Jordan Bloom in the United States District Court for the Eastern District of Virginia, Alexandria Division, Case Number 1:25-CV-147-MHN-WBP.

Today's date is Tuesday, November 11th, 2025. The time on the video monitor is 10:12 a.m. eastern standard time -- I'm sorry. That should be 10:14 a.m. eastern standard time.

This deposition is being held at 11710 Plaza America Drive, Reston, Virginia.

The court reporter is Kirk Sturges on behalf of ICR.

The video camera operator is Jon Rasson on behalf of ICR.

Will counsel please introduce themselves and state whom them represent beginning with the party noticing the deposition?

MR. BURNS: Sure. My name is John Burns,

Page 5

and I represent Plaintiffs Yaacov Apelbaum and XRVision, LLC.

THE VIDEOGRAPHER: And will the court reporter please swear in the witness.

Thereupon,

JORDAN ARTHUR BLOOM

was called as a witness, and after having been first administered an oath by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. BURNS:

Q Mr. Bloom, thank you very much for attending.

Now, you don't -- you're not accompanied by an attorney. So, normally, an attorney would kind of provide you with a basic understanding of depositions.

Have you ever had your deposition taken before?

A No.

Q Okay. So, I want to go through just some sort of -- I'm, obviously, not your attorney; but I'm

going to represent a few things to you just to -- a few basic housekeeping issues.

You know, so, first off, obviously, if you could, please wait to answer my questions after -- until after I actually, you know, speak them just so that we're not talking over each other.

Obviously, it makes it easier for the court reporter. Okay?

The other thing is -- is that, you know, a deposition is an interview; but obviously, you're giving your answers under oath.

And also, there are only a handful of different reasons why you could refuse to answer a question. Right?

So, for example, if -- you know, if it touches on an issue of attorney-client privilege, you know; if it touches on your Fifth Amendment privilege right -- something like that -- but other than that depositions are allowed a very wide latitude.

So, the scope is not trial admissibility but rather discoverability; and for the purposes of a deposition, that's pretty broad.



So I want to let you know about that just so we don't hopefully run into any issues as we are going on.

Could you please state your full name for the record?

A Jordan Arthur Bloom.

Q Okay. And what is your current residential address?

A 3315 North Brandywine Street.

Q And do you live there alone?

A No.

Q Okay. Who lives with you?

A My family.

Q Okay. And who would that be?

A My mother and father.

Q Okay. So, is that your parents' -- do your parents own the home?

A It's my childhood residence.

Q Okay. And you still live there currently.

A Yes.

Q Okay. So, do you understand that you are under oath today just as if you were testifying in front of a judge and jury?



A Yes.

Q Is there any medical impairment or medication that would prevent you from answering questions truthfully today?

A No.

Q Did you review any documents in preparation for this deposition?

A The motions, where things are at -- I'm working on getting you your answers to the second set of interrogatories and production requests -- so, I've been keeping a close eye on everything in the case.

Q Okay. And speaking of -- so you mentioned the second requests.

So, regarding the first interrogatories and first requests for production, do you have those supplemental productions today?

A No. I'm going get it to you by the end of the week.

Q Okay. Well, so -- thank you. I appreciate that, but I do want to flag an issue for you just to, you know, make you're aware of it.



We're probably going to end up having to -- in fact, we will have to end up leaving this deposition open. I'm not going to be able to complete it all in one day just because there are additional documents that you need to provide from that first -- from those first discovery requests. Okay? I just want to make you aware of that.

Did you meet with anyone to prepare for the deposition?

A No.

Q Now, if I ask you a question and you don't understand the question, you can just ask me to clarify it. Okay?

A Yeah.

Q Now, but if I ask you a question, I'm going to -- and you answer it, I'm going to assume you understood it.

Is that fair?

A Yes.

Q If you need a break at any time, just let

Page 10

me know.

However, if -- the only, you know, caveat is if there a question pending, you have got to answer the question first before we break.

A Yes.
Q Does that make sense?
A (Witness nods head.)
Q Okay. Have you brought any documents with you today?
A Just the notice of deposition.
Q Mr. Bloom, what is your educational background starting with high school?
A I graduated from public high school in Arlington, Virginia.
I did my Batchelor's -- I completed my Bachelor's at the College of William and Mary -- I transferred from the University of Mary Washington -- and I did my graduate research and two Master's degrees at the University of Kansas.
Q Okay. So you have two Master's degrees?
A Yes. It's a joint -- I was in a joint-degree program.

Page 11

Q Okay. What are they?
Could you tell me a little bit about the two degrees in the joint-degree program?
A Sure. The -- one of them is a Master of Urban Planning.
The other is a Master of American Studies where my research was on informants and extremist groups.
Q Informants and extremist groups. Okay.
What -- can you tell me a little bit about that?
A Sure.
My mentor at the University of Kansas -- well, he's not a professor -- but my mentor who I got to know very well while I was out there is the man who built the Wilcox Collection at the University of Kansas, and I did my these thesis based on research that was done in the archive that he built. And it was work looking at, specifically, three informants within various Pennsylvania right wing groups.
Q Interesting. Now, those two different

Page 12

degree programs seem like they are not very much related. Urban planning and informants and extremists don't really seem like they're in the same ballpark.
What led you to have a dual degree program with those two degrees?
A Well, I didn't create the dual degree program. The university of Kansas did.
But I was interested in Laird because I had read his books and I had been in correspondence with him.
Q I see. Okay.
So the -- and why did you want to go into urban planning?
A It was another thing I could do while I was there that was probably more easily employable. Let me put it that way.
Q Okay. So the one -- with the one we are looking for employment, and with the other you were pursuing an interest.
Is that fair?
A That's fair. Yeah.

Page 13

Q Okay. However, if you did want to seek employment with the extremist studies and informants -- I'm sorry. Was it extremist studies and informants? Is that the degree?
A No. It's a degree in American Studies, but that's what my research was about.
Q Okay. Got it.
Now, what would one do with that degree?
A I mean, there's whole galaxy of NGOs that keeps and eye on that sort of thing.
There's -- there are government jobs that do that sort of thing.
I think the perspective of my mentor, himself, was kind of more geared toward keeping an independent perspective about the problem. That's probably what I'd say.
Q Okay. What does that mean?
A That their -- that it's an important part of kind of the political economy of extremism that there are people in these groups that are informants and that whose goals are maybe at odds with the stated ones of the groups concerned.

Page 14

Q Okay. What is an informant?
A It could mean a variety of things from a formal CHS to, you know, someone who is amassing information.
Q Okay. And what is a CHS?
A A confidential human source.
Q And these are informants for whom?
A It could -- I think we are talking right now just generally.
It could be law enforcement. I mean, that's the main one.
Q Okay. So, or, you know, I mean, I'm asking this because I'm -- out of ignorance, you know.
So, law enforcement -- yeah -- that makes sense. You know, that's what we see on television.
But, you know, what other types of informants are there?
A One thing that's -- that's -- you see popping up in the news fairly often these days is someone who infiltrates a group on behalf of an NGO, whether it's Hope not Hate but the people -- I mean,

Page 15

law enforcement is the big one, but there are examples you could point to of NGOs doing this sort of infiltration work.
Q And what is the -- what is the mark of -- you know, what is some of the indicia of an organization that has been infiltrated?
A If it's being done well, you wouldn't know.
Q Well, let's say, that the organization had you on their staff.
What would you be looking for if you were trying to engage, I guess, in counterinformantism?
A I'm not sure. I'm not somebody who does that.
I'm interested in this as sort of more of a question of political economy how these groups work and kind of telling an accurate story of how they come to be and how they disappear or cease to be.
Q Got it. Okay.
One moment.
Have you ever operated as an informant for anyone?

Page 16

A No.
Q Do you know of any informants to anyone?
A Yeah. I mean, you read about them all the time.
Q I'm sorry. I mean, do you, personally, know of any of them as in they are a personal acquaintance of yours?
A Ordinarily, you are not supposed to ever find out that someone is a CHS. Occasionally, it does happen.
Q Okay. But, I mean -- but my question was a little bit different.
I mean, do you -- as in your personal life, do you know?
Do you have a personal or business relationship with anybody who is or was an informant of any kind?
A I have no business relationships with someone who has ever been a CHS.
Q Okay. Do you have any personal relationships with anyone who has ever been a CHS or otherwise an informant?

Page 17

A To the extent that they've been sources, yes.
Q Okay. And who would that be?
A It's known now that, you know -- and I've published about it -- Charles Johnson was a CHS who was terminated.
Q Terminated by the -- by who?
A The FBI.
Q Okay. Okay.
And real quick, I want to go back.
You had asked -- so, you had mentioned that you were interested in this topic because it was part -- you know, you were interested in the broader political -- you know, of it's place in the broader political economy.
Is that fair?
A Yeah. That's fair.
Q Okay.
A I think my writing reflects that, my record of publication.
Q Okay. And what is -- for the benefit of the jury, what is political economy?

Page 18

A How power and money work, that would probably be the simplest way to put it in layman's terms.
Q Okay. And then so what would be the function within the political economy -- you know, how power and money work -- what is the function or the relationship between extremist studies and informants or -- I'm sorry -- extremism and informants within that dynamic?
A You have the way people's hopes, the way people's expectations about how politics ought to work, about what they're pushing for. Those can be disappointed through all manner of kind of dirty tricks, infiltration, these sorts of things.
Q Okay. And what about extremism?
A By salting various extremist groups is one of the most common ways of seeking to limit their influence, limit their impact, or control or destroy them.
Q Okay. And when you say salting, what does that mean?
A Inserting people into them under, you

Page 19

know, more or less false pretenses.
Q Okay. And is -- so in your experience and your education, is extremism or, you know, being an informant, is that the same as, you know, engaging in espionage?
A No.
Q Okay.
A But there are ways -- those are separate categories.
Q Okay. Now, as part of that degree program, did you study espionage?
A I did a lot of reading about it.
Q As part of the program?
A No.
Q Okay. Just on --
A I guess, if I were to revise that, the subjects of my thesis, you could argue, you know, have a clear counterintelligence angle.
So one of the key -- I had three subjects in the thesis. I mean, I could show it to you.
One of them was a guy who went AWOL in his army career and tried to flee to Cuba. So when

Page 20

you have a guy who is participating in extremist activities while being in the army and then goes and tries to flee the country to a communist country, that raises all sorts of questions. Right?
Sorry. I didn't mean to ask a question.
But like these are the sorts of issues.
There's -- the line in that case, that guy was also -- you know, he would go to meetings of the American Nazi party -- which was, at the time, you know, in the '60s based in Arlington -- and then he would go back to home to Redding, Pennsylvania, and walk right into the FBI office. Right?
And so the kind of shaded relationships -- you know, what are his real intentions -- in his case, I don't think there is any reason to think he was anything other than, you know, a sincere Neo-Nazi; but these relationships can be pretty murky.
Q So -- thank you.
And so was this -- as part of that degree program, was there any training that you received that would help you -- I mean, I kind of already

Page 21

asked this question; but I'm going to ask it in a different way.
Is there any training that you received that would kind of, you know, assist you or provide you with some sort of a leg up to identify an informant from the rest of the population?
A Not in an official way but, I mean, I've read a lot of stories about people who were informants.
Q Okay. But as you said earlier, if you were on -- if you were part of an NGO that had been infiltrated, you wouldn't necessarily know whether there was an infiltrator in your midst.
A That's right. If it was well done, you wouldn't know.
Q Okay. How would you -- how would you define the word notorious?
A Someone who has -- someone who is known and not necessarily for good reasons.
Q Okay. And known -- and is that -- would that be widely known, or would that be just known to a small group? And I'm just -- I'm asking for your

Page 22

personal definition.

A You know, someone could be notorious within a certain professional context.

Like somebody who has, you know, a habit of sort of bullying journalists, you know, can be become notorious to journalists.

Q Okay. So, was there any component of your degree program that studied, you know, espionage by state actors?

A I think in -- I mean, no, not in any official capacity. No.

Q Okay. And just real quick as far as that program is concerned, what's the objective of that degree program.

You know, so, for an example, if -- and let me try to provide some context.

So if, you know -- you know, and my son is looking at, you know, going into an engineering program. And so, obviously, an engineering -- in an engineering program, you're going to learn how to build bridges or, you know, conduct stress tests or whatever. There's a functional, you know, purpose

Page 23

here to it.

What is the objective of, you know, the American Studies, extremist studies and informants degree?

A The degree is just in American Studies.

The research program I was allowed to set, and the reason why -- there are a couple of reasons why that's an issue that interested me.

One is that I appreciated the perspective of the guy who built it who died a couple years ago.

And two, in conversation with him, I mean, this is a -- it's a large archive of ephemera, official publication, letters, all sorts of things related to both left and right wing domestic extremist groups.

And one of the things the guy who built it -- you know, we were close -- he expressed frustration to me that people would go out and they'd use it, but they would use it for opposition research, rather than what he kind of wished and intended for it was -- which is for it to be used as kind of a place to study the science of propaganda.

Page 24

And so I thought taking -- you know, rather than doing a -- you know, finding one particular part of it that I could, you know, basically do like opposition research with and as a thesis, I thought taking the bigger problem of like how do we think about the political economy of informants and that's -- and looking at that through a couple of case studies was maybe a more objective way of doing it.

Q Okay. How common is -- are informants within the NGO community?

A I mean, every couple of years, it seems like we find out that -- like Hope not Hate, the British NGO, I mean, they seem to do it.

It's been said, I think -- I don't want to state specific examples off the top of my head, but, you know, the SPLC in my thesis, I talked about one guy who was an informant for the antidefamation league who was involved with the LaRouche organization who -- and he knew some of these other Neo-Nazi figures in Pennsylvania. So that's, you know, another example.

Page 25

There's a documentary, a televised documentary of this ADL informant pretending to be a Neo-Nazi. And so that's a great example of sort of a conflict between stated intensions and what's actually going on.

Q Gotcha. By the way, I noticed that you have -- you're are wearing a necklace.

Can you tell me a little bit about your necklace?

A Yeah. It's a tau cross. It's Saint Francis.

Q Okay. Great.

Are you a Christian?

A I belong to the Catholic church.

Q Okay. Thank you.

Sorry. I just noticed that.

Okay. All right.

So, people with your agree, what field do they typically go into?

What sort of -- how do they support themselves once they graduate in that American Studies program?

Page 26

A I think a lot of them teach or go into academia.
Q Do any of them get employed by law enforcement?
A I'm not aware of out of that department.
I think -- without getting ahead of myself, I think, you know, they have a pretty standard left of center skepticism of law enforcement.
Q Interesting. Okay.
So, do you have any degrees or formal training in journalism?
A I don't have a degree in it.
I've interned at The Washington Post, the Washington Times; and I've worked in it for about 12 years, something like that.
Q Okay. Did you -- at The Washington Post and the Washington Times, were you on the news side or the opinion side?
A At the post, I worked in the going out guide, so that was like entertainment; and at the time -- the Times, I was in political opinion.

Page 27

Q Okay. And what years was that?
A Oh, gosh. The Post -- it was both during college. I graduated from undergraduate in 2011.
Q Gotcha. Okay.
Have you ever attended seminars or conferences on journalism standards?
A No.
Q Have you ever taken courses in journalism or media ethics or communications?
A No.
Q Are you familiar with the Society of Professional Journalists Code of Ethics?
A No.
Q Are you a member of any professional journalism organization?
A No.
Q Okay. Okay.
So, what year did you graduate from your undergrad at William and Mary?
A 2011.
Q Okay. And then when did you graduate from your dual program at -- did you say Kansas State

Page 28

or university Of Kansas?
A University of Kansas, Jayhawks.
I started in 2016 and, I guess, I got done -- it was two and a half years; so, December 2018.
Q And so if you started in 2016, there was a little bit of a gap between that and your undergrad graduation.
A That's correct.
Q After you graduated from your undergrad, what did you do?
A I worked in journalism.
Q Okay. And what was your first job out of undergrad?
A I interned at The Daily Caller, and then my first -- I interned at The Daily Caller and then went to work for The American Conservative magazine.
Q Okay. And how long was your internship with The Daily Caller?
A I think it was several months.
Q And then you said The American Conservative was after that?

Page 29

A Yes.
Q And how long was that?
A I was there for about a year and a half.
Q Okay. And so that would have been about 2012-ish? 2013?
A That -- I think that's right.
Q Okay. And so what did you do at The American Conservative?
A Editorial work, some writing, you know, helping with the magazine, mostly the web site at the time, getting a feel for political writing.
Q Okay. And then the work that you did with The Daily Caller, what did you do there?
A Yes. So I started out as an intern and then I went back there after The American Conservative, and I worked as their opinion editor for about three and a half years.
Q Okay. And so that would have been between 2013 and 2016?
A Yes. From The American Conservative until when I went to graduate school.
Q Okay. Now, during the time that you were

Page 30

there at The Daily Caller, was The Daily Caller still owned by Tucker Carlson?
A Yes. I believe so.
Q Okay. Have you met Tucker?
A Oh, yeah.
Q Okay. Are you still on good terms with him?
A I haven't -- I've only talked to him once in recent years. I haven't talked to him very much at all.
Q Okay. When was the last time you spoke with him?
A As in verbally, I haven't spoken to him at all in many years.
Q Okay. What about in, I guess, in an email?
A I told him that I -- you know, that I was facing this lawsuit.
And he said, "I'm rooting for you."
Q Oh, okay.
How did -- now, why did you communicate with Tucker about this lawsuit?

Page 31

A Because, you know, an old boss -- I mean, I think in journalism when you're facing a meritless lawsuit of this kind, you expect your bosses to have your back and having been, you know, facing lawfare for many years now the -- you know, seeking moral support. And especially, you know, it's very common in D.C. in journalism for somebody who has ever taken an adversarial line of any kind toward the State of Israel to get fired.
Q Okay. So, you graduated from University of Kansas in 2018, is that right?
A Yes.
Q Okay. And what did you do after that?
A I came back to D.C. and went back to The Daily Caller.
Q Okay. And how long were you there? With this stint, how long were you there?
A About a year and a half again, something like that.
Q Okay. And what was your role there?
A I worked on both the for-profit and the nonprofit sides. On the for-profit side, I was the

Page 32

deputy editor. On the nonprofit side, I ran a paid opinion program.
Q And what's the paid opinion program?
A What's kind of standard practice in the industry these days is that only at the very top tier are opinion columns actually paid for.
This was an exception to that in that there was a grant, and so I was managing the grant to pay for the writing.
Q How does that work?
A The -- it could be structured in different ways depending on who the granting organization is, but usually it's a foundation or something. They want a particular issue covered or they want -- or they just want a paid opinion program. They want to free up money so that people who write good opinion columns can be compensated for it. I've done it both ways.
But, yeah, I mean, the paid opinion program was called American Renewal; and I recruited a number of opinion writers that I'm very proud of.
Q Okay. All right.

Page 33

So, then, after -- well, real quick, you mentioned that email with Tucker. Was that just one email, or were there a series of emails?
A Just one. I mean, we have not been in any kind of ongoing communication.
Q Okay. No texts or other digital communications?
A Like I said at first, I mean, I messaged him about the lawsuit.
Q Okay. And was that an email or was that like on a DM, or how did that happen?
A A Signal message.
Q Okay. Got it. Okay.
So you graduated from the University of Kansas; you go back to Daily Caller; you're there for about a year and a half; and then what did you do?
A I went back to The American Conservative.
Q And this time, how long were you there?
A About a year and a half.
Q Okay. So that would have put us to, I guess, 2021-ish?
A Yeah. Yeah.

Page 34

Q Okay. And when you were there again for The American Conservative, what did you do there?
A I was pretty much the lead editor for the web site.
Q Okay. And by the way, what's your date of birth?
A September 9th, 1989.
Q Okay. Then after -- so, why did you leave The American Conservative?
A Time to go. I resigned. It's a magazine that I care about a lot, but I think in the last couple of years I've kind of came -- come to the conclusion that I can do better work on my own.
Q Okay. And what is the better work that you would like to do that you think you do better without them?
A So, for instance, I won a defamation last year over a story that I did about an assault. So this is -- you know, it goes back to extremism.
I guess one of my thoughts is a lot of these incidents that become major public -- causes of major public outrage, there is very often, you know,

Page 35

more to the story than, you know, we're initially told about.
And so I had covered an assault in Upstate New York -- and the prosecutor was initially seeking, I think, 25 to life for attempted murder and -- you know, to just do this as a kind of, you know, courtroom drama sort of story; and I started calling around and the prosecutor immediately offered a plea deal.
And to me that -- you know, my inference is that that would be a sign that the case was weak, but I did a long story.
And of course, the victim in the assault the charges were about was unhappy with what he saw as my intervention in it -- even though I was just calling the prosecutor, you know, doing my due diligence -- and so he sued me about it, and he sued me in Arlington.
But, you know, I think that these stories -- I guess, my general perspective about it is that there is a delta both in terms of interest in terms of what stories could be done and what's, you

Page 36

know, sort of being missed by the big guys.
Q Okay. And so your opinion was, I guess, that The American Conservative was missing the boat.
A There were -- I think that's fair to say. Yeah.
Q So you left there voluntarily. Is that fair?
A Yes. That's correct.
Q Okay. You weren't pushed out.
A No.
Q Okay. And when you -- why did you -- and before that when you left your stint at The Daily Caller, why did you leave that to go to The American Conservative?
A I sort of prefer the nonprofit environment. I was able to start a podcasting program. It was just a good offer.
Q Got it. Okay.
So that one, again, you just -- you unilaterally left.
A That's correct.
Q Okay. So after -- so just to recap -- so

Page 37

after undergrad, you went -- you did an internship at The Daily Caller, followed by a stint at The American Conservative. Right?
A Yes.
Q By the way, at one point in time -- when did you do your Washington Post, Washington Times internships?
A They were one after the other in, I think, before junior and senior year of college.
Q Okay. How long did they last?
A Just over the summer.
Q Okay. All right.
And was -- the internship with The Daily Caller, was that a paid internship?
A No, it was not.
Q Okay. It was unpaid.
And you said that that lasted about six months. Was that right?
A I think it was less than that, but it's been so long ago --
Q Sure.
A -- I don't really remember.

Page 38

Q Sure. Okay.
And then when you worked for The American Conservative then, that was -- or how much were you making there?
A I was a junior position.
Q And just approximately, how much -- what was your annual income?
A Less than $50,000.
Q And again, you worked that job, then, until 2016 when you went to Kansas. Right?
A In between, I went to The Daily Caller.
Q Right. Right.
Okay. Then when you graduated from -- well, while you were in Kansas, did you hold any positions?
A Yes. I worked at a homeless shelter.
Q Okay. Then after you graduated from your Master's programs and you went and you worked and went back to The Daily Caller, what was your annual income then?
A I think probably around $75,000, something like that.

Page 39

Q Okay. And when you mentioned The American Conservative, you know, prior to going to grad school, you said it was under $50,000.
Can you give more -- can you kind of pinpoint a little bit better?
A Yeah. It was like 30 or 35. It wasn't very much.
Q Okay. Then -- all right.
So then you went to The Daily Caller after grad school. You're make being $75,000.
Then after that, you went to The American Conservative; and how much were you making annually there?
A In the same range, there was a small bump up. I think 75,000 or 85,000.
Q Okay. All right.
And then, so, in about 2021, you left The American Conservative; and where did you go?
A On my own for a while.
Q Okay. And what did that consist of?
A Reading, thinking, writing -- yeah -- kind of planning what's next.

Page 40

Q Okay. And how did you sustain yourself?
A Mostly on savings.
Q Okay. Where did those savings come from?
A From myself from working.
Q Right. But, I mean, when you were working at The Daily Caller and working at The American Conservative, were you living in Virginia?
A Yes -- no. I was living in D.C. for a lot of the time.
Q And whereabouts in D.C.?
A I lived in NOMA. I lived --
Q I'm sorry. What's NOMA?
A Northeast.
Q Okay.
A Yeah. That was the main place. Yeah.
Q And were you in an apartment or did you -- did you share an apartment with somebody or you have a roommate?
A A row house.
Q A road house? I don't know what that is.
A A row house.
Q Oh, a row house.

Page 41

A It's like a brownstone.
Q Gotcha. Okay.
And then did you have roommates?
A Yeah.
Q And what was the monthly rent on that?
A I had a good deal. It was 750 or 850 a month, something like that.
Q Okay. I mean, I'm only asking about your savings because, you know, I have some familiarity with the nonprofit sector. Those are good people doing good work and -- but they're not paid very well; so, it doesn't seem like you had a lot of savings to rely upon.
A Yeah. That's true.
Q Now, you mentioned you got a good rental deal. How did you get a good rental deal?
A The house was in bad shape.
Q And who were your roommates?
A They fluctuated a lot over time. There were a lot of team in and out.
Q Okay. Now, after you left The American Conservative and you were out on your own, how long

Page 42

did that period last?
A I took a job with Modern Age for about a year, and then I decided, you know, really the time is to -- you know, I've got to do my own thing.
Q And so when did you start working for Modern Age?
A I don't recall the dates exactly, but it was late 2022 to early 2023.
Q Okay. So between 2021 and some time in late 2022, you were you unemployed?
A Yes.
Q Okay. And what did you do to fill your time?
A Reading mostly.
Q I mean, that's kind of unusual to take that kind of a block of time.
Were you planning on writing a book?
A I was. Yeah.
Q Did you start writing a book?
A Oh, yes. I've got a proposal. I've got a manuscript.
Q No, no, no. I'm sorry. I misspoke.

Page 43

What my question was or what I intended my question to be was: During that time period, were you writing a book?
A Yes.
Q And what book was that?
A I wanted to do a book-length project about this informant issue.
Q Okay. And what specifically?
A Go over case studies and kind of publish findings.
Q Okay. Did you begin that --
A Yes.
Q -- in 2021?
A It's -- I've had it on the mind and intermittently working on it for many years.
Q Okay. So for that period of time when you were unemployed before Modern Age, what did you do full time?
A Mostly reading, you know, working on my own things.
Q Okay. And where were you living?
A At home.

Page 44

Q Okay. And what books were you reading?
A A lot of -- mostly older research from like the mid to late 20th century.
Q Okay. Can you be more specific?
A Sure. I mean, informant case studies, histories of -- I mean, history books, histories of intrigues in American government.
Q Okay. Have you any -- you know, I'm just trying to better understand this period of your life just because it's kind of unusual to -- I mean, your story arc starts pretty normal in D.C. in that you're starting with internships and working your way up through the nonprofit sector and different stints with different journalistic outfits; but then all of a sudden it kind of goes into that -- into kind of a strange direction there.
You must have wanted to leave The American Conservative to do something, but it doesn't seem like for that year or so long period, it doesn't really seem like you were doing anything.
A I mean, it would be pretty normal at the close of one's graduate work to try to pitch a book

Page 45

about it; and the reality is these issues about extremism and -- so, let me give you an example.
Their, you know, COINTELPRO is very kind of in the minds of the mythology of your average left-winger, right, how the FBI worked to destabilize the Black Panthers. That's a story all of them know.
When you're talking about those sorts of issues with right wingers, it's a lot more controversial.
And so, you know, on the one hand, it's very controversial. On the other hand, it's a big hole in the research. And so that struck me as a big place where, you know, an authoritative book might be written.
Q So what was your contribution?
A I mean, I've been looking at case studies on this for years; but in the course of talking to publishers about it, I mean, a lot of them are gun shy.
Q Gotcha. Okay.
Which publisher -- and during that time period, which publishers did you approach?

A I spoke to people at Regnery.
I sent a proposal to a whole bunch of people.
Q Okay. Can you be a little bit more specific about other publication houses?
A I don't recall off the top of my head.
I spoke to -- I emailed the widow of Lyle Stuart about it, who ran a famously transgressive publisher for a long time.
I mean, kind of my feeling was/is the big guys aren't going to touch it. Right?
And so, you know, I thought that, you know, Lyle Stuart was a famously courageous small publisher; and so that was kind of the market I was looking at.
Q Okay. Now, as part of that book program were you doing original research; or were you just reviewing case studies or -- you know, and kind of aggregating case studies?
A Both. Where it was possible to speak to a source, I would try to do that. Where there was a gap where I would expect there might be files that



could be obtained pursuant to FOIA, I would do that.
You know, the -- part of the reason why you read the back story is so you can develop a good nose for where you might be able to intervene in new ways.
Q Okay. Did you ever go to any archives?
A Yes.
Q Okay. Which ones?
A I mean, the big one is the University of Kansas one that I worked in. It's the -- from what I understand the second largest dead tree library related to this subject.
The other one which I want to visit -- but, you know, it's the sort of trip during this time, you know, I would have loved to take but don't have the money -- to go to Providence, and the other one is the Hall-Hoag Collection. That's at Brown.
There are a handful across the country that do this sort of thing.
Q Interesting. Okay.
Now, you mentioned you spoke to a few sources. What sources did you speak with?



A I mean, one important one who passed away recently was the real wizard of the Freedom of Information Act, Ernie Lazar. He maintained this very impressive archive of his FOIA requests over many, many years, just sort of the slow and steady but in the long run heroic work of public disclosure.
Q Okay. Now, have you ever -- as part of your research, have you ever done any intelligence analysis?
A No. But I've read a lot.
Q Okay. How do you validate your sources then?
A You check everything. You speak to people who might have known them. You see what's been published, what checks out, what -- you know, what of their documentation can be verified.
Q Okay. One moment.
Okay. So -- all right. So, you went to work for Modern Age, and what did you and -- at the end of 2022, and what did do you there?
A I helped bring out the print magazine.
Q Okay. And what does that mean?



A Layout, line editing, those sorts of things.
Q Okay. And about how much were you earning while you were working there?
A I think it was about $75,000 a year.
Q Okay. Were you still living at home?
A I had my own place for a while.
Q Okay. And so you worked there at Modern Age for about a year, is that right?
A Yes.
Q Okay. And so you quit at the -- well, did you quit or were you terminated? What was the -- how did you separate?
A We have a separation agreement.
Q Okay. So does that mean that you were terminated?
A No. I wasn't.
Q Okay. Now, what prompted a separation agreement?
A I was ready to go and do my own work.
Q But, yeah, normally when people leave the employment of somebody, they don't necessarily have

to get an agreement for it. They just take off.
Why did you sign a contract with them?
A I was sort of under the impression that a lot of that was standard.
Q I mean, it can be; but it's not -- but it's not -- but it's standard when somebody gets pushed out, for example. Right?
A Uh-huh (affirmative response).
Q So what were the terms of that agreement?
A I don't really see how this is relevant.
Q I'm trying to understand, you know, why you left that particular entity.
A Yeah. I mean, the reason is so -- you know, I do writing and publishing in an area that is inherently controversial. If I want to push that forward, doing it within some of these institutional frameworks is not going to work.
Q What does that mean?
A You know, publishing on stories about, you know, informants and extremist groups and raising questions that I have raised in some of these stories, this is not -- you know, that's not



consistent always with how, you know, a venerable magazine or conservative institution might want to present itself. Right?
Q Okay. So, what types of articles does Modern Age publish?
A It's mostly political theory, books reviews, some poetry.
Q Okay. And they -- and it sounds like -- from what you're are saying, it sounds like they didn't want -- they didn't like some of the things you were coming up with or published.
A They never told me that but if -- you know their -- it's an educational institution, and if I'm -- if I'm putting together stories that are much more tied to current events or much more tied to more controversial areas of research that are not just about, you know, encouraging students to read Aristotle or whatever.
You know, if there's a way -- they didn't tell me this. But it's always been my impression -- and even, you know, when I was working at Kansas, I mean, these are -- I'm going after the difficult



questions and so that needs to be done with some sensitivity and, also, respect for the fact that you may be -- there may be attempts to make guilt-by-association accusations that any institution may not wish to deal with.
Q Now, you mentioned that when you are going after some of these different -- you know, when you're going after -- your pursuing these different, you know, lines of, you know, investigation, they have to be handled with some sort of sensitivity.
Could you tell me more about that?
A Yeah. I've done stories that carry legal risk including this one.
There are certainly instances where -- that's where, as a matter of integrity and as a matter of kind of the duties of a journalist, one must bear that risk. That doesn't mean one should be foolish about it.
Q Well, what's the difference then? Where is the line, you know, between pursuing truth and accepting some of the risk and -- where is the line from that and shear folly and recklessness?



A I guess what I'd say is you have to look at it on a case-by-case basis.
Q Okay. Do you consider yourself a journalist?
A Yes.
Q Okay. So, did they -- did Modern Age ever tell you why they were asking you to leave?
A No.
Q Who told you that -- who ultimately informed you that you needed -- that they wanted you to go?
A I mean, I have agreements not to talk about some of this.
Q Well, I mean, those agreements are -- well, let me put it this way. Those agreements are subject to, you know, court investigations.
A Uh-huh (affirmative response).
Q All right. So, ultimately, I don't believe that those apply.
Do you still have copies of those agreements?
A No. I don't think so.

Page 54

Q Okay. And so did you accept money as part of those agreements?
A No.
Q What did you get in exchange for them?
A I mean, two months severance.
Q Okay. So you got a severance. It was a severance agreement in exchange for you, you know, not disparaging Modern Age.
A Yeah.
Q Okay. Now, did you also agree not to return, not to seek employment at Modern Age subsequently as part of the agreement?
A No.
Q All right. Now, at Modern Age who was your boss?
A Dan McCarthy, the editor.
Q And was he the one who informed you that you were being let go?
A No.
Q Who informed you?
A I think it was Johnny.
Q I'm sorry. Who is Johnny?

Page 55

A The executive director of ISI.
Q And can you tell me what's his full name?
A Johnny Burtka -- B-U-R-T-K-A.
Q Okay. And did he give you any reason?
A Yeah. I mean, I was under a lot of stress and I wasn't performing.
Q Okay. Can you be -- can you provide a little bit more detail and elaborate?
A Yeah. I mean, some of the stores that I had done I was being threatened for. I've been threatened for stories; it happens fairly regularly; and this is what I mean.
The sorts of things that I publish on carry, I mean, not just legal risk but people will threaten you; and there's a conflict between a staid ivy-wrapped educational institutional and stories for which people are threatening you.
Q Okay. And so tell me a little bit -- can you give my some examples of stories where people were threatening you?
A Yeah. I mean, I've gotten all sorts of people upset about, you know -- I mean, I've been

Page 56

threatened with lawsuits. I've been threatened with physical harm.
Someone will tweet at you, "I'm going to beat you up."
Someone will say, "I'm going to mess with your family," in direct messages, what have you.
Q Okay. Well, during -- so, I guess, I'm being a little bit more specific during this time period.
So you mentioned that you were under a lot of stress; you were having performance issues; and that you were saying that the stress was related in some way to these stories that you were getting threats.
A Yeah. So shortly after I left, I was hit with the lawsuit concerning the case in New York.
Q And what was -- and what was that again?
A It was a defamation suit for $10 million from the former owner of Ted Bundy's Volkswagen.
Q And was that what caused -- was that what caused your performance issue, that particular investigation?

Page 57

A Well, I mean, this is -- you know, when you are about to have to put your head down and fight a lawsuit that you didn't choose but you feel like you need to defend against -- defend your reputation, defend your reporting, defend your work -- do I want this, you know, fairly sedate institution to have to bear the reputational risk of that, to have to bear the costs of my work going -- you know, going to fighting that instead of my job. All these sorts of things factor into it.
And like I'll give you another example. The sort of incident that caused that lawsuit -- the plaintiff, by the way, is now facing criminal charges for shooting somebody in Daytona Beach.
But the initial incident in New York is very much the sort of incident that would end up on the lists of the sort of institution that tracks hate crimes.
And the point with some of this, I mean, there's -- in the interest of kind of public honesty or giving the public an accurate picture, you know, there was -- in one of these AGL lists, recently, it

Page 58

was added to their list of extremist incidents because some -- like if he was a homeless defendant or something, he stabbed something and then claimed to be a sovereign citizen while being a criminal defendant.

And, you know, you could argue that that's an example of political extremism; but that's not really what most people have in mind when they are talking about political extremism, I don't think.

So in this case, the man who sued me had a record of drawing, as in firearms, on people who did work at his property.

And so he -- after a number of these incidents, somebody came over and punched him in the mouth -- and I think that's horrible and people shouldn't do that -- and you should go to jail if you do that -- but is this a hate crime worthy of an attempted murder charge? I'm not so sure.

And so interrogating these sorts of grey areas is, I would argue, very much in the public interest and --

Q Okay. So --

Page 59

A Go ahead.

Q So, I would like to get back to you mentioned that you were -- you were under a lot of stress and you were not performing well. What caused that?

I guess, here is what I'm driving at. What I'm driving at is you mentioned that you had some performance issues and that -- while you were working at Modern Age and that those performance issues are what precipitated your being terminated.

I'm trying to understand what those were.

A Yeah. I mean, not terribly happy, not doing the work I want to be doing, and facing threats and staring down the barrel of a defamation suit.

Q So, now, in other words, you wrote an article; you got threatened with a defamation suit; and then Modern Age decided to let you go.

A No.

Q Is that fair?

A They didn't let me go.

I decided that -- I mean, I spent a long time thinking about it; and I didn't present them

Page 60

with that choice. I mean, I just sort of -- I just slacked off. I quiet quitted.

MR. BURNS: Okay. Let's take a brief break. We have been going for about an hour; so, let's take maybe five minutes.

THE VIDEOGRAPHER: The time is 11:18, and we are off the record.

(There was a break taken from 11:18 a.m. to 11:24 a.m.)

MR. BURNS: All right. Let's go back on the record.

THE VIDEOGRAPHER: The time is 11:24, and we are back on the record.

MR. BURNS: Great. Okay.

BY MR. BURNS:

Q So, Mr. Bloom, I wanted to -- okay.

So we were talking about you kind of, you know, having some mental distress.

I don't know. I don't want to put words in your mouth, but it seems like you were describing you went through a period of time towards the tail end of your time at Modern Age where you were having

Page 61

some trouble with sort of some mental distress because of your writings. Is that fair? Is that a fair description?

A Yeah. Or mental distress because of threats and the possibility of legal action.

Q You mentioned the threats. There was more than one threat?

A Oh, yeah.

I've regularly -- I mean, I've been told to shut up.

I've been told, "You don't want to cover this stuff. You'll get in trouble if you cover this stuff."

One of the pieces that I did -- I mean, my last piece at The American Conservative, multiple people said to me, "If you keep covering this, I mean, you could get hurt."

Q Okay. And so -- but let's, if we could, please stick to this -- the time when you were at Modern Age.

What threat -- while you were at Modern Age, what threats did you receive?

A I think I got a cease and desist in connection with that lawsuit.
Q Okay. And anything else?
A Yeah. I mean, a lot of people were unhappy with my writing.
Q Okay. And why?
A It's controversial. The -- I mean, the story that I was told could cause physical harm has been a -- it's been a many-years-long process.
The story concerned a man who went to prison on a sentence of life plus 75 years, who, it's my belief, had to go down to protect the fast-and-furious operation.
And I involved myself in a clemency petition for him in the latter days of the first Trump administration, and it didn't go through.
And so when you have something like that which involves at least -- you know, there are reasons to think were part of a collection of deals between drug cartels and of the U.S. Government.
If you try to get a handle on what's really going on there and you touch something you're



not supposed to or you cover it in a way you're not supposed to, that can, you know, certainly be harmful to your career, potentially harmful to your life.
And so my thought at the -- but at the same time, there is another guy's life on the line; and this guy will never see the light of day and I think he's innocent.
And so I don't think I would have been able to live with myself if I didn't try; so I tried, and it didn't work and -- but to have that happen all of a sudden, you know, people in the White House know that I've tried to -- I've advocated for this guy's cause, and so there are risks that could come with that.
And so, I mean, those are the sorts of things. I mean, they are the sort of stories that I think any reasonable person would think could cause a person to incur stress.
Q Okay. And you mentioned -- and what was the basis for the cease and desist?
Oh, and by the way -- well, sorry.
What was the basis for the cease and



desist where somebody was accusing you of defamation?
A He -- there was -- there was no -- it was a similar kind of shotgun complaint. The -- he accused me of scotching the criminal trial against his assailant.
Q What is scotching?
A That he was going to be able to get this guy to go down on 25 to life; and because I called the prosecutor and asked questions, he didn't get what he wanted.
And I would -- scotching is like in sabotaging. He accused me of sabotaging the case against his assailant.
And I would argue every action I took is utterly consistent with the role of a journalist -- the proper role of a journalist when covering a story like that.
So, I mean, there is an inherent conflict.
And then, so, I had to spend the next 17 months fighting this case in Arlington Circuit Court; and when it came down to it, you know, nobody -- he didn't show up and the case was



dismissed.
But nevertheless, I mean, it's costly to do that. I mean, you can see right now that I'm defending myself pro se. I was -- I had savings that I could hire a lawyer for in that case, but I'm tapped out.
So, you know, I've been facing meritless defamation suits for the last like three years.
Q So, prior to working for The Daily Caller, did you ever -- did you know Tucker Carlson or did you have any connection to Tucker Carlson?
A No.
Q What -- how do you define the intelligence community?
A I think there are 17 institutions which are defined as part of it, both military and separate.
Q Okay. And are you -- are you qualified to analyze intelligence materials?
A Not in any official way.
Q Okay. Do you think that you are able to analyze intelligence materials?

Page 66

A I think I probably have read more files than your average person.
Q Okay. How would you go about verifying intelligence materials to determine whether or not they were legitimate, to determine whether or not they were manufactured? What would you do?
A Check who produced it. Check the sources. Verify such public documents as it's possible to do.
Q But what if -- I mean, what if you can't really check the sources?
A Yeah. I mean, I think there are certainly instances where you are faced with a judgment call. You either trust your source or you don't.
Q Well, what happens if you can't really get any verification one way or the other?
A I mean, generally, the standard for journalism is -- I mean, I almost never use off-the-record sources. But if it's on the record it's somebody else making the claim, and so from a journalistic standpoint that seems like it would be

Page 67

fair game.
Q What happens if you don't have sources and you are only reading public data which is often wrong?
A I think the assumptions that I would make when writing in a journalistic capacity would be you assume public data is correct unless you're given some reason to believe it's not.
I mean, I fret for the idea of a public if we can't presume trust in that sort of thing.
Q Well, but, I guess, if there's -- if there's -- well, that's -- there's different types of data that's circulating in public, but not all of it is accurate. Is that fair?
A Yeah. I guess what I mean is when you are talking about like information in a public contract, in a court document, in things that have kind of the statement of imprimatur of a public institution.
Q Okay. Well, so, you know, but if you are just finding random things on the Internet, how do you know?

Page 68

A You try to suss it out.
Q One moment.
So after -- after you -- after you -- after you -- after you were asked to leave Modern Age, what did you do? So, that would have been in 2023.
A Yeah. I started my own nonprofit to support my --
Q Okay.
A -- my independent work.
Q And is that -- is that what you have been doing ever since Modern Age?
A That's correct.
Q Okay. And so you have a nonprofit. What is your nonprofit?
A The Center for the Digital Republic.
Q And you've been sustaining yourself on that for the past, what, going on two years?
A I've been doing the best I can.
Q Okay. How much have you earned -- how much did you earn in 2024?
A Not much. Negligible. I mean, less than

Page 69

$10,000.
Q Okay. How did you support yourself then? How did you survive in 2024?
A Spending down savings.
Q Okay. I mean, you spent about a year between 2021 and 2022 living off savings and then you spent 2024 living off savings. I mean, that's a lot of savings to go through.
A Yeah. I mean, I would rather be working; but the rule in journalism is if you have been blacklisted by the Israelis, you are not allowed to work.
Q Okay. You have been blacklisted by the Israelis?
A I mean, I think if I've been sued by a former IDF intelligence officer, I would make the assumption that it would be difficult to find a journalism job.
Q Okay. So, let's talk about that.
So, what -- is your father employed currently?
A He's -- I don't see how this is relevant.

Page 70

Q I'll get there. I promise.
Does he currently -- is he currently employed?
A I think he's self-employed.
Q Okay. And what does he do?
A Consulting.
Q Okay. What kind of consulting?
A Related to defense technology.
Q Okay. And what did he spend the bulk of his career doing?
A Navy and DoD.
Q Well, he was a naval aviator; wasn't he?
A Yeah.
Q And then he worked for the Department of Defense after his naval aviation career, is that right?
A That's correct.
Q What did he do in that capacity?
A I don't know.
Q You don't know?
A It's some sort of defense cooperation.
Q Defense cooperation.

Page 71

Does your father speak any foreign languages?
A Yeah. He's pretty fluent in Japanese.
Q Okay. So, was he -- was he working with defense collaboration with the Japanese?
A Yeah.
Q Okay. And in fact, he still does a lot of work in that area; doesn't he?
A Yeah.
Q Okay. So if your father sued me, does that mean that I'm -- that I would be blacklisted by the American government?
A No.
Q Right. Okay.
And your father has been working for the Department of Defense for almost his entire adult life. Is that fair?
A Yeah.
Q And he had access to classified information at various points. Is that fair?
A I don't know.
Q Well, I mean, he was a naval aviator and

Page 72

some of those -- and some aspects of our fighter jets are classified. Fair?
A Yeah.
Q Okay. And presumably if he is operating with and collaborating with the defense between the United States and Japan, presumably, a lot of that stuff is going to be classified, at least I would hope it would be.
A Yeah.
Q So, is your father -- on that basis is your father a spy for either the Americans or the Japanese?
A No.
Q Well, how do you know?
A I suppose I don't.
Q Okay. So, if I accused your father of being a spy for either Japan or America, I could be right or I could be wrong.
A Yes.
Q Okay. Now, if all I had were those data points that I just shared with you, would it be reckless for me to publish that in an article online?

Page 73

A Yeah.
But, I mean, so, there's the question of identity versus act.
If you've -- I guess what I would say is there are -- if you're handling classified materials, would it be within the realm of reasonable characterization to call someone a spy for that exclusive reason? I would probably say no.
If somebody has been quoted in, you know, a wide circulation newspaper saying, "I used to operate in that world," with respect to intelligence agencies and is working in the realm of, for instance, facial recognition technology, that strikes me as within the realm -- and somebody who served as an intelligence officer, that's much more specific than just handling classified materials.
Q So let's talk about your article about Plaintiffs back in 2024 -- in January of 2024. At that point -- so I'm going to restrict my questions for the moment just for that time period. Okay?
And so I would like to talk about your knowledge about Mr. Apelbaum and XRVision at that

Page 74

period of time. Okay?
A Yeah.
Q At the time that you wrote that article, did you ever ask, you know, Mr. Apelbaum about his company or his background?
A No. I mean, I had seen how it was being used.
Q Okay. Did you ever ask him for a comment?
A Not on that story. I mean, I had talked to him in the course of reporting out the Hunter Biden files, and I later found out through the reporting that was published in 2023 that, oh, this guy had a relationship with Mati Kochavi, that he was an IDF veteran --
Q Hold on. Hold on. Let's just stop right there because, remember, I'm just talking about your knowledge at the time that you published the article. Okay?
At the time that you published the article, okay -- the first article that's the subject of this lawsuit, right -- what -- tell me everything

Page 75

that you know -- you knew about Mr. Apelbaum and XRVision.
A That he was deeply involved with the Hunter Biden files.
Q Okay.
A That this was a facial recognition company or at least it advertised itself as a facial recognition company which was based in Singapore; and that he and his co-founder Guy Ron were both involved with the IDF.
Q Okay. So let's take each one of those.
All right. What's the basis for your knowledge that Guy Ron has anything to do with XRVision?
A It was regularly reported including in that Arizona Republic article. It was reported in Yahoo News. It was reported in Biometric Update. It was reported in many different places.
Q Okay. And is that the full basis for your knowledge?
A Yes. I mean, I would go off of that because it's reported in a reputable publication and

Page 76

it doesn't seem there could be any possible way it could be defamatory.
Q Well, but it also has to go to, you know, what -- how you're actually describing the information, whether you're describing it as actual factual information or whether you are describing it as possibly being true. Right?
Those are two different things? Right?
A So you are telling me that Guy Ron has nothing to do with XRVision?
Q Correct. But let's set that to the side.
You mentioned that, you said, you knew -- as of January 2024, you said that there was a -- that XRVision -- that plaintiff in this case XRVision advertised itself as being a facial recognition company based in Singapore.
A Yes.
Q What was the basis for your knowledge for that?
A In databases and web sites which track the cap tables of VC-backed companies, it's stated that it is a Singapore-based company, as well as in

Page 77

reputable publications it's also characterized that way.
Q So, did you, for example, do any search for the -- you know, for any Secretary of State's web site on XRVision?
A No. I mean, if I see it in -- you know, Biometric Update covers these sorts of tech companies and there's, you know, a second characterization on something that tracks cap tables, I wouldn't think that that was something that I needed to check.
Q So you read about it. You read certain things in certain outlets and certain magazines or publications, and you assumed them to be true. Is that fair?
A Well, and also, the VC cap table tracking databases.
Q Well, how did you verify that those companies -- that that company was one and the same with Plaintiff in this case?
A I mean, the whole basis of the Arizona Republic story is that they are one and the same.
Q Right. But I'm asking: How did you

-- how did you come to that conclusion?
A I mean, I'm taking that, you know, basically assumed to be true and seeing what I can add.
Q Okay. So you just assumed it.
A Yeah.
Q Do you know where -- do you know where, in fact, Mr. Apelbaum's company actually is registered?
A Long Island.
Q Yeah. Yeah. It's a New York company -- corporation.
Okay. So, you knew that Mr. Apelbaum had had some doing with reviewing the Hunter Biden laptop information; you assumed that his company was based in Singapore -- was a facial recognition company based in Singapore; and on that basis you called him an Israeli spy. Is that fair?
A No. I read the Arizona Republic story that quoted Apelbaum, himself, saying, "I used to operate in that world," with respect to a question about does he work with intelligence agencies that



said he has a background in the Israel defense forces that also makes reference to XRVision being a Singaporean company.
Q But you made -- these are all assumptions that you made. You don't have any independent knowledge.
A Yeah. I assumed that the quote is not faked; but you're telling me that the Arizona Republic's quote where he says, "I used to operate in that world," he never said that?
Q Well, I guess, what I'm saying is that irrespective of that, I'm saying that it's sort of like your father.
Your father -- just because your father worked with some things that were classified or worked for the United States government for the past 40 years, right, that doesn't make him a state-sponsored spy; does it?
A I mean, it could.
Q But that's -- but that's -- that's the difference. There's the rub.
Just because it's possible doesn't mean



it's actually true, and with mister -- and I guess the issue here is that with Mr. Apelbaum and XRVision, you claimed it to be true.
A It is true.
Q Okay. And what's the basis of your knowledge that it was true?
A That he was an IDF intelligence officer for several years.
Q No, no, no, no.
I said that what's the basis for your knowledge that he is state-sponsored spy?
A I didn't say that.
Q Okay. Well, let's -- you know what? I think the time has come for us to actually look at that article.
A Okay. I mean, he is an IDF intelligence officer, to --
Q Okay. Well, let me stop you right there.
All right. So, you said -- so, he is currently an IDF intelligence officer; is that right?
A No. He is not anymore.
Q Okay. And when did he stop being an



IDF intelligence officer?
A I don't know but --
Q Well, what if I was to represent to you that he stopped being an IDF intelligence officer before you were born.
A Okay.
Q Right? I mean, just because somebody did a tour of service, you know, in a particular military doesn't mean that they're presently active engaging in espionage on behalf of a state actor; does it?
A Well, someone who provides the key authentication in an operation attacking the first family, there's grounds for reasonable suspicion.
Q Well, what I'm saying is you don't know.
A I'm saying that the way I have characterized it is within the bounds of reasonable characterization.
MR. BURNS: Okay. One moment.
Let's go off the record for just a second.
THE VIDEOGRAPHER: The time is 11:51, and we are off the record.

(There was a break taken from 11:51 a.m. to 11:53 a.m.)

MR. BURNS: Okay. Let's go back on the record.

THE VIDEOGRAPHER: The time is 11:53, and we are back on the record.

MR. BURNS: Okay.

(Bloom Deposition Exhibit No. 2 was marked for identification.)

BY MR. BURNS:

Q So, Mr. Bloom, I'm showing you what we have marked here -- well, I'm going to ask the court reporter to mark as Exhibit 2.

Do you recognize this exhibit?

A Yes.

Q Is this your article that's referenced in the lawsuit?

A Yes.

Q Okay. And it was published in January 2024.

Now, the title of the article is "The Role of Yaacov Apelbaum in the Hunter Biden Drama"?



A Yeah.

Q The subheader is, "An Israeli spy involved in shaping the whole thing."

A Yes.

Q What is -- how would you define spy? What is a spy?

A I think that somebody who has been an intelligence officer, it is well within the bounds of reasonable characterization to call that person a spy.

Q Okay. So, but as you wrote this, you knew he was a former intelligence officer.

A What had been published -- I mean, I can show the Arizona Republic article -- IDF veteran, used to be involved with intelligence agencies. He has been accused of being a spy.

And the special knowledge that I'm adding is that he had different -- a different version of the Hunter Biden files than I had seen from others, and that gives me a lot of pause.

Q So, okay. So when you're writing your articles for -- you know, for your Substack, are you



intending that your articles are going to be understood by the average reader?

A I'm not too concerned with that; but yeah, I make an effort to do that.

Q Well, and you're writing for an audience.

A Yeah.

Q Is that right?

A Yeah.

Q Okay. So it's important that they understand what you're saying.

A Yeah.

Q Otherwise, it's sort of counterproductive. Fair?

A Yeah.

Q Well, so, when you have -- when you -- if I were to -- well, let's put it -- define it in these terms. Right?

If I were to say somebody was an American baseball player, what does that mean?

A An American who plays baseball.

Q If I were to say that, you know, your father is an American businessman, what would that



mean?

A Someone who does business.

Q Right. But that he's an American.

A Yeah.

Q Okay. Well, if I were to say that your father was a spy for the Americans, what would that mean?

A Most people would mean -- would take that to mean that he currently or used to work in the intelligence community.

Q Now let me change it a little bit.

What if I just -- what if I said that he is currently a spy for the Americans? What does that mean?

A That -- the same thing. I mean --

Q So that he's currently engaging in espionage on behalf of the American government. Fair?

A No.

Q Okay. What does it mean?

A I mean, I think -- I think what you are getting at is, you know, spy is a type of person in

the same sense that we would talk about a businessman.
To say that he's engaged in espionage is to make an accusation about committing acts and committing acts which may be against the law. Right?
And in the same sense that like the -- you know, if somebody worked -- I mean, I think from the standpoint of journalistic standards if somebody worked at the CIA, it's reasonable to call them a spy. If somebody worked at the DIA, it's probably reasonable to call them that.
Q Okay. Let's look at the article.
So, like I said, the subheader is "An Israeli spy involved in shaping the whole thing."
A Yes.
Q So is it your contention -- well, who is -- well, actually, what is your -- what is your contention? Who is he spying on behalf of?
A What do you mean?
Q Mr. Apelbaum. If Mr. Apelbaum is an Israeli spy, who is he spying on behalf of?
A So, I mean, if we talk about the acts he



is engaging in or at least what he has represented himself to be engaged in as part of XRVision, he is taking public footage and he is identifying individuals in crowds. Right? He has done that with January 6. He has done that with a number of other kind of high-profile public incidents.
And then in the case of the Hunter Biden stuff, I think -- you know, for instance, the Hunter Biden stuff when it hit the news, the publishers that really drove that forward were the Rupert Murdoch properties, The New York Post chief among them; and I think, I would imagine, that without the confirmation from a person like Apelbaum that they probably would not have run with it.
Q Okay. Now let's -- let me ask you: What is espionage?
A It's the gathering of information.
Q Okay. Does it also sometimes consist of theft?
A It could.
Q Okay. Does it also consist of sabotage?
A It could.



Q Okay. And would the average reader understand those things to be, you know, various components of espionage?
A Not necessarily.
I mean, the explicit remit of, for instance, the American intelligence community, it's to gather information and advise.
The -- I mean, as we all know, there are activities that go on that are beyond that remit; but the plain and, you know, the central purpose is not to do those things.
Q So you're saying that the central role that the chief job of a spy is to gather intelligence and report back or provide advice.
A Right.
Q Okay. Do they do this -- and they can do this out in the open or they can do it clandestinely. Fair?
A Sure.
Q But your article doesn't -- well, who does your article say that Mr. Apelbaum is working for in his espionage?



A I mean, his work history is with Israel and his patents evince an ongoing economic relationship.
Whether that means he was specifically tasked in these matters, I can't say for certain; but what I'm saying is the way I've characterized it is within the bounds of reasonable characterization.
Q Well, but you say that you can't say for certain, but yet you did say for certain in your article.
For example, if you look at the screen there, the first paragraph, it says, "Yaacov Apelbaum is an Israeli spy, and the sort of Israeli who would have good reasons to smear American facial recognition technology because his company XRVision is a competitor."
A Right. So if I was accusing him of engaging in an act, I would say he actually has smeared American facial recognition technology.
Q Well, does this -- well, let's continue reading.
"The Israelis do not want American-born

Page 90

technology used by, for instance, CBP, because they want to sell it to us instead, and they also have a hand in some of the human trafficking rackets. In some cases, this wicked nation will steal the technology and sell it back to us."

So you're making some claims there.

You're saying that Mr. Apelbaum is a spy.

You're saying that he is an Israeli spy, that he is spying on behalf of the Israeli government.

How is -- how is a reader supposed to --

A It doesn't say that.

Q Well, that's exactly what it says.

It says, "Yaacov Apelbaum is an Israeli spy."

What is a reader supposed to take from that other than what -- exactly what it says?

A He is.

Q Okay. And what's the basis for your knowledge that he is spying on behalf of the Israelis?

A You're making -- so, there is a distinction that you're relying on here between

Page 91

reasonable characterization of a quality of a person versus reasonable characterization of acts the person has committed.

Q Okay. So I don't -- I'm looking at -- I'm looking at something that's very plainly written, and I'm trying to derive any sort of alternative meaning from that from what is plainly written.

What's plainly written is that "Yaacov Apelbaum is an Israeli spy."

So are you saying -- and you just said, "Yes, he is."

So is he or is he not spying on behalf of the Israeli government?

A I think that calling a seven-year IDF intelligence officer who thereafter has had relationships with known IDF intelligence guys like Mati Kochavi and is currently engaged in the last couple of years in an operation targeting the first family, there are -- I mean, I think the way I've characterized it is within the bounds of reasonable characterization.

Q So, again, though, your father has worked

Page 92

with people within intelligence for 40 years, but that doesn't make him a spy on behalf of the American government now; does it?

A I don't understand where you're going with this.

Q I'm saying -- I'm saying Mr. Apelbaum, he served a tour of duty in the Israeli defense force.

A Several tours of duty.

Q Okay. Fair. Okay. Before you were born. But yet you're accusing him of actively and currently, as of January 2024, being a spy on behalf of the Israeli government.

How is that any different from me accusing your father of actively spying on behalf of either the Japanese or the Americans?

A I think it's totally different.

Q Okay. Please explain.

A He wasn't -- Yaacov Apelbaum was an intelligence officer.

Q And what does that mean?

A Somebody whose remit is activities -- it's working for an institution that is officially

Page 93

regarded as par of the intelligence community doing work that any reasonable person would consider intelligence work.

Q So, you're saying that because he was an intelligence officer in the IDF in the middle of the 1980s -- right -- he is currently a spy?

A He is currently involved in authenticating the Hunter Biden files and working on technology alongside all these Israelis that has to do with security.

Q Now, how do you know he was analyzing the Hunter Biden laptop on behalf of Israelis?

A I mean, I don't.

He is a -- what I will say is that the Israeli government would have preferred Trump to Kamala Harris; and to the extent that the Hunter Biden files or -- sorry -- Trump to Biden, and to the extent that the Hunter Biden story was the chief thing that was used to try to make a go in the other direction, it raises a lot of questions.

And, you know, in the interim the Biden administration was, you know, for the most part

taking a hands-off approach with what's being going on there for the last couple of years; but in general, I think, we can see that democrats are willing to pressure the Israeli government more than republicans tend to be.
Q So, you know, let's just take this.
So, you conduct investigations. Right?
A Yeah.
Q All right. You look at all sorts of different pieces of evidence. Is that fair?
A Yeah.
Q Okay. And you've reviewed portions of the Hunter Biden laptop corpus. Is that fair?
A Yes.
Q And you published some of your findings on your Stubstack. Is that fair?
A Not having to do directly with them. I mean, I did two articles in, I think, early 2021.
Q Okay. And you have also collaborated with The New York Times on the Hunter Biden laptop story. Is that fair?
A I don't think so.



Q Well, you provided your materials to Mattathias Schwartz. Right?
A Oh, yeah. He was a business insider at the time. We never wrote anything together. He just wanted to get a look at it.
Q Okay. All right.
So, you know, do you know where -- do you know what -- well, I'm going to represent to you that Mr. Apelbaum was working with The Gateway Pundit on the Hunter Biden laptop story.
Have you seen any of his work in The Gateway Pundit?
A Oh, yeah.
Q Yeah. So, I'm going to represent to you that Mr. Apelbaum was not working on behalf of the Israeli government but rather Jim Hoft at The Gateway Pundit on that particular story which ran dozens of stories about the Hunter Biden laptop.
Have you read any of the stories that Mr. Apelbaum contributed to?
A I've read a few. I mean, Jim Hoft, when Bright Bart --



Q Well, hold on. Well, hold on.
So You said you read a few. Right?
A Yeah.
Q Okay. Well, then, let me just put a bow on this. So, how -- you know, based off what you're telling me, if the idea is the sensitivity of the Hunter Biden laptop, how is anything that -- what -- how is Mr. Apelbaum's activity in terms of trying to verify and make sense of the Hunter Biden laptop materials any different than what you did in your capacity as a journalist?
A Oh, it's very much not about the sensitivity of it. It's about the points of origin and the authentication of it.
So right now there are two -- there are two laptops of Hunter Biden's which are --
Q Well, hold on. We are getting kind of far afield.
I'm going to let you answer -- and I want to hear what you have to say on that -- but I would like you to first answer my question.
My question is: How is what he did any



different from what you did?
A That he was called in to authenticate it for Rudy Giuliani or whoever else.
Q And how would you know that?
A He has said it in court filings.
Q That he did it on behalf of -- specifically on behalf of Giuliani?
A Well, I think that's who was working on it, that they were involved in disseminating the material.
Q Okay. So, but you tried to -- so, I mean, does Rudolph Giuliani work for the Israelis?
A No.
Q Okay. So, again, I guess what I'm saying is: How is what he did any different from what you did?
A I've never represented in a way which claims to be authoritative, that I'm using my expertise to say these are authentic files.
Q Okay. All right.
I guess my point is -- is that how is -- how is trying to authenticate the files in and of

itself the mark of a spy?
A When it's somebody who has been published, you know, saying, himself, "I used to operate in that world," in respect to intelligence agencies.
You know, when you see him doing something like that, you say, "Oh, yeah. This is some guy who is using the skills he has."
Q Okay. But at the time that you published this article, you didn't know one way or the other whether or not he was a spy for the Israeli government. Is that fair?
A If -- I'm not sure what you're driving at, like the --
Q No. That's my question.
At the time you published the article, you didn't know one way or the other whether he was a spy for the Israeli government.
A Yeah. In the sense that the Israeli government has not claimed that -- "He's working for us" -- that would be the highest level of authentication -- most other things are within the



realm of reasonable inference.
Q So, you are saying you do know that he was working as a spy for the Israeli government.
A I'm saying his -- this is a guy who has worked as a --
Q No, no, no.
You know what? I'm going to make it a yes or no question. Either you know or you don't know.
Did you know -- at the time that you wrote this, did you know one way or the other whether he was a spy for the Israeli government?
A I thought that characterizing him that way was --
Q I'm not asking about how you characterized him. I'm asking your personal knowledge.
Did you know one way or the other whether or not he was an Israeli spy at the time that you wrote that article?
A Yes.
Q You knew that he was.



A Yes. I mean, you see a guy who has been in the IDF, who's working on bringing Israeli security technology here and is acting in ways which are --
Q Hold on. Let me stop you right there.
So, he is bringing Israeli technology to the United States?
A He has patents with Mati Kochavi. Of course.
Q How do you know that he's bringing Israeli technology to the United States?
A I mean, Kochavi is a well-known like front and --
Q Okay.
A And he and Kochavi are registering patents together.
Q So, two things. I mean, you're making a large number of different assumptions.
I don't think that you mentioned Mati Kochavi in your article, did you?
A I don't remember.
Q Well, here. I'll let you look through



it; or I could just do a control F.
There is nothing found.
A Okay.
Q So, the basis -- so he may or may not be on a patent with somebody.
A He is on patents. These are publicly registered documents.
Q Okay. So if you have -- if you have a patent with somebody who is, you know, a citizen of another country, you're working with, you know, the Israeli -- you're working with the Mossad?
A No. When you are an IDF intelligence officer who's registering patents with the guy who sells security technology to the Middle East on behalf of Israel, then that is within the realm of reasonable characterization.
You're making these very general things, but the claims I'm making are a lot narrower than your representing.
Q Well, that's exactly what I am saying. I'm saying that you're making very narrow claims. You make very definitive claims. You say that he is

an Israeli spy.
A Yeah. He was an IDF intelligence officer.
Q No, no, no.
You said he is a spy currently.
A In the same sense that I'm a journalist.
Q Well, that's -- so, you're saying that you really believe that somebody reading this article would not believe that Yaacov -- based off of what you've written, the plain text of the article, you're saying that your average reader would not believe, have come off reading this that Yaacov Apelbaum is currently spying on behalf of the Israeli government?
A I think that to the extent that it describes actions he has taken and that's an inference they make, it's because of his actions themselves.
Q Well, is it because of the -- is it -- is it because of his actions, or is it because you are leading the reader down a path?
A I mean, leading the reader down the path to deducing that he was an IDF intelligence officer for seven years?



Q Well, let's scroll down here.
You are quoting from AZ Central, and it says Apelbaum said he was from -- and can you see it on the screen here? (Counsel publishes document.)
A Yeah.
Q And it says, "Apelbaum said he was from Israeli and immigrated to the United States in his late 20s. His social security number was issued in Massachusetts in 1988 the records show." This is all quoted from AZ Central.
Some of Apelbaum's closest business associates have ties to foreign intelligence.
So you can -- I'll just let you read it yourself here, okay, but I'm looking at -- this is, I guess, the fifth page of the document.
But do you see at the end, it says, "In 2019, the company entered a seven-year contract with the Department of Homeland Security to provide the U.S. Customs and Border Protection agency 'software for wearable devices -- for matching human face images.'"
A Right.



Q And then you said, "This is very funny."
So going on to the next page, "There is no evidence to suggest Apelbaum, 60, is a spy. He has acknowledged contracting with government intelligence and defense agencies, but he is tight-lipped about much of his background. 'I used to operate in that world,' he said, declining to elaborate."
And then you say, "Yeah. All right." What did you mean by that?
A I mean he is doing a two-step where I'm expressing skepticism toward the two-step in those two paragraphs.
Q So, I mean, a few minutes ago you said that you weren't saying that he was, in fact, an Israeli spy; and then you said that you weren't leading the reader down a path.
I mean, here you're obviously -- you're obviously putting your finger on the scale.
A I'm leading the reader down the path to deduce that he's an IDF intelligence officer of seven years?



Q Well, did you know that at the time that you wrote it?
A He is.
Q Well, but did you know that at the time that you wrote it?
A The reasonable inference from those two paragraphs that he is an IDF veteran -- that's also in the Arizona Republic story --
Q Okay. Yes.
A -- that he is, specifically, doing intelligence work; that he is, specifically, working on security technology; that he is, specifically, in business with Israeli figures, I mean, this is all within the scope of reasonable inference.
Q So, the AZ Central article also says that Apelbaum is not a spy.
A No. It says there's no evidence to suggest he's a spy after stating a lot of evidence.
Q Okay. So, you are saying that -- again, you're saying that he is a spy. Fair?
A That he -- yes. I mean, an IDF intelligence of seven years, it is reasonable to

Page 106

characterize them as a spy.
Q Okay. So somebody who has worked with classified/unclassified Defense Department projects is, therefore, by the same rationale, also a spy.
A No.
Q What's the difference?
A Because the Defense Department on its own is not one big intelligence agency.
Q Oh. Well, wait a minute. But neither is the IDF.
A Yeah. That's right. They have infantry. They have -- they also have military intelligence divisions.
Q Well, but you don't know -- do you know what -- do you know what function Mr. Apelbaum performed in the IDF as an intelligence officer?
A No. But, I mean, there are a couple of different offices that do it.
Q Well, hold on. But do you know -- do you even know what the function of an intelligence officer is in the IDF or what ranges of functions they might have?

Page 107

A It depends on which one it is.
Q Well, are you -- do you have -- are you an expert on the IDF?
A No.
Q Have you ever served in the IDF?
A No.
Q All right. Have you ever done any extensive investigation into the practices and trainings and -- of the IDF?
A No. But there are a lot of alumni from their military intelligence Signals Intelligence division that end up starting companies in the U.S.
Q Well, I mean, so, therefore, anybody who was in -- was any sort of -- you know, anybody who worked for the army in Signals Intelligence is, therefore, by definition a spy?
A No.
Q Okay. Then what's the difference between that and Mr. Apelbaum?
A That he was working as an intelligence officer or seven years in the IDF. It's not the United States.

Page 108

Q Okay. But you don't know. You don't know how the IDF is structured and you don't know what functions he performed.
A Okay. I think it would be within the scope of reasonable inference to say -- to think that it has something to do with the companies he's patenting and trying to do business with the federal government with.
Q Okay. Well, what if I told you that Apelbaum served in combat reconnaissance?
A Yes. I've heard that.
Q Okay. Well, what does that mean then to you?
A There are -- it could mean a lot of different things.
Q Sure.
A Sayeret Matkal, is that correct?
Q I'm sorry?
A Sayeret Matkal is the unit?
Q I don't know.
A Okay.
Q I don't know what his unit was.

Page 109

But more to my point, neither do you. Right?
Just because somebody served in the IDF and performed Signals Intelligence or combat reconnaissance or whatever doesn't make them a spy for that particular country.
A In the United States, our military intelligence agencies are considered part of the intelligence community. That's a reasonable characterization.
Q One moment.
Okay. So, for example, let's talk about -- you know, we're talking about the Americans. Right?
And by the way, did you ever serve in the military?
A No.
Q Okay. So, is somebody who has served as in Marine recon, are they a spy?
A It depends on the office but potentially yes. I mean --
Q Potentially.

A I mean, if you're an intelligence officer with like the army, it would be reasonable to call them that. One of the army's intelligence agencies is considered part of the intelligence community.
Q So let's say -- let's say that -- let's say you have a hypothetical man who is 60 years old who has served in Marine recon in Granada during the Granada conflict, okay, for the Americans.
Is it fair to call that man an American spy?
A It depends.
What we are talking about here is whether it's reasonable to call Apelbaum an Israeli spy.
Q No. But I'm just asking you. I'm just asking you that hypothetical question.
A Yes, I mean, it depends. I don't know the details.
If there were -- if there -- there are circumstances I could see where it would be. There are circumstances where it wouldn't be.
Q Okay. So, let's say, that Jim Jones, Marine recon during Granada, then goes and gets a



degree, starts working in cyber security, and investigates the Hunter Biden laptop. Is Jim Jones an American spy?
A Well, if you're just the guy with the radio, that's one thing.
If you're on the general staff in the reconnaissance unit, that's quite another thing.
Q Was Mr. Apelbaum on the general staff?
A This is beyond what I printed but that's -- that's what I've heard, is that he was part of the general staff reconnaissance unit.
Q But do you know that to be true?
A There's -- I have a good source that has told me that it was.
Q Who is that?
A I'm not required to divulge that.
Q Yes, you are, sir.
A I need to protect my sources.
Q Well, I'm afraid that that doesn't work, not in the context of a defamation suit.
Look. You've placed that squarely in play now. Right? So, I'm afraid that you are going



to have to divulge that.
A Yeah. I mean, the -- I need to protect the source.
Q Look. I mean, we can go in front of the judge.
A And it's not even defamatory. Like to say someone was part of a reconnaissance unit isn't defamatory.
Q But it's part of your argument that he's spying on behalf of the Israeli government. That's what relevant.
A It is uncontested that he was an IDF intelligence officer.
Q Well, just -- and what? So what?
A So how could it be -- how could the difference between defamation and not be the -- you know, the specific unit he was a part of.
Q Well, that's what I'm saying. You just said there's a difference if he was working for the general staff versus he was just a radio operator.
And what I'm saying is you don't have any knowledge.



You're saying, "Yes, I do have knowledge. I've got a source."
So, I would like to know who the source was?
A I've already told you the basis for the characterization of him as an Israeli spy. It's what he said in the Arizona Republic article and it's what he's doing.
Q Okay. Now, then you go into -- and there are some other things you talk about in the first article.
You then start going into a different direction and you say -- you can see it on of the screen -- "Apelbaum has claimed that Mike Flynn and Patrick Buma of Overstock are trying to take Trump supporters away from him, but that might just be a way of the Israelis trying to protect their control of Trump because Flynn has turned on Benjamin Netanyahu."
A Yeah.
Q What did you mean by that?
A I think that the way President Trump has

acted certainly within the beginning of his administration has been to give Netanyahu absolute cart blanche to kill as many Palestinians as he wishes and that has been standard operating procedure from American presidents for some time.

And some people that have kind of a sense of where this is heading are getting to the point where they are prepared to throw Netanyahu under the bus, and I noticed that Flynn was one of the ones who did that.

Now, you know, in between the publication of that article and today, a lot more have done that.

But, you know, expressing -- I think it was in the course of protective edge in 2014 where the slogan that you would hear from the pro-Israel conservative influencers was: No daylight. No daylight.

There is no possible circumstance in which our interests could diverge or there might ever be reasonable grounds for disagreement.

And so, I mean, that was how things worked when you were dealing with people who were



trying to increase their profile in the conservative movement like Flynn was trying to do for a long time; and that has just become untenable in the last couple years.

Q Okay.

A Yeah.

Q Let me stop you right there.

So I would also like to about this particular paragraph. There is a paragraph here -- after you say, "Yeah, alright" -- "What the case of Apelbaum actually represents is how badly the conservative movement has been penetrated by Israeli intelligence at the level of human intelligence and technology contracting."

What did you mean when you wrote that article? What does that paragraph mean?

A I mean that the Israeli government works through a number of Zionist groups in the United States, and the ordinary laws which are supposed to govern foreign influence are -- until very recently, after this was published -- basically never applied.

And so the -- you know, I mean, one



example would be, you know, a person, you know, with whom both Apelbaum and Laura Loomer have a relationship is Bob Schulman. He's a former --

Q Wait a minute. Wait a minute.

I had kind of a very relevantly specific question here.

I'm just asking what that particular paragraph means because you weren't writing about some guy named Bob Schulman or Laura Loomer.

You were talking about Apelbaum and XRVision and the Hunter Biden laptop saga.

A Yeah.

Q So what did that --

A This is an IDF intelligence veteran who is trying to sell security technology to the CBP and there is -- I mean, so that's -- the person who he has worked with in the past on these sorts of technology endeavors is Kochavi, and --

Q Okay. Let me stop you right there.

What the paragraph says is, is that Apelbaum "represents how the conservative movement has been penetrated by Israeli intelligence."



So you're saying that Apelbaum is working for the Israeli government on behalf of Israeli intelligence to penetrate the conservative movement.

A Do you think Laura Loomer or Jim Hoft --

Q Hold on. No, no.

I want you to answer my question.

A Yeah. I mean, I think someone with Apelbaum's skills is a force multiplier for people like Laura Loomer and Jim Hoft.

Q Okay. All right.

Now, what is your evidence, though, that he's working on behalf of the Israeli government?

A That he is in business with known Israeli cutouts; that he's working with influencers backed by the Friends of the IDF; that the actions that he takes seem to be consistent with Israeli geopolitical goals.

Q And is that it?

A And he was an IDF intelligence officer of seven years.

Q Forty years ago.

A Okay. Well --

Q Is that not relevant to you that his military service was before you were born?
A That he -- what's relevant to me is that he served far longer than the term of conscription.
Q Well, so did your father.
A We don't have conscription right now in the U.S.
Q No. Your father -- your father -- served more than a standard tour; and hell, he served more than four times, like five or six times longer than Mr. Apelbaum.
A Yeah. But that's the U.S. military.
Apelbaum served in a foreign military.
Q Well, but also, Apelbaum -- well, A, you don't -- you've already said that you don't know anything about that military; and B, Apelbaum renounced his citizenship in 2013. He's an American citizen.
A An American citizen who remains in business with an Israeli intelligence cutout is actually --
Q Wait a minute. And how do you -- how do


you know he remains -- how do you know that he does any business with any Israeli company?
A The patents with Kochavi.
Q Well, hold on.
How do you know that he does business with any Israeli company?
A Kochavi's company is Israeli.
Q Yeah. But you've just said that the patent was held by Kochavi and --
A No. Their names are both on them.
Q Right. But Kochavi is an individual. He's not a company.
A Okay.
Q And they're also dated -- and they're also dated back to 2013, I mean; so, I don't see how you could say he has an ongoing business relationship with anybody in Israel.
A Okay. I mean, the patent is still active.
Q Well, yeah. Patents remain active for what -- I don't know -- 17, 20 years, something like that.


A Yeah.
Q Well, and your father -- your father -- has done business with companies in Japan. Right?
A Yeah.
Q Okay. So does that mean that he's either working on behalf of the Japanese government or spying for either government?
A There's no -- there's no point in -- I mean, this is far afield and it's somewhat offensive for you to bring it up.
But he has never been a Japanese national.
Q Has he worked in Japan?
A In the Navy.
Q Okay.
A He was based there; so was I, when I was a child.
Q How do you know that Mr. Apelbaum's service didn't include the reserves?
A I suppose I don't.
Q Okay. Then later in the article -- as you can see on the screen here -- there is one sentence here, but then it continues on the next


page.
You said, "Apelbaum has been involved in a number of other weird things. In 2021, he started this business" -- and you list the four limited liability company articles of organization for a Florida company.
And you say -- you can see it on your screen there -- "According to Florida business records, this company was dissolved on December 16, 2021, the same date this story came out about the CDI's role in demolishing what was left of the Surfside condo complex. CDI was also the company that cleaned up the remains of the Murrah Building after the Oklahoma City bombing. So there is an interesting question of what New Horizon Autoparts was for."
What did you mean by that?
A That there is an interesting question as to what Horizon Autoparts was for.
Q I mean, how do you -- what is the average reader left to conclude as they read that paragraph?
A That there is an interesting question of

what New Horizon Autoparts was for.
Q Okay. So, somebody who starts a business or closes a business in the State of Florida on or around any particular date of, you know, significance to you implies some sort of nefarious undertaking?
A No, not necessarily. Yeah. Not necessarily.
Q So what makes it -- what's the interesting question then?
A What the company was for.
Q Okay. And what makes it an interesting question?
What about -- CDI cleaning up the remains of the Murrah Building and CDI demolishing what was left of the Surfside condo complex, how is that relevant?
A It's just interesting timing.
Q Okay. But what was your point? What was your -- let me put it this way.
What was your point in juxtaposing Mr. Apelbaum, that particular business that he started or closed in Florida, and those other events?


A That it's interesting timing.
Q Okay. And what makes it interesting?
Lots of businesses open or close?
A That it happened around the time of the Surfside event.
Q And so you're not implying anything else?
A Certainly not that he committed a crime.
Q Okay. But, I mean, I'm just asking you what you intended by this.
I mean, it's a deliberate juxtaposition; and so I'm asking what you wanted your audience to take away, specifically.
A Well, I mean, this is a guy who works in -- I think, you know, at least he represents himself as doing pretty high tech stuff; and this is like an autoparts company.
Q How do you know it's an autoparts company?
A That's what it says it is.
Q Okay. But how do you know?
A Yeah. I don't know.
Maybe they make balloon animals.


Q Right. I mean, did you do any due diligence?
A On a company that had just gone extinct?
Q Yeah.
A I pulled up the incorporation. It's in there.
Q Okay. So you pulled up the incorporation document, and then you smeared it by linking --
A I didn't smear it.
I said, "What was this for?"
Q Right. Well, I mean, come on.
What did you really mean, and what do you think that your readers came away with?
A That there is an interesting question of what New Horizons Autoparts was for.
Q Okay. Are you suggesting that New Horizons Autoparts had something to do with demolishing the Surfside condo complex?
A Not necessarily, no.
Q Okay. Are you suggesting that it had business dealings with CDI?
I don't even know what CDI is.


A It didn't say that.
Q Yeah. But it juxtaposes it in the same paragraph.
A Uh-huh (affirmative response).
Q Okay.
A So, your contention is it's a defamatory juxtaposition.
Q I don't know what other conclusion you can come to.
A Okay.
Q Well, because then you scroll down --
A I don't really think a juxtaposition can be defamatory.
MR. BURNS: All right. Let's take a quick break. Can we do another five-minute break, please?
THE VIDEOGRAPHER: The time is 12:43, and we are off the record.
(There was a break taken from 12:43 p.m. to 12:55 p.m.)
MR. BURNS: Okay.
THE VIDEOGRAPHER: The time is 12:55, and

Page 126

we are back on the record.
MR. BURNS: Okay.
BY MR. BURNS:
Q Let's see here. Let me re-share my screen. (Counsel republishes document.)
Okay. Mr. Bloom, the final paragraph is that -- in the final paragraph of that article, you say, "I should think that the Roman perspective on this would be that a president who fails to go after the people who went after his son is weak.
"President Biden was angrily quoting the 'suckers and losers' story, which comes from the poorly sourced sole dual citizen Israeli prison guard Jeffrey Goldberg. It's a sad thing to watch an old man and American president be run around like this by dual loyalists and spies."
A Yeah.
Q At the time -- now, as you sit here right now, you know that Mr. Apelbaum is an American citizen. Fair?
A Yeah.
Q All right. And he is not an Israeli

Page 127

citizen.
At the time that you wrote this article, did you know, you know, what Mr. Apelbaum's citizenship status was?
A No. I knew he was routinely characterized as Israeli; and I knew his business relationships; and I knew, you know, the evidence in the Arizona Republic story that -- the business relationship with Kochavi; that he is regularly characterized as Israeli and whatever else is there.
I mean, he's working with Israelis on technology and he's a former -- you know, a guy who by his own admission is in business with intelligence agencies and is Israeli.
Q So one of the -- and you're saying that this -- XRVision -- is a Singaporean company. Right?
A It's called that on Biometric Update.
It's called that in the Arizona Republic story, I believe.
It's called that on Yahoo News.
It's called that in a lot of places.
Q But you don't know one way or the other,

Page 128

do you?
A You're telling me that it is, in fact, incorporated in Long Island.
Q Right. But, I mean, you don't -- but at the time that you wrote this article, you didn't know one way or the other.
A Yeah. I mean, I think when it comes to claims that it's hard to imagine how they could be defamatory, I mean, I have no reason not to take, you know, a specialist's reporting about where it's based at face value.
Q Okay. But other than reading a couple of online articles, did you do any due diligence on the company?
A Yeah. I looked up the cap table.
Q Okay. Well, you looked up what you thought was the cap table. Is that fair?
A I suppose so.
Q Okay. And you didn't -- and I think you already said that you didn't reach out to Mr. Apelbaum on behalf of himself or XRVision for a quote to get his side of the story on some of these

Page 129

different allegations that you're making in the article. Is that fair?
A What am I alleging that he has done?
Q Well, upon any of the -- anything that you wrote in the article.
A Yeah. Do you think that he would dispute that he's Israeli?
Q Yes.
A Okay. Even though he served in the IDF for seven years?
Q Yes.
A Okay. Why? Is he offended at the idea of serving in the IDF?
Q So, the point is -- is that a -- well, I guess, first off, you didn't -- the first thing is is you didn't get a quote from him, did you?
A No. No.
Q Okay. And you could have.
A Yeah. I mean --
Q Okay.
A I mean, the specific claims about his business I had no reason to think he would even

Page 130

object to.
Q Well, for example, you had his contact information; didn't you?
A Yeah. I mean, I talked to him in the course of the Hunter Biden reporting.
Q Okay. So, what if I told you that there were two XRVision companies?
A Okay.
Q Okay. And you just simply mistook one for another.
A Okay.
Q So, I mean, does that change your opinion of Mr. Apelbaum?
A So there's the Indian XRVision and then there's Apelbaum's XRVision? Is that what you're telling me?
Q I'm saying that there is a New York -- there is a New York corporation owned by Mr. Apelbaum and that there is another company that is somewhere else -- frankly, I don't know where it is; but it's not in the United States -- and it's not owned by Mr. Apelbaum, nor has it ever been owned by

Page 131

Mr. Apelbaum, nor has it ever been owned by the company that Mr. Apelbaum owns.
A Okay. So if what you're telling me is the Singaporean XRVision is different from the one that Mr. Apelbaum is involved with, then that would mean the Arizona Republic is wrong; Biometric Update is wrong; Yahoo News is wrong; and then, most importantly, Rajit Khare is mischaracterizing his involvement with Apelbaum on his own investment firm's web site.
And if that's the case, I feel very sorry for Mr. Apelbaum; but, I mean, that's something to take up with him.
Q Well, what if I said that there are -- like I said, what if there are, literally, two companies that have the same name?
A Okay. Is there a trademark?
Q For Mr. Apelbaum's company -- I'd have to check -- I believe so.
A Okay.
Q I think if you -- I think if you look at it, if I'm not mistaken -- and I would have look into

Page 132

this myself -- I think that the -- I think, A, I think Mr. Apelbaum owns trademark for a company which is his company which is XRVision LTD, and I think that the company that you mistook for his company was XRVision PTE -- right -- which is -- which is, as I understand it, is a type of corporate entity that exists in Singapore; but those two companies are totally different.
A Their -- do they do the same sort of thing?
Q No.
A Okay.
Q I mean, is a technology company kind of in the same, you know, field as another technology company? Kind of.
But are they involved in the same types of technology? No.
A No. So, I guess, the claim is that one is video analytics and the other is facial recognition.
Q I don't want to -- look. I'm not an expert in these areas of technology; so, I don't want

Page 133

to -- I don't want to misspeak. I don't want to mischaracterize anything.
But my point here for the purposes of the deposition is what -- you know, how does that -- what do you -- does that change your assessment of your article knowing this now, knowing that you were -- that you made a mistake?
A I'm not even sure that it's a mistake.
The -- his -- he is claiming to use his own XRVision mark in his work with Jim Hoft, and his U.S. work that -- that you're telling me this is different from the Singaporean company which has also been -- you know, for the last seven years in reporting about it has had an association with Mr. Apelbaum.
At any rate, being associated with a Singaporean company isn't defamatory. Like it's not accusing someone of wrongdoing, and it -- so I -- no.
Q I guess the reason why I ask is that when I asked you what the bases for your belief that Mr. Apelbaum was an Israeli spy, one of them was that you said that you knew that he was -- that he owned a

Page 134

Singapore-based technology company that was -- that was, you know, co-owned with Guy Ron. So, I'm telling you that's not true.

A Okay. So, he just has a -- he -- so, but you've also claimed that the quotes in the Arizona Republic are also pure fabrications.

Q Well, hold on. We can get to that, too; but let's just stick with this for a second.

A Okay.

Q So I've just eliminated one of the -- one of your purported bases of knowledge.

A No.

Q Right?

A I mean, he's still -- the patents still exist and XRVision is still being used.

His own, you're claiming to me, is something different; but his own version is still being used in connection with all these high-profile events in the U.S.

That's hardly the definitive thing, and that's also not what I've stated in my defense.

Q Well, and also, I'd also tell you that,

Page 135

A, he doesn't do any business overseas. Would that change -- would that change your assessment?

A I mean, the patents are extant in the U.S. that have Israeli nationals on them.

The -- their -- it is a transnational business relationship whether -- you know, whoever his clients are.

Q Well, I mean, so, first off, he doesn't have any transnational clients.

Second off --

A Just co-inventors.

Q Well, at the time -- at the time that it was patented, he may have still carried an Israeli citizenship himself; but that doesn't mean anything.

Like, what? I guess, what does that have to do with the price of tea in China to your claim that he's an Israeli spy?

A Well, he's an intelligence officer.

Q Okay. So, let me -- let's talk about General Flynn because you go into Flynn in your article. Right?

Were you aware that Flynn was on the

Page 136

board of NSO?

A Oh, yeah.

Q Okay. So, NSO, it's my understanding, is an Israeli spyware company.

Is that fair based off of your understanding?

A Yes.

Q Okay. So, Flynn was on the board of the NSO group and is instrumental -- well, was at least part of bringing spyware, Israeli spyware, to the United States.

So, I guess, my question is: On that basis, is Flynn and Israeli spy?

A You could argue he is involved in technology transfers that compromise the security of Americans. Yes.

I mean, that's --

Q But would you think it would be fair to characterize him in one of your blog posts as an Israeli spy?

A I probably wouldn't do it that way. No.

Q Why?

Page 137

A Because a more specific way of doing it would be this guy is -- I mean, like many Americans -- is working with the Israelis to compromise the security of Americans.

Q Okay. But you think it would be fair to describe him as an Israeli spy. You could do it, and it wouldn't be unreasonable.

A I mean, I think when you look at a guy like Flynn, I mean, this is a -- this is a judgment call based on, you know, your sense of the person; but he doesn't strike me as the most careful when it comes to things like this which is why he had that problems with the Turks, as well. Right?

Q One moment.

So when did you start your Substack?

A I don't remember the exact date. I don't remember.

Q Okay. Do you remember the year?

A I think it was probably 2021.

Q Okay.

A The first couple of articles, I believe, are then.

Q Okay. Now, and so far in 2025 are -- is your only employment your nonprofit?
A That's correct.
Q Okay. And so far to date in 2025, how much have you earned?
A Not much, like a few hundred dollars.
Q Okay. And how are you sustaining yourself?
A Barely getting by.
Q What, I mean, how do you pay for food?
A I spend down my savings.
Q I mean, do you have family members who give you money or give you a loan or something like that?
A No.
Q Do you have some sort of a trust?
A No.
Q Okay. Where did -- how much savings do you have?
A Very little now.
Q And so your savings came through your own personal income generation over the past, you know,



15 years?
A That's correct.
And now it's all gone because of this lawfare that I've --
Q How many lawsuits have you been embroiled in?
A This is the second in three years.
Q Okay.
A I've been subpoenaed before but -- yeah.
Q And I think you mentioned that you consider yourself a journalist. Right?
A Yeah.
Q What journalistic standards do you follow?
A The -- I don't have a book that I say this is my professional Bible.
Q Okay. Do you have an editor who reviews any of your work?
A No.
Q Do you ever try -- whenever you have close questions, do you ask colleagues to look at your work, friends?



A No.
Q Do you work with anyone as part of your work with -- on your blog?
A No.
Q Are you employed full-time working on your blog?
A Yes.
Q Okay. Do you have any other employment?
A No.
Q Does -- is anyone else affiliated with your blog?
A No.
Q So you don't have a fact-checker.
A No.
Q All right. What fact-checking do you do before publishing?
A Satisfy my own sense that something is true.
Q Well, what does fact-checking mean to you?
A It depends on the claim.
Q Okay. How many sources do you require



for factual claims?
A It depends on the factual claim.
If it's, you know, the national origin of a company, I would consider a VC database and three reputable publications sufficient.
Q Well, obviously, it wasn't sufficient in that particular example.
But do you ever require independent corroboration?
A Yeah. It depends on the claim.
Q All right. Well, in what sort of a -- what -- in what sort of a claim would you require independent corroboration and what would that -- would independent corroboration look like to you?
A Well, a second source that didn't know about the first.
Q Okay. Do you attempt to verify information before publishing?
A Yes.
Q Okay. And what steps do you usually take?
A Consult public sources, other publishers,

Page 142

and human sources.
Q Okay. How do you indicate to readers what is fact versus opinion?
A The way a sentence is written.
Q Okay. So you leave it up to the reader?
A Yeah. I suppose.
There is a category that's often referred to -- even The Washington Post calls it this -- is reported opinion; but, you know, I've done both. I mean, I was an opinion editor for three and a half years; and for the most part when I've published others, it has been not straight news.
Q Okay. Do you believe that journalists have an obligation to be truthful?
A Yes.
Q Do they have an obligation to be accurate?
A Yes.
Q Do they have an obligation to verify information?
A Yes.
Q Do they have an obligation to seek

Page 143

comment from the subjects of their writing?
A If it -- if it's something that's contentious.
I mean, something that's taken for true as background knowledge, maybe not necessarily.
I mean, if I was doing a story about, you know, say, just like a normal -- you know, you're getting a -- the county board wants to put in a new dog park. You go and talk to some people at the dog park. You are going to like not check every person's actual address. Right? You would assume that the people who have something to say about the dog park when you go to speak to them at the dog park have some sort of connection to it. Right?
And at any rate, the -- whether or not they're driving across town to exercise their dogs, there is no possible way that that could reflect badly on the reputation?
Do you know what I mean?
Q Well, so, I mean, let me ask you this.
Do you think that it's important for reporters to consider, to weigh the potential harm

Page 144

that could come to subjects in their writing?
A Yes.
Q Okay. Well, so, for example, with your -- with your first article here that we have been discussing -- right -- do you see how making an allegation that Mr. Apelbaum is an Israeli spy might have a tendency to harm his work with American government agencies?
A I can see how he might think that.
But there are also many instances, especially when you are dealing with security contractors with foreign connections where you -- you know, what is within the realm of what a journalist ought to be mindful of in the interest of, you know, looking out for the public interest is different from what he might want published.
Q Right. Well, like, I mean, for some of these different things that you've stated, some of these different factual claims that you have made or that you have reported on in your article -- right -- some of them by your own admission are just suppositions or assumptions. Right?

Page 145

And wouldn't it make sense to just reach out to Mr. Apelbaum just to get his side of things just to make sure that you are not making a mistake?
A I'm not sure that I have.
Q Well, but you don't really know one way or the other, though; do you?
A I -- you're disputing four different sources.
Q No. I'm just asking you a very simple question.
You don't know one way or the other.
A I do know.
Four different sources that are saying this is a Singaporean company is sufficient for me.
Q Okay. And so -- and even if that's incorrect?
A If I come to find out in a verified -- you know, I'm persuaded that all four of those other things are wrong, you have to weigh those things against each other.
Q Okay. So you didn't think it was necessary to contact Mr. Apelbaum to make sure that

that was accurate.

A I don't -- it didn't even occur to me. The idea that it's a Singaporean company, it's called that in four places, and there's no way it could be objectionable either from a like a business standpoint or a reputational one, that's just -- that's at the point where it's taken as background knowledge.

Q Okay. So you didn't think there was any potential harm to Mr. Apelbaum's reputation or XRVision's trade reputation by any of the statements that you made in his article -- in your article rather?

A Well, what we were just talking about is the statement that it's a Singaporean company.

Q Okay. Well, now I'm asking just about your article as a whole.

A I think that it's -- I think that, generally speaking, for the last 20 years when somebody has identified as being -- you know, having some sort of connection to Israeli intelligence, what's more likely to happen certainly with the



gateway pundits of the world is that they roll out the red carpet and treat you like a profit and maybe you'll get introduced to senators. Maybe people will start giving you money. Maybe, you know, Mike Huckabee will say you're blessed by God.

And so, no, I mean, the standard in the conservative movement is when somebody is called -- you know, is said to have some sort of reputation -- you know, relationship with Israel -- which is incontestably true -- that that actually tends to be beneficial for the reputation rather than harmful to it.

Q Okay. So, you're making a statement that he was -- that Mr. Apelbaum is a spy for the Israelis. There was no harm that could come to him from that statement. In fact, it was a benefit potentially.

A I said he was an Israeli spy.

Q Correct.

A And that's true.

Q Okay. One moment.

When you make an error, what is your



correction policy?

A It depends on the error.

Q Okay. Can you elaborate?

A If it was very substantial, I would print a correction.

Q All right. Have you ever published something you later learned was false?

A No. No.

Q Do you believe that bloggers have the same responsibility as traditional journalists?

A I think they should aspire to that.

Q But you consider yourself a journalist.

A Yeah. I'm a journalist with few resources, so, you know, without the resources either with legal defense or fact-checking or research, which I would wish to have.

MR. BURNS: One moment.

I would like to go off record for just a second. I need to send another exhibit.

THE VIDEOGRAPHER: The time is 13:22, and we are off the record.

(There was a break taken from



13:22 p.m. to 13:23 p.m.)

MR. BURNS: Let's go back on the record.

THE VIDEOGRAPHER: The time is 13:23 and we are back on the record.

MR. BURNS: Thanks.

BY MR. BURNS:

Q So, when did you -- how did you meet Charles Johnson?

A I don't recall the first time I met him, but we came up through journalism programs together. I mean, I've known who he was for probably 12 years, 13 years -- something like that -- since college.

Q Okay. And what journalism programs did you do together with him?

A I don't think we were ever in the same room as part of one of them, but we were both part of the Intercollegiate Studies Institute network. We both had internships through them, that sort of thing.

Q Okay. And so when, if you just had to give a ballpark? When did you first talk to him?

A We probably exchanged some messages

around the time of the 2016 election because he was influential during all of that but we -- I started talking to him with more regularity after he was terminated as a confidential human source by the FBI.

And I expressed to some people in the D.C. area who, you know, he makes himself a topic of conversation, I expressed to them that I thought that he was -- he was probably an informant just because of, you know, the places he was seen and what he was doing.

So, I'll leave it there for now.

Q Okay. So, he was a confidential human source for the FBI; is that right?

A That's correct.

Q Okay. And how do you know that?

A I talked to his former handler at the FBI.

Q Okay. And what was -- what was -- what was he used as a confidential human source for, for what purpose?

A I have seen reports. There is one which I have published which relates -- which appears to be



him through a couple of circumstantial details, and he was -- that one concerned Ghislaine Maxwell and a meeting that she was at that he was also at.

The -- I -- he has represented that he has been doing a whole lot of -- a whole lot of things.

His -- but remaining agnostic about that question, you know, his handler -- he's identified himself as code name Genius, and his handler Jonathan Buma has given -- he gave a statement to the Senate Judiciary Committee which I published.

Q Okay. And so when did he stop working as a confidential human source?

A I don't want misspeak, but he didn't stop. He was terminated.

Q Okay. I'm sorry.

When was he terminated?

A I'm not sure, exactly; but I think it's in the statement that I published.

Q Okay. Does he have any other ties to American intelligence agencies?

A Not that my knowledge.



Q Okay. All right.

Are you -- do you consider yourself friends with Charles Johnson?

A We were friendly. I think he was a person in -- you know, when what he was representing was that he has been terminated by the FBI as a CHS after he was working on corruption related to the Russians, and those are details which are reflected in the statement to the Senate Judiciary Committee.

And so this is a guy who's at least from the same network from me who is now in a situation which -- you know, based on what I'm able to deduce from, you know, the sources I've spoken to and the documents I've published, I mean, there's -- there's a -- there are reasonable grounds to think that that could be hazardous to his health. So, you know, this is -- this is a guy that, you know, we don't want to get hurt.

And moreover, this issue of informants, I mean, I think Charles is an example of an informant. I mean, I don't know that he was ever a member of an extremist group, but he has certainly said a lot of



offensive things in the past and he has certainly been involved with a number of people who you could reasonably call extremists.

Q How did you meet his handler?

A I was introduced to him while he was, I think, on ice at the FBI. He was kind of in limbo before finally being fired.

Q Okay. One moment.

Is it against the law to disclose a confidential human source?

A Yes. But if you are the source, you can disclose yourself.

Q Okay. So in this case, we had served a subpoena to Cloudflare.

A Yes.

Q How did you first become aware of that subpoena?

A I got an email about it.

Q Okay. From whom?

A The full name was not disclosed.

Q Okay. Well, what name was disclosed?

A An email address that was associated with

Page 154

the first name Ethan.
Q Okay. Did they purport to be part of the -- of a particular -- well, I don't want to put words in your mouth.
Who did he say he was with?
What did he say?
A I don't remember.
He told me that they got a subpoena.
Q Okay.
A I don't want to misquote you or misquote to you.
Q And what did he -- what did -- did he have some sort of a request to you?
A No. He just asked, "What's this all about?"
Q I see. Okay.
Had you ever spoken with that individual before?
A No.
Q Okay. And you filed a motion to quash that subpoena, did you not?
A Yes, I did.

Page 155

Q Okay. However, you also said that you had nothing to do -- that the requests in the subpoena, the information requests had nothing to do with you, is that right?
A That's right.
Q Okay. So, why were you seeking to quash the subpoena?
A Because it's not relevant.
Q Okay. But what -- if it's not -- if it's not relevant to you, then why do you care one way or the other?
A Because it's being -- it's a subpoena which is being sent in relation to a case in which I'm the defendant.
Q And, but, I mean, how do you have a dog in that particular fight? I'm talking about the subpoena, itself.
A Well, I mean, if -- I presume, you know, if, you know, a plaintiff, especially after they filed a reckless and malicious lawsuit such as this one, if you were permitted to subpoena -- send subpoenas to every person under the sun, you might.

Page 156

MR. BURNS: Okay. One moment. I'm sorry. We need to go off the record for a brief minute.
I'm sorry. I just have to address something. If we could, go off the record.
THE VIDEOGRAPHER: The time is 13:33, and we are off the record.
(There was a break taken from 1:33 p.m. to 1:34 p.m.)
MR. BURNS: I'm ready to go back on.
THE VIDEOGRAPHER: The time is 13:34, and we are back on the record.
MR. BURNS: Okay.
BY MR. BURNS:
Q Mr. Bloom, do you have any investments?
A No.
Q Okay. Do you have any business interests? What I mean -- go ahead.
A I mean, I have what's left of an IRA.
Q Okay. Do you own any stock?
A No. I mean, I have what I own in what's left of an IRA.

Page 157

Q Okay. No other investments other than that single IRA?
A That's correct. I mean, I might have a few hundred dollars in an old 401K.
Q Okay. Do you engage in any business with Charles Johnson?
A No.
Q Okay. When was the last time you spoke with Johnson?
A Several weeks ago.
Q Have you spoken to Johnson about this case ever?
A He knows I'm being sued. Yes.
Q Okay. But have you spoken with him about the case at all?
A Not in detail.
Q But you have spoken to him about it?
A Yeah. I mean, he knows I'm being sued.
Q Okay. And how did you -- in what way did you speak with him about it?
Did you speak with him over electronic communications or over the phone or how?

Page 158

A No. We've had lunch before.
Q Okay. You've had lunch and you discussed it?
A I mean, not at length. I mean, he knows I'm being sued.
I was also present when he was served with his own lawsuit. I think it was in Fort Worth.
Q Okay. And where was he served?
A He was served in Arlington while it was his birthday and I was having coffee with him.
Q Gotcha.
Does he live in the Arlington area?
A He is in Northern Virginia, I think, or until very recently.
Q Okay. And have ever been to his home?
A Yes.
Q Has he ever -- how often?
A A few times when I was trying to suss out -- I mean, I've been writing about -- the situation with him and Special Agent Buma was significant enough to be covered in Business Insider; there was a story, I think, in Mother Jones about it;

Page 159

and I've been writing about it, too.
Q Okay. So about how many times have you been over to his house?
A I don't know. Maybe a dozen.
Q Okay. One moment.
A His had handler was also interviewed on a major German public broadcaster: Buma.
Q Are you aware that he just got hit with a $70 million judgment?
A Yes.
Q What do you make of that?
A That it's unfortunate for him.
Q Do you think that there was any validity to that lawsuit?
A I think, there, you would struggle to find any lawsuit that didn't have a smidgen of validity on both sides.
Q All right. Okay.
Scan you see that article, Mr. Bloom?
A Yes.
Q Do you recognize this article?
A Yes.

Page 160

Q And this is an article that you wrote?
A Yes.
MR. BURNS: Okay. This is Exhibit 4.
(Bloom Deposition Exhibit No. 4 was marked for identification.)
MR. BURNS: Okay. (Counsel publishes document.)
BY MR. BURNS:
Q So I would like to direct your attention, Mr. Bloom, to interrogatory number one and your objection there.
And you said, "Objections. Interrogatory is overly broad and unduly burdensome. Presumably, there are many people who have knowledge of the facts and circumstances in the complaint, possibly to include the notorious Indian hacker Rajit Khare on XRVision's board."
And then later on in the article, you say, "I have also informed the Court in my latest filing that to the board of XRVision was recently added the notorious Indian hacker Rajit Khare."
Now, before I ask you a question, I'm

Page 161

going to show you another exhibit; but you reference there a particular court filing which I'm going to show you in just a second here.
Now, this is Exhibit 13.
(Bloom Deposition Exhibit No. 13 was marked for identification.)
BY MR. BURNS:
Q Now, do you recognize this document, Mr. Bloom?
A Yeah.
Q Did you author this --
A Yes --
Q -- court filing?
A -- I did.
Q Okay. And this is your response. This is actually your reply brief to your motion for summary judgment, is that right?
A Yes.
Q And in the second paragraph, you say, "Plaintiff's behavior is highly consistent with the operating methods of Mr. Apelbaum and XRVision to whose board the notorious Indian hacker Rajit Khare

was added in the last couple of years, reporting of which still characterizes it as a Singaporean company."
A Yes.
Q "One of Defendant's concerns as to the further discovery is the possibly that e-discovery may be used in parallel reconstruction of records already stolen from the defendant which would make the proper investigation of that crime impossible.
"There is further reason to believe Mr. Khare is state backed in some of his activities which would explain while he has been so effective in silencing critical reporting on him in India and elsewhere."
A Yeah.
Q Now, so, what's interesting here is in each of those different selections that I've highlighted for you, you've used a very, very particular -- you have used the same -- you have used a very particular phrase -- right -- regarding Mr. Khare over and over again?
You said that Mr. Khare was a notorious



hacker or -- actually, the phrase is "notorious Indian hacker Rajit Khare."
And the reason why I'm asking about that is that it seems like that was done deliberately. Why did you use that phrase when you're referring to Mr. Khare?
A Because he has been -- he successfully had the Reuters investigation about Appin taken down in India; two, there have been a number of stories in US-based publications about his bullying of journalists.
There was one in the Daily Beast. There was one -- I don't want to speak other than that.
But, you know, there is a pattern of him going off journalists, and the investigation that he successfully managed to get taken down in India was about his hack-for-hire company called Appin.
Q Now, when you say hack for hire, what does that mean?
A That he works for either corporate clients or potentially states to illegally obtain information -- yeah -- for money.



Q Okay. So, he's a -- he's -- on some level, he's a criminal.
A There are indeed criminal complaints against him. I mean, I showed you the files.
Q Sure. Okay.
And so is that what you mean when you say notorious Indian hacker, that he's --
A No. I mean what I said, that he is notorious because of the way he bullies journalists. One of the stories he has bullied journalists about had to do with his alleged hacking.
Q But you didn't say that he was notorious -- in all these different places, you haven't said he was notorious because of his bullying journalists. You said that he was notorious for his hacking.
A I said he's a notorious hacker.
Q Okay. And so what's the basis for --
A I think these days he likes to be thought of as a deep tech investor, I believe.
Q So what's the basis for your knowledge that he is a criminal hacker?



A The criminal complaints against him and the long Reuters investigation about him running a hack-for-hire business.
Q Okay. And what's the -- you said in multiple places here that XRVision -- that he's on the board of XRVision.
A Yes.
Q What's the basis for your knowledge there?
A Khare's own investment firm's web site boundary holdings, which I sent to you; there's the articles in Yahoo News; and there's the articles in Biometric Update.
Q Is it possible that there are lots of businesses that have the same or similar sounding names?
A Yeah. But when Khare has represented himself as a board member of, specifically, the one which involves Yaacov Apelbaum and Guy Ron.
Khare has represented himself as, specifically, an investor in the XRVision that involves Guy Ron and Yaacov Apelbaum.

Page 166

Q He, specifically, said that. He has, specifically, said that he is in business with Yaacov Apelbaum?
A Yes. He says it on his investment web site, and I sent it to you.
Q Okay. And have you ever -- have you ever asked Mr. Apelbaum about that?
A No. Because, I mean, he was already suing me at that point.
Q Well, but, I mean, do you not have an obligation to try to verify the accuracy of your reporting?
A I sent it to you.
I mean, it would be when there is an ongoing legal proceeding, it's much appropriate to send it to the person's counsel.
Q Well, those are rules for lawyers. Those are not rules necessarily for lay people.
A Yeah. Well, even just in the interest of kind of getting to the facts, I mean, the -- at the beginning of all this, I mean, I haven't heard anything yet from the plaintiffs' side that would

Page 167

indicate the proposed adjustment that I made to -- that I offered to the article would have been accepted.
And if you or Apelbaum had just said, "Oh, yeah. We don't like it when you call me an Israeli spy," but an Israeli in the spyware business who by his own admission has done business with intelligence agencies, that's A-OK-OK. Right?
That's -- as far as I can tell that's not -- that is even more beyond dispute.
You could have just said, "Yes. We accept that amendment."
I don't concede the idea that that's actually correction.
But all you had to do is say, "Oh, yeah. We prefer that wording. We prefer that language."
And now -- you know, and the same thing just happened with Khare. You want to amend the complaint to add a Khare as a plaintiff; and what's the basis for that other than, you know, if he's not actually a board member, if he actually --
Q Let me stop you right there because

Page 168

you're misspeaking in a couple different ways.
A Okay.
Q First off -- first off -- the motion for the first amended complaint does not add Mr. Khare as a plaintiff.
It's amending the plaintiff's pleadings to include the defamatory statements that you've made regarding Plaintiffs' association with Mr. Khare.
Plaintiffs have no association with Mr. Khare. They've never done business with him. He's not on a board; and in fact, there is no board.
Mr. Apelbaum is the sole owner and the sole member manager of his company.
A So Khare has then lied and said, "I'm an investor," when he's not an investor?
Q Yes. That's correct.
A And so has Biometric Update?
Q Well, let me put it this way. Let me take that back.
I don't know. I have not seen his statement to that effect. However, if he did make that statement, then, yes, that's -- that is a false

Page 169

truth that. That is not true. That's a lie.
A Okay.
Q So, I guess, my question then becomes: What level of verification would you need to determine that your assumptions are not true?
A I mean, it would be an exceedingly shady investment firm that goes around saying, "I own a piece of that," but he actually doesn't. Right?
And that's --
Q And you've already said, though, that he's a criminal. You already said that Khare is a criminal.
So, why wouldn't he? You know, he is hacking people on behalf of governments and private corporations. What's one more lie?
A Well, he has got enough pull with the Indian government to have the Reuters investigation taken down. So, you know, there are things that could possibly be inferred about a relationship there.
Q One moment.
Do you have -- other than the few

Page 170

articles that you have seen online, do you have any other information that would suggest that Mr. Khare actually is an investor in Plaintiff?

A Khare's own investment firm, Yahoo News, biometric Update.

Q Okay.

A I've sent these to you already.

Q But, again, you still haven't asked for Mr. Apelbaum's comment; have you?

A No. I mean, I'm assuming that Apelbaum doesn't -- this is just a really weird thing to assume would be false.

Like if a guy is going out and saying, "I'm in business with this guy," I mean, I assume these filings are, you know -- I assume Khare wouldn't lie about something like that and neither would Apelbaum.

Q But how would you know?

A If Apelbaum publicly disputed it.

Q But you never gave him the ability to do so.

A Well, I mean, he -- there's this guy who

Page 171

is well known enough to have criminal complaints against him and to have articles taken down about him who is going around saying, "I'm in business with Apelbaum." He doesn't have a problem with that?

Q Well, you're assuming -- you're assuming a particular level of information and knowledge. Right? You're making a lot of assumptions here.

But at any rate, let me see here. I'm going to pull up a new exhibit.

Can we go off the record for a minute?

THE VIDEOGRAPHER: The time is 13:53, and we are off the record.

(There was a break taken from 1:53:15 p.m. to 1:53:56 p.m.)

MR. BURNS: Okay. We can go back on the record.

THE VIDEOGRAPHER: The time is 13:53, and we are back on the record.

MR. BURNS: Okay.

(Bloom Deposition Exhibit No. 10-9 was marked for identification.)

BY MR. BURNS:

Page 172

Q Mr. Bloom, can you see this article that I've pulled up here. (Counsel publishes document.)

A Yes.

Q This is Exhibit 10-9.

Okay. So, I would like to go look at -- first off, do you recognize this exhibit? Is this one of your articles?

A Yes.

Q And in this article -- well, in this article on the first page, you are talking about -- well, you say here, "Within a day of each other, two" -- actually, I'm going to back up.

You open with a quote from Ian Fleming, if I'm not mistaken, that's the author of James Bond; is that right?

A Yeah.

Q "As Ian Fleming famously wrote, 'Once is happenstance; twice is coincidence; three times is enemy action.'"

And then on the third paragraph, you then say, "Within a day of each other, two actions were filed against this blog on two separate continents.

Page 173

First, a lawsuit was filed by Yaacov Apelbaum against me in the Eastern District of Virginia alleging I have defamed him. It's dated January 29, the very day the statute of limitations for defamation suits expires in Virginia given that the first exhibit in this suit is this post," and then you link to your article.

A That's right.

Q And then it goes on to say, "The second complaint was made in Rome. Pierre Louvrier" --

A Louvrier, yeah.

Q -- "has asked a Roman court to criminally charge me and some New York Times reporters and seize my Substack."

Now, what is the current -- I mean, so, why did Mr. Louvrier ask a Roman court to criminally charge you and seize your Substack?

A Because I had -- there was a New York Times story concerning how Tulsi Gabbard was put on some sort of no-fly list, and it was a photograph that -- so the meeting that Tulsi Gabbard, the Director of National Intelligence, participated in

Page 174

which got her put on the no-fly list was a peace conference at the Vatican.

And the peace conference at the Vatican which got her put on some sort of no-fly list, according to the New York Times, was put on in part by this guy Pierre Louvrier.

And it's been alleged about Louvrier, though the most troubling piece doesn't seem to be consummated, was there was a -- he was involved, briefly, in acquiring a Bulgarian telecom company that allegedly the Russians had some sort of interest in; and that didn't actually come through. And so this was all back in the news because it's being used against Tulsi Gabbard.

And the picture that was mentioned that got Mr. Louvrier -- you know, that allowed Mr. Louvrier to become the kind of guilt-by-association mechanism was a picture of him and some sort of GRU-linked figure; and the New York Times made reference to it, but they didn't publish it. It was them at some sort of event.

I published it, and he didn't like that.

Page 175

He flipped out and he was, you know, "I'm going to come after you."

So I had a conversation with him. I said like, "Look. All I've done is add this new piece of information to what the New York Times has published."

And he's, you know, telling me, "You're defaming me. You're defaming me. You're defaming me."

And I'm telling him, "No, I haven't. No, I haven't. No, I haven't."

And, you know, "I accept your argument that, you know, the Bulgarian telco acquisition didn't go forward; and therefore, you know, you maybe were being set up as some sort of Russian front; but it didn't actually happen. So, good for you. But nevertheless, it's being used in the context of a confirmation hearing for the Director of National Intelligence. And so, you know, the basis of this is very much in the public interest to know."

And as to the criminal charges piece, he's making a complaint. The Italian system is a little different from the American one. They have

Page 176

judge prosecutors and so -- and defamation can be a criminal matter.

Q So have you been criminally charged?

A In Lazio, no -- L-A-Z-I-O.

Q So, Louvrier, he asked the Roman court to charge you; but they never charged you.

A That's right.

Q Okay. So, what is the connection between Mr. Louvrier and Plaintiffs in this case?

A Well, the timing is certainly quite suspicious, you know, within 24, 48 hours to be hit with two legal complaints, you know, more or less at the same time.

There's the fact that the Israeli right in the last couple of years has been trending in a pro-Russian direction.

There's the fact that some of Apelbaum's associates have been accused of carrying water for the Russians, among them, Jim Hoft.

I mean, that would be the start.

Q Okay. So, you're saying there is some level of hidden coordination between Mr. Louvrier and

Page 177

Yaacov Apelbaum and XRVision; is that right?

A You keep asking me: What are you really saying? I'm saying what I'm saying.

I'm saying there's -- that it's unusual timing and it happens nearly at the same time.

Q Well, I mean, like, you know, there's eight billion people on earth and so something is always happening somewhere.

But you took two things that happened in your life in the same time period and you juxtapose them and suggested that there was -- that this might not be a coincidence?

A Well, the guy who is working with the Russians in Bulgaria and the guy who is working with the Russian-aligned blog in St. Louis, that's a little bit unusual.

Q Okay. Let me stop you right there.

What is your evidence that Jim Hoft is aligned with Russia?

A There were a lot of mostly like sort of globalist, for lack of a better word, publications that were saying that.

Page 178

Q What does it mean to be -- when you say Russian aligned, that sounds nefarious. What does that mean to you?
A Carrying water for them in various ways in terms of how a story is framed, in terms of foreign policy perspective that's consistent with their geopolitical goals, those sorts of things.
Q Okay. And is that -- is that carrying water, you know, at the behest of the Russians or is that just some -- or is it -- in your opinion, or is it because just sort of happenstance?
A I think it's probably happenstance. I don't have any reason to think it's not.
Q Well, then, what's the -- so, all right.
So if it's happenstance that Jim Hoft and the Gateway Pundit just happened to be carrying water for the Russians, even though they're not paid for it, they're not being asked to do it but any government actors, then how is it significant, then, that -- you know, what is the significance of putting plaintiffs together with Mr. Louvrier?
A Well, usually you publish on a schedule

Page 179

when you're working as a journalist, and these things happened in the same week.
Q Right. But you are suggesting that there's -- that this is more than just a mere coincidence. I mean, "Once is happenstance; twice is coincidence; three times is enemy action."
A Yeah. Two legal complaints against a journalist in the same week, there is reason to think that something else is going on.
I don't know what it is, and I haven't supposed what it is. I haven't stated anything other than opinion about that but it's -- I still think it's unusual.
Q Let's see here.
Then later on in the article, you say, "It seems pretty clear to me that this suit is not intended to actually prevail but to raise my costs to operate. The attorney he retained" -- referring to Mr. Apelbaum -- "is Timothy B. Hyland, the same one Hal Lambert initially used to respond to Charles Johnson's suit over the Umbra shares. Incidentally, I am told that recently that Omeed Malik and Chris

Page 180

Buskirk recently topped the little pig-faced Texan off. Maybe they really liked the Chinese MAGA ETF he was involved in."
A Right.
Q So, what's your point with making the statements in that particular paragraph?
A It looks like because I was talking to him, I attracted some of the -- you know, the heat, for lack of a better word.
The -- it is -- you know, noticing networks of foreign influence and foreign business relationships is something that's within the scope of a journalist -- of what a journalist should and certainly can do.
Q Right. But, I guess, you know, you're making -- you're making a lot of kind of wild speculation throughout this article, and I'll go through a few more examples in a second.
But, yes, I mean, looking for connections to things is one thing; but where do you draw the line between that and seeing, you know, the likeness of Jesus on your french toast?

Page 181

A Yeah. I mean, it's almost like send =ing a subpoena to CloudFlare over something I have nothing to do with.
Q Well, it's the same -- you used the same phrasing in his yours as they did in theirs.
A Uh-huh (affirmative response).
Q At any rate, so, but I'm asking you a question.
Like where do you draw the line between making these -- at what point does making these connections just become reckless?
A I think you need to think inductively when you are being hit with two legal complaints in 48 hours.
Q What does that mean?
A Consider everything.
Q Well, just because you have to consider everything doesn't mean that you have to write everything, though. Right?
And in fact, it may be that it might not be a good idea to write certain things because they might be completely reckless?

Page 182

A I offered you an amendment, and you refused to respond to it.
Q Well, I had a question there. Right?
A Whether it's reckless or not and whether it's defamatory are two different things.
Q I'm just asking you whether it's reckless.
A I don't think there's anything reckless.
Q One moment.
So, I mean, you are just pointing out the coincidence. Is that what you are saying?
You're just pointing out the coincidence of these two things happening simultaneously?
A Yeah.
Q Well, but here's the problem. So, you close out the article with these two paragraphs, first off, you say, "Moreover, the business relationships between Louvrier and sanctioned individuals, Konstantin Malofeev and Alexander Torshin, are not speculative."
A Are Malokeev and Torshin plaintiffs?
Q Hold on. I'll get that.

Page 183

"Mr. Louvrier has proposed to the Court to seize the Substack and, presumably, the New York Times, as well. Quite drastic action. Not at all unlike the type of lawfare for which the Russians have become famous in the West. I'll go ahead and publish my full conversation with him, which occurred on January 29, the same day the Israeli Yaacov Apelbaum filed his suit against me in federal court in Virginia."
So, again, it looks -- I mean, I don't know how to say this any other way. You're leading your reader to make these different conclusions that there is some sort of connection. You're not saying that this is just coincidence. You're saying there is some there, there.
A They happened on the same day. I mean, the -- yeah. I think that it is an unusual and coincidental series of events.
Q One moment.
Sorry. I misspoke. Here is where you close out the article. (Counsel publishes document.)
You said -- and this is in the final

Page 184

paragraph, you said -- "I've contacted a number of sources for legal representation, though I'm waiting to hear back, and I'm a little tapped out from the last one. Needless to say it is clear already that intelligence services of a number of countries are looking at this situation. I'm being kept just below the threshold of paid subscribers necessary to apply for the legal defense resources Substack has been shamed into starting to provide, and the domain mapping I set up on November 1 has yet to kick in. Whether that's because of the Chinese mob cash the company has taken, who's to say. But it's necessary to take on some of these fights. This is a time for choosing." What? A time for choosing what?
A I mean, do you think it's not true that professionals that look at this stuff wouldn't look at how the future director of national intelligence ended up on a no-fly list?
Q No. But that's not what I'm asking.
That's not what you're saying here.
I mean, first off, you're saying -- what you're are suggesting in the article is that there is

Page 185

a level of lawfare coordination against you, and you are expressing frustration with the fact that there is nobody reaching out to help you even though you are a persecuted journalist -- right -- and that you are standing on your principles and you're choosing to fight for truth and justice. Right?
So, my question then is: What evidence do you have that my clients are engaged in some sort of conspiracy to engage in lawfare against you?
A This meritless lawsuit.
Q Right. I said a conspiracy.
A Yeah. I mean, there are multiple people involved.
Q Yeah. But so are you saying that Mr. Apelbaum or XRVision or myself are working with Pierre Louvrier?
A I have not written that.
Q Well, in order for there to be a conspiracy, there has to be other people. You said there are other people involved.
Who are we working with?
A I've said that I got hit with complaints

from you all and Mr. Louvrier, who is believed to have Russian issues, on the same day; and Mr. Louvrier was used to apply legal scrutiny to the future director of national intelligence.

Q I'm going to jump back to Exhibit 2, which is the first article.

Here you quote from -- let's see here.

So you mentioned the CBP at several different points in the article.

Do you recall that?

A Yeah.

Q Okay. And by the way, if you feel -- if you need to refresh your recollection by looking at the exhibit more carefully, please, let me know. Okay? Is that fair?

A Yeah.

Q Okay. So, all right.

So, who is the CBP?

A Customs and Border Protection.

Q So you say in the first paragraph here, it says, "The Israelis do not want American born technology used by, for instance, CBP because they



want to sell it to us self instead they have a hand in some of the human trafficking rackets."

Now, why is the CBP relevant to Mr. Apelbaum and XRVision?

A Because he has a trademark registered with them and he does business with them and the technology that Apelbaum sells and which he's listed as a co-inventor with Mati Kochavi on is very relevant to the sort of work that the CBP does.

Q Okay. And what's your evidence that Mr. Apelbaum has a contract with the CBP?

A I don't remember where I first read that.

I think it's in the --

Q I'm sorry.

A It's in the Arizona Republic story.

Q Okay. Well, you quote it; but I'm not sure that you quote that there was a business relationship.

A Okay. It's a longer story. It can be I.P. infringement to quote too much of a story.

Yeah. It says, "entered a seven-year contract with the Department of Homeland Security to



provide the CBP with software for wearable devices for matching human face images."

Q Okay. So you took that from the Arizona Central article and you assumed that to be true, is that right?

A Yeah. And I checked and there's a trademark registered there.

Q Right. But that's different.

A That's true.

Q Okay. Right?

And how is that different?

A The trademark does not mean that they're receiving funds.

Q What's the significance of registering one's trademark with the CBP?

A That it can be enforced, I.P. enforcement.

Q Okay. So it's -- that's I.P. improvement -- enforcement, but that's different from having a contract where you're selling stuff, some sort of a service or some sort of goods or something to the CBP. Right?

A Yeah.



Q Okay. Now, so what if I told you that there is -- so what if I told you that that paragraph that you quoted from the AZ Central is false?

A I would say that you should seek a correction.

Have you sought a correction with the Arizona Republic?

Q I mean, I, personally, have not. I'm not sure if my client has or not. I feel confident that he probably has but --

A I don't really think like a regional Gannett newspaper is in the business of keeping up a claim like he got a contract, but he didn't actually get a contract. There is a lot of grey area there.

Q Well, it could -- you know, not every -- not every journalist or purported journalist is really good with doing their due diligence.

A I think you are coming after me because I don't have the resources of Gannett.

Q No. That was not -- I wasn't making a claim against you. I'm talking about the Arizona Central article author.

Page 190

I'm not saying that there was any necessarily -- I mean, there could have been -- malice on the part of this particular author, but sometimes people just make mistakes. Right?
A Uh-huh (affirmative response).
Q And that's -- and then, so, I'm not going to make any comment about whether or not the -- why the person did it.
But what is clear is there no contract with the CBP. My clients have no contract with CBP.
We do have a trademark registration with the CBP to, as you point out, enforce I.P.; but that's the extent of it.
So, now, basically, I just want to clarify, though. So your -- the sole basis for your understanding of their being a contract with the CBP is that Arizona Central article, is that correct?
A Yeah.
MR. BURNS: Okay. Okay.
I think we are nearing the end. I'd like to take maybe a 10-minute break just so that I can gather my thoughts as we head into the home stretch

Page 191

for at least for today. Okay?
THE VIDEOGRAPHER: The time is 14:17, and we are off the record.
(There was a break taken from 2:17 p.m. to 2:33 p.m.)
MR. BURNS: I'm ready to go back on.
THE VIDEOGRAPHER: The time is 14:33, and we are back on the record.
MR. BURNS: Okay.
BY MR. BURNS:
Q Now I want to go back, Mr. Bloom, to your -- you said you that offered to amend your -- the first article, is that right?
A Yes.
Q And in what way did you offer, or what was that offer?
A I offered to -- if I'm recalling the wording correctly, rather than "Israeli spy," I offered to say or to change it to state an "Israeli in the spyware business who by his own admission has done business with the intelligence agencies," in other words, bring it into line with the, as far as I

Page 192

can tell, unobjected to claims in the Arizona Republic article.
Q Okay. And when you say spyware, what do you mean?
A The term can have a broad definition, but I would argue facial recognition software is within that.
Q Okay. So, and what's the basis for your -- for that belief?
A People routinely talk about the security risks of widespread use of facial recognition.
It violates, I think, a lot of people's ordinary expectations as to the data that's being gathered about them in public places.
Those would be two reasons, I guess.
Q So, we were talking earlier about General Flynn and how he was on the board of NSO. Right?
A Yes.
Q And they're in the spyware business. Right?
A One-hundred percent.
Q And what is the spyware that they sell?

Page 193

A Oh, it's much more invasive.
Q Okay. So, they're -- actually, the spyware they sell puts applications on people's devices so that their phones can be -- can -- they can -- someone can absorb the information from the phone without the user knowing it. Right? That's just one example.
A Yeah. I think in both cases, you know, another -- another commonality would be, you know, an ordinary person using an NSO product on another person would almost always be illegal, and that's not necessarily always true with facial recognition companies.
But, you know, one of the ones that a lay member of the public could use is AnyVision, which is the major Russian facial recognition product; but in the main, in both cases the customer is governments and law enforcement.
Q Okay. But, you know, do you see how there's a substantial difference between facial recognition and surreptitiously pulling information off of somebody's device?

A I mean, they're both banned in New York.
Q All right. So I would like to direct your attention to the first -- sorry -- to Exhibit Number 2, the first article; and I'm going to pull it up here in a second.
Can you see that article again? (Counsel publishes document.)
A Yes.
Q Okay. So you quote from the Arizona Central article, and you say, "XRVision was founded in Singapore in 2015. It bills itself as a specialist in artificial intelligence technology and markets facial recognition software to governments worldwide."
A Right. That's not my words. Those are words which I'm quoting.
Q I understand. I understand. Yes.
Now, but did you make any effort to try to verify the veracity of that claim?
A Yeah. You would look at how it -- you know, how he is -- how the company markets itself; how its investors understand its value; how, you



know, when the journalist who have worked with Apelbaum, how they characterize the technology which he's using.
Q Okay. Did you do -- did you do any of that?
A Yeah.
Q Okay. So, what? You said you looked at how Apelbaum markets himself.
At the time you wrote that article, how was Mr. Apelbaum and XRVision marketing itself?
A I mean, it's watermark was all over all these conservative web sites.
Q Okay. But, I guess, the specific thing that I was directing you to was that XRVision was founded in Singapore in 2015 and it bills itself as specialist in artificial intelligence technology and markets facial recognition software to governments worldwide.
A Is there a question there?
Q Yeah. So, I mean, there's several different points that that -- there's several different things that that paragraph is stating.



Right?
It's claiming that XRVision was founded in Singapore in 2015. I guess we should just break it down by each claim. That would make sense.
So, what did you do to verify that XRVision was founded in Singapore in 2015? And when I say XRVision, I'm referring to Mr. Apelbaum's company XRVision.
A Look at what else has been written about it; looking at statements by its investors; looking at how he's characterized in -- you know, by business partners and people he's working on specific projects with.
Q Okay. Now, here's the problem.
How do you know who his investors are?
A It's very easy to hide that when it comes to VC-backed companies; but in the case of Khare he is advertising it and it's corroborated in reporting.
Q Well, how do you know? I mean, is it really corroborated in reporting or is it just merely an echoing of what Khare is himself saying?
A Yeah. I mean, you're trying to get me to



say these reporters are all wrong about Khare's involvement. I'm not really convinced of that.
Q No. That's not what I'm trying to get you to say at all.
I'm just trying to see what you did to try to verify these different things. Right?
So, for example --
A Yeah. I mean, when a tech investor is saying, "I'm investing in this company," I assume that it would be sufficiently harmful to his reputation to falsely claim something like that that, you know, that unless proven otherwise, he's telling the truth.
Q Well, I guess, proven otherwise.
I mean, but, again, you're making -- that's an assumption. Right? And you're making an assumption about somebody that you have already identified as a criminal.
But let's set that aside for a second.
How do you know that it was founded in Singapore in 2015?
A I didn't print that. The Arizona

Page 198

Republic printed that.
Q Right. But you reprinted it.
So did you do any level of due diligence so see if, in fact, it was a Singapore company that was founded in Singapore in 2015?
A No. But I'm not representing it as my words.
Q Well, but you previously -- that's not what you said earlier. Right?
You said earlier that you relied upon this as part of the basis for your statements that Mr. Apelbaum was an Israeli spy. That was one of your data points.
A No. The -- where the seven-year IDF intelligence officer incorporates his companies in the course of his post-formal employment work is not really all that relevant to that claim.
The -- now we're having a conversation about where, in fact, XRVision is incorporated, but that doesn't really seem to bear on that question.
And like, look. The -- I see it in the Arizona Republic. I quote it in the same way that

Page 199

one -- you know, conventions of blogging, you know, you can quote a couple of paragraphs, you know, with attribution and that's, you know, considered fair use -- and then on top of that, you know, checking other places that have made that claim.
Q Right. But, I guess, my point is that if you are not checking to make sure that they are, in fact, correct, then aren't you just really repeating a falsehood -- what could be a falsehood?
Basically, you're -- if you don't do a due diligence yourself, you're -- basically, you're taking a false claim and just repeating a false claim.
A Yeah. Potentially.
But it's not just them that are saying it. It's three or four publications and a VC database.
Q Well, so, here is the other thing. Right? So one thing that might undermine some of those claims is if you actually looked to find the incorporation documents for the particular company because that might tell you, hey, some of this

Page 200

reporting is incorrect. For example, Mr. Apelbaum's company is not, in fact, a Singaporean company. Right?
And so, you know, for example, here in this article you did look up the Florida limited liability company, the New Horizons Autoparts, LLC; but it appears that you did not look up to try to find Mr. Apelbaum's XRVision corporation.
A Well, the Arizona Republic piece, I believe, says based, not where is its paperwork filed.
I mean, there are plenty of U.S. companies that are incorporated in Delaware, but their substantial operations are elsewhere.
Q Well, it says -- it says that it was founded in Singapore.
A Okay. So, you know, it's possible to reincorporate in the U.S. thereafter.
Q Well, I mean, yes. Okay. I guess that's true.
But I guess my point, though, is that you didn't look into that; did you?

Page 201

A I did. I read three or four other articles and checked the VC database.
Q But you didn't actually check the source documents.
A Yeah. I mean, I think in the conventions of blogging when you -- the -- when -- reporting by a Gannett newspaper about a basic claim like that will probably be taken at face value until shown otherwise, especially when three or four other places are saying it and a VC database is.
Q Let me run through a hypothetical with you. Right?
So, I'm going to represent to there is a company called Newmont which is a gold mining company that has holdings all over the world. Right?
But in the various different countries that -- you know, including this country, it may have, who knows, half a dozen or a dozen different spinoffs or subsidiaries or whatever or similarly sounding, you know, names. There could be -- there could be Newmont Australia. There could be Newmont America. There could be Newmont LTD. There

Page 202

could be Newmont, LLC. Right? But they're not all the same company.
And sometimes those spin-off companies are totally spinoff and totally at some point sold off and no longer related to it even though they have the same name -- right -- or a similarly sounding name?
A Yeah.
Q If you were doing an article on Newmont -- on a company called Newmont that was a gold mining company, how would you verify that you had the right company -- that you were referring to, in fact, the correct company -- and not one that just sounded like it?
A I think that circumstance is different for a lot of reasons. I mean, with gold mining, you are talking about a lot of hard industry which you can touch.
You can't touch a facial recognition algorithm. It's more complicated in terms of the capital involved.
The way you talk about, you know, if

Page 203

you're on a mining controversy, the way you'd tell the story is how is -- you know, you would look at the mine, itself -- you know, who has got the lease -- and then you would look at, you know, the board room.
And so, you know, this is -- what you're telling me -- and the first time I'm hearing it is in your motion for leave to amend -- is that this guy Rajit Khare has absolutely nothing to do with the company even though for the last eight years reputable publishers are saying he does and he is representing himself that he is an investor.
Q Right. So I guess my question, though, is, again: If this were Newmont, how would you go about verifying that you had the right company? What steps would you take?
A This isn't Newmont.
This is XRVision.
Q Okay. Fine. So be it.
What steps would you take with Newmont?
A That's a hypothetical. I don't know. It depends on the company.

Page 204

Q I'm taking the example of Newmont Gold Mining Company?
A Yeah. I mean, asked and answered.
I said, you know, you check the leases. You'd look at the board room.
Q Okay. So would you check the incorporation documents?
A Not necessarily.
I mean, you'd -- especially if you're dealing with like a tiny subsidiary, what's relevant is not that. It's the company that owns that.
Q Right. But what if that subsidiary is totally owned by a completely different set of investors?
A Yeah. That's what I'm saying.
Rajit Khare is relevant.
Q Right. So, that's why I'm saying -- I guess we are talking past one another here.
So I'm asking you: Wouldn't that be a good thing to know whether or not it was a different company altogether that had a different ownership structure?

Page 205

A Yeah.
Q Great. So, Mr. Bloom, can you please -- now, you mentioned that you're going to have a supplemental production pursuant to --
A Related to the production requests which were granted in the motion to compel two weeks ago.
Q Right. Now, I would just -- I would flag for you that the deadline to produce those was yesterday.
When would -- when do you think you could have those to us?
A I was going to have it to you tomorrow.
Q Okay. All right.
And what about the second requests for production?
A I'll have a response for you about that tomorrow, as well.
Q Now, as I kind of highlighted earlier, because we haven't received those document talking about the first request for production, I'm going to have leave this deposition open and we're going to have to come back and conclude it at a later date.

So, can you -- would you please provide me your reliability over the next two or three weeks so that we can put a cap on this?

A Sure.

MR. BURNS: Okay. Thank you. We can go off the record now.

THE VIDEOGRAPHER: The time is 14:51, and we are off the record.

(In the presence of counsel, the witness requested to read and sign the deposition.)

(At 2:51 p.m., the taking of the deposition was concluded.)



DECLARATION UNDER PENALTY OF PERJURY

BEFORE: US DISTRICT COURT FOR EASTERN DISTRICT OF VA

RE: YAACOV APELBAUM, et al. V. JORDAN ARTHUR BLOOM

CASE NUMBER 1:25-CV-147-MHN-WBP

DEPONENT: JORDAN ARTHUR BLOOM

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ______________, 2025.

___________________________________

Jordan Arthur Bloom



E R R A T A S H E E T

BEFORE: US DISTRICT COURT FOR EASTERN DISTRICT OF VA

RE: YAACOV APELBAUM, et al. V. JORDAN ARTHUR BLOOM

CASE NUMBER 1:25-CV-147-MHN-WBP

DEPONENT: JORDAN ARTHUR BLOOM

Enclosed is the transcript of your deposition testimony. Please review the transcript, complete, and distribute the signed errata sheet and acknowledgement page to all parties, including this office, within 30 days. Any changes and/or corrections should be listed below and not made upon the transcript itself:

| PAGE | LINE | CHANGE OR CORRECTION | REASON THEREFORE |
|---|---|---|---|
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |
| ____ | ____ | ____________________ | ______________________ |

DATE __________ SIGNATURE________________________

Jordan Arthur Bloom



CERTIFICATE OF NOTARY PUBLIC

I, Kirk A. Sturges, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me by machine shorthand and thereafter reduced to typewriting, by myself; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Kirk A. Sturges, Notary Public for

the Commonwealth of Virginia

(Notary Registration No. 103694)

My Commission Expires:
June 30, 2029

$

**$10** 56:18
**$10,000** 69:1
**$50,000** 38:8 39:3
**$70** 159:9
**$75,000** 38:21 39:10 49:5

1

**1** 184:10
**10-9** 3:14 171:20 172:4
**10-minute** 190:21
**10/1/2025** 3:13
**10:12** 4:10
**10:14** 1:20 4:12
**11** 1:14
**11710** 1:19 4:14
**11:18** 60:6,9
**11:24** 60:9,12
**11:51** 81:21 82:2
**11:53** 82:2,5
**11th** 4:9
**12** 26:16 149:11
**12:43** 125:17,20
**12:55** 125:20,22
**13** 3:17 149:12 161:4,5
**13:22** 148:20 149:1
**13:23** 149:1,3
**13:33** 156:6
**13:34** 156:11
**13:53** 171:11,17
**14:17** 191:2
**14:33** 191:7
**14:51** 206:7
**15** 139:1
**16** 121:9
**160** 1:19 3:11
**161** 3:17
**17** 64:20 65:15 119:21
**171** 3:14
**191250** 2:6
**1980s** 93:6
**1988** 103:9
**1989** 34:7
**1:25-CV-147-MHN-WBP** 1:9 4:8
**1:33** 156:9
**1:34** 156:9
**1:53:15** 171:14
**1:53:56** 171:14

2

**2** 3:9 82:8,13 186:5 194:4
**2/18/2025** 3:16
**20** 119:21 146:19
**2011** 27:3,20
**2012-ish** 29:5
**2013** 29:5,19 118:17 119:15
**2014** 114:14
**2015** 194:11 195:15 196:3,6 197:21 198:5
**2016** 28:3,6 29:19 38:10 150:1
**2018** 28:5 31:11
**2019** 103:17
**20190-4756** 1:20
**2021** 39:17 42:9 43:13 69:6 94:18 121:3,10 137:19
**2021-ish** 33:21
**2022** 42:8,10 48:20 69:6
**2023** 42:8 68:6 74:13
**2024** 68:21 69:3,7 73:18 76:13 82:20 92:11
**2025** 1:14 4:10 138:1,4
**20s** 103:8
**20th** 44:3
**22207** 2:14
**24** 176:11
**25** 35:5 64:8
**29** 173:3 183:7
**2:17** 191:5
**2:33** 191:5
**2:51** 1:20 206:12

3

**30** 39:6
**314-329-5040** 2:8
**3315** 2:13 7:9
**35** 39:6

4

**4** 3:11 160:3,4
**40** 79:17 92:1
**401K** 157:4
**48** 176:11 181:14

5

**5** 3:5
**571-317-9823** 2:15

6

**6** 87:5
**60** 104:3 110:6
**60s** 20:10
**63119** 2:7

7

**75** 62:11
**75,000** 39:15
**750** 41:6

8

**82** 3:9
**85,000** 39:15
**850** 41:6

9

**9/22/2025** 3:19
**9th** 34:7

A

**A-OK-OK** 167:8
**a.m.** 1:20 4:10,12 60:9 82:2
**ability** 170:20
**absolute** 114:2
**absolutely** 203:9
**absorb** 193:5
**academia** 26:2
**accept** 54:1 167:12 175:11
**accepted** 167:3
**accepting** 52:21
**access** 71:19
**accompanied** 5:14
**accuracy** 166:11
**accurate** 15:17 57:21 67:14 142:17 146:1
**accusation** 86:4
**accusations** 52:4
**accused** 64:4,12 72:16 83:16 176:18
**accusing** 64:1 89:17 92:10,14 133:18
**acknowledged** 104:4
**acquaintance** 16:7
**acquiring** 174:10
**acquisition** 175:12
**act** 48:3 73:3 89:18
**acted** 114:1
**acting** 100:3
**action** 61:5 64:14 179:6 183:3
**action.'** 172:19
**actions** 102:14,15, 18 117:15 172:21
**active** 81:9 119:19, 20
**actively** 92:10,14
**activities** 20:2 88:9 92:21 162:11
**activity** 96:8
**actor** 81:10
**actors** 22:9 178:19
**acts** 86:4,5,22 91:2
**actual** 76:5 143:11
**add** 78:4 167:19 168:4 175:4
**added** 58:1 160:21 162:1
**adding** 83:17
**additional** 9:7
**address** 7:8 143:11 153:22 156:4
**adjustment** 167:1
**ADL** 25:2

**administered** 5:8
**administration** 62:16 93:22 114:2
**admissibility** 6:20
**admission** 127:13 144:21 167:7 191:20
**adult** 71:16
**adversarial** 31:8
**advertised** 75:7 76:15
**advertising** 196:18
**advice** 88:14
**advise** 88:7
**advocated** 63:12
**affiliated** 140:10
**affirmative** 50:8 53:17 125:4 181:6 190:5
**afield** 96:18 120:9
**afraid** 111:19,22
**Age** 42:2,6 43:17 48:19 49:9 51:5 53:6 54:8,11,14 59:9,17 60:22 61:20,22 68:5,12
**agencies** 73:12 78:22 83:15 98:5 104:5 109:8 110:3 127:14 144:8 151:21 167:8 191:21
**agency** 103:19 106:8
**Agent** 158:20
**aggregating** 46:19
**AGL** 57:22
**agnostic** 151:7
**agree** 25:18 54:10
**agreement** 49:14, 19 50:1,9 54:7,12
**agreements** 53:12,14,15,21 54:2
**ahead** 26:6 59:1 156:18 183:5
**Alexander** 182:19
**Alexandria** 1:3 4:7
**algorithm** 202:20
**aligned** 177:19 178:2
**allegation** 144:6
**allegations** 129:1
**alleged** 164:11 174:7
**allegedly** 174:11
**alleging** 129:3 173:2
**allowed** 6:19 23:6 69:11 174:16
**alongside** 93:9
**alright** 115:10
**alternative** 91:6
**altogether** 204:21
**alumni** 107:10
**amassing** 14:3
**amend** 167:18 191:12 203:8
**amended** 168:4
**amending** 168:6
**amendment** 6:17 167:12 182:1
**America** 1:19 4:14 72:17 201:22
**American** 11:6 13:5 20:9 23:3,5 25:21 28:17,21 29:8,15,20 32:20 33:17 34:2,9 36:3, 13 37:2 38:2 39:2, 11,18 40:7 41:21 44:7,18 61:15 71:12 84:18,20,22 85:3,17 88:6 89:14,19 92:2 110:9 111:3 114:5 118:17,19 126:15, 19 144:7 151:21 175:22 186:21
**American-born** 89:22
**Americans** 72:11 85:6,13 92:15 109:13 110:8 136:16 137:2,4
**analysis** 48:9
**analytics** 132:19
**analyze** 65:19,22
**analyzing** 93:11
**angle** 19:18
**angrily** 126:11
**animals** 123:22
**annual** 38:7,19
**annually** 39:12
**answering** 8:5
**answers** 6:11 8:11
**antidefamation** 24:18
**anymore** 80:21
**Anyvision** 193:15
**apartment** 40:16, 17
**Apelbaum** 1:5 3:9, 11 4:5 5:1 73:22 74:4 75:1 78:13,20 80:2 82:22 86:20 87:13 88:21 89:12 90:7,13 91:9 92:6, 18 95:9,15,20 102:11 103:3,6 104:3 105:16 106:15 107:19 108:10 110:13 111:8 113:14 115:11 116:2,10,21 117:1 118:11,13,14, 16 121:2 122:21 126:19 128:21 130:13,19,22 131:1, 2,5,9,12 132:2 133:15,21 144:6 145:2,22 147:14 161:21 165:19,22 166:3,7 167:4 168:12 170:10,17, 19 171:4 173:1 177:1 179:19 183:8 185:15 187:4,7,11 195:2,8,10 198:12
**Apelbaum's** 78:8 96:8 103:11 117:8 120:17 127:3 130:15 131:18 146:10 170:9 176:17 196:7 200:1, 8
**appears** 150:22 200:7
**Appin** 163:8,17
**applications** 193:3
**applied** 115:21
**apply** 53:19 184:7 186:3
**appreciated** 23:9
**approach** 45:22 94:1
**approximately** 38:6
**arc** 44:11
**archive** 11:18 23:12 48:4
**archives** 47:6
**area** 50:14 71:8 150:6 158:12 189:14
**areas** 51:16 58:20 132:22
**argue** 19:17 58:6, 20 64:14 136:14 192:6
**argument** 112:9 175:11
**Aristotle** 51:18
**Arizona** 75:16 77:20 78:19 79:8 83:14 105:8 113:7 127:7,18 131:6 134:5 187:15 188:3 189:7,21 190:17 192:1 194:9 197:22 198:22 200:9
**Arlington** 2:14 10:14 20:10 35:18 64:20 158:9,12
**army** 19:22 20:2 107:15 110:2
**army's** 110:3
**Arthur** 1:10,16 2:12 3:2 4:4 5:6 7:6
**arthuriana89@ gmail.com** 2:16
**article** 59:16 72:22 73:17 74:3,18,21 75:16 80:15 82:16, 21 83:14 86:12 88:20,21 89:10 98:10,16 99:20 100:20 102:7,9 105:15 113:7,11 114:12 115:16 120:20 126:7 127:2 128:5 129:2,5 133:6 135:21 144:4,20 146:12,17 159:19, 21 160:1,18 167:2 172:1,9,10 173:7 179:15 180:17 182:16 183:21 184:22 186:6,9 188:4 189:22 190:17 191:13 192:2 194:4,6,10 195:9 200:5 202:9
**articles** 51:4 83:22 84:1 94:18 121:5 128:13 137:21 165:12 170:1 171:2 172:7 201:2
**artificial** 194:12 195:16
**aspects** 72:1
**aspire** 148:11
**assailant** 64:5,13
**assault** 34:18 35:3, 13
**assessment** 133:5 135:2
**assist** 21:4
**associates** 103:12

176:18
**association** 133:14 168:8,9
**assume** 9:18 67:7 143:11 170:12,14, 15 197:9
**assumed** 77:13 78:3,5,15 79:7 188:4
**assuming** 170:10 171:5
**assumption** 69:17 197:16,17
**assumptions** 67:5 79:4 100:18 144:22 169:5 171:7
**ATTACHED** 3:22
**attacking** 81:12
**attempt** 141:17
**attempted** 35:5 58:18
**attempts** 52:3
**attended** 27:5
**attending** 5:13
**attention** 160:9 194:3
**attorney** 5:15,22 179:18
**attorney-client** 6:16
**attracted** 180:8
**attribution** 199:3
**audience** 84:5 123:11
**AUDIO-VISUAL** 1:15
**Australia** 201:21
**authentic** 97:19
**authenticate** 97:2, 22
**authenticating** 93:8
**authentication** 81:12 96:14 98:22
**author** 161:11 172:14 189:22 190:3
**authoritative** 45:13 97:18
**autoparts** 121:15, 19 122:1 123:16,17 124:15,17 200:6
**average** 45:4 66:2 84:2 88:1 102:10 121:20
**aviation** 70:15
**aviator** 70:12 71:22
**aware** 9:2,9 26:5 135:22 153:16 159:8
**AWOL** 19:21
**AZ** 103:2,10 105:15 189:3

**B**

**B-U-R-T-K-A** 55:3
**Bachelor's** 10:16
**back** 17:10 20:11 29:15 31:4,14 33:15,17 34:19 38:19 47:3 59:2 60:10,13 73:18 82:3,6 88:14 90:5 119:15 126:1 149:2, 4 156:10,12 168:19 171:15,18 172:12 174:13 184:3 186:5 191:6,8,11 205:22
**backed** 117:14 162:11
**background** 10:12 74:5 79:1 104:6 143:5 146:8
**bad** 41:17
**badly** 115:11 143:18
**balloon** 123:22
**ballpark** 12:4 149:21
**banned** 194:1
**Barely** 138:9
**barrel** 59:14
**Bart** 95:22
**baseball** 84:19,20
**based** 11:17 20:10 75:8 76:16 78:15,17 96:5 102:8 120:15 128:10 136:5 137:10 152:12 200:10
**bases** 133:20 134:11
**basic** 5:16 6:2 201:7
**basically** 24:4 78:3 115:21 190:14 199:10,11
**basis** 53:2 63:20,22 72:10 75:12,19 76:18 77:20 78:17 80:5,10 90:18 101:4 113:5 136:13 164:18,21 165:8 167:20 175:18 190:15 192:8 198:11
**Batchelor's** 10:15
**Beach** 57:14
**bear** 52:17 57:7 198:20
**Beast** 163:12
**beat** 56:4
**begin** 43:11
**beginning** 4:20 114:1 166:21
**begins** 4:3
**behalf** 2:3,11 4:16, 18 14:21 81:10 85:17 86:18,21 90:9,19 91:12 92:2, 11,14 93:12 95:15 97:6,7 101:15 102:12 112:10
117:2,12 120:6 128:21 169:14
**behavior** 161:20
**behest** 178:9
**belief** 62:12 133:20 192:9
**believed** 186:1
**belong** 25:14
**beneficial** 147:11
**benefit** 17:21 147:16
**Benjamin** 113:18
**Bible** 139:16
**Biden** 3:10 74:12 75:4 78:14 82:22 83:19 87:7,9 93:8, 12,17,18,21 94:13, 20 95:10,18 96:7,9 111:2 116:11 126:11 130:5
**Biden's** 96:16
**big** 15:1 36:1 45:11, 12 46:10 47:9 106:8
**bigger** 24:5
**billion** 177:7
**bills** 194:11 195:15
**biometric** 75:17 77:7 127:17 131:6 165:13 168:17 170:5
**birth** 34:6
**birthday** 158:10
**bit** 11:2,10 16:12 25:8 28:7 39:5 46:4 55:8,18 56:8 85:11 177:16
**Black** 45:6
**blacklisted** 69:11, 13 71:11
**blanche** 114:3
**blessed** 147:5
**block** 42:16
**blog** 136:19 140:3, 6,11 172:22 177:15
**bloggers** 148:9
**blogging** 199:1 201:6
**bloom** 1:10,16 2:12 3:2,8 4:4,5 5:6,12 7:6 10:11 60:16 82:8,11 126:6 156:15 159:19 160:4,10 161:5,9 171:20 172:1 191:11 205:2
**board** 136:1,8 143:8 160:17,20 161:22 165:6,18 167:21 168:11 192:17 203:4 204:5
**boat** 36:3
**Bob** 116:3,9
**bombing** 121:14
**Bond** 172:14
**book** 42:17,19 43:3,5 44:22 45:13 46:16 139:15
**book-length** 43:6
**books** 12:10 44:1,6 51:6
**Border** 103:19 186:19
**born** 81:5 92:10 118:2 186:21
**boss** 31:1 54:15
**bosses** 31:3
**boundary** 165:11
**bounds** 81:16 83:8 89:7 91:20
**bow** 96:4
**Box** 2:6
**Brandywine** 2:13 7:9
**break** 9:22 10:4 60:4,8 82:1 125:15, 19 148:22 156:8 171:13 190:21

191:4 196:3
**bridges** 22:21
**briefly** 174:10
**Bright** 95:22
**bring** 48:21 120:10 191:22
**bringing** 100:2,6, 10 136:10
**British** 24:14
**broad** 6:22 160:13 192:5
**broadcaster** 159:7
**broader** 17:13,14
**brought** 10:8
**Brown** 47:17
**brownstone** 41:1
**build** 22:21
**Building** 121:13 122:14
**built** 11:16,18 23:10,16
**Bulgaria** 177:14
**Bulgarian** 174:10 175:12
**bulk** 70:9
**bullied** 164:10
**bullies** 164:9
**bullying** 22:5 163:10 164:14
**Buma** 113:15 151:10 158:20 159:7
**bump** 39:14
**bunch** 46:2
**Bundy's** 56:19
**burdensome** 160:13
**Burns** 2:4,5 3:5 4:22 5:11 60:3,10, 14,15 81:18 82:3,7, 10 125:14,21 126:2, 3 148:17 149:2,5,6 156:1,10,13,14 160:3,6,8 161:7 171:15,19,22 190:19 191:6,9,10 206:5
**Burtka** 55:3
**bus** 114:9
**business** 16:15,18 85:2 95:3 103:11 105:13 108:7 117:13 118:20 119:2,5,16 120:3 121:4,8 122:2,3,21 124:21 127:6,8,13 129:22 135:1,6 146:6 156:17 157:5 158:21 165:3 166:2 167:6,7 168:10 170:14 171:3 180:11 182:17 187:6,17 189:12 191:20,21 192:19 196:11
**businesses** 123:3 165:15
**businessman** 84:22 86:2
**Buskirk** 180:1

**C**

**call** 66:14 73:7 83:9 86:9,11 110:2,9,13 137:10 153:3 167:5
**called** 1:17 5:7 32:20 64:8 78:17 97:2 127:17,18,20, 21 146:4 147:7 163:17 201:14 202:10
**Caller** 28:15,16,19 29:13 30:1 31:15 33:15 36:13 37:2,14 38:11,19 39:9 40:6 65:10
**calling** 35:7,16 91:14
**calls** 142:8
**camera** 4:17
**cap** 76:21 77:9,15 128:15,17 206:3
**capacity** 22:11 67:6 70:18 96:11
**capital** 202:21
**care** 34:11 155:10
**career** 19:22 63:3 70:10,15
**careful** 137:11
**carefully** 186:14
**Carlson** 30:2 65:10,11
**carpet** 147:2
**carried** 135:13
**carry** 52:12 55:14
**carrying** 176:18 178:4,8,16
**cart** 114:3
**cartels** 62:20
**case** 1:9 3:12 4:7 8:14 20:7,15 24:8 35:11 43:9 44:5 45:16 46:18,19 56:16 58:10 64:12, 20,22 65:5 76:14 77:19 87:7 115:10 131:11 153:13 155:13 157:12,15 176:9 196:17
**case-by-case** 53:2
**cases** 90:4 193:8, 17
**cash** 184:11
**categories** 19:9
**category** 142:7
**Catholic** 25:14
**caused** 56:20,21 57:12 59:4
**caveat** 10:2
**CBP** 90:1 116:15 186:8,18,22 187:3, 9,11 188:1,15,21 190:10,12,16
**CDI** 121:12 122:13, 14 124:21,22
**CDI's** 121:11
**cease** 15:18 62:1 63:20,22
**center** 26:8 68:16
**central** 88:10,12 103:2,10 105:15 188:4 189:3,22 190:17 194:10
**century** 44:3
**change** 85:11 130:12 133:5 135:2 191:19
**characterization** 73:7 77:8 81:17 83:9 89:7 91:1,2,21 101:16 109:10 113:6
**characterize** 106:1 136:19 195:2
**characterized** 77:1 81:16 89:6 91:20 99:16 127:5,9 196:11
**characterizes** 162:2
**characterizing** 99:13
**charge** 58:18 173:13,17 176:6
**charged** 176:3,6
**charges** 35:14 57:13 175:20
**Charles** 17:5 149:8 152:3,20 157:6 179:20
**check** 48:13 66:7, 11 77:10 131:19 143:10 201:3 204:4, 6
**checked** 188:6 201:2
**checking** 199:4,7
**checks** 48:15
**chief** 87:11 88:13 93:18
**child** 120:16
**childhood** 7:18
**China** 135:16
**Chinese** 180:2 184:11
**choice** 60:1
**choose** 57:3
**choosing** 184:14 185:5
**Chris** 179:22
**Christian** 25:13
**CHS** 14:3,5 16:9, 19,21 17:5 152:6
**church** 25:14
**CIA** 86:9
**Circuit** 64:20
**circulating** 67:13
**circulation** 73:10
**circumstance** 114:18 202:15
**circumstances** 110:19,20 160:15
**circumstantial** 151:1
**citizen** 58:4 101:9 118:18,19 126:13, 20 127:1
**citizenship** 118:17 127:4 135:14
**City** 121:14
**claim** 66:21 132:18 135:16 140:21 141:2,10,12 189:13, 21 194:19 196:4 197:11 198:17 199:5,12,13 201:7
**claimed** 58:3 80:3 98:20 113:14 134:5
**claiming** 133:9 134:16 196:2

**claims** 90:6 97:18 101:18,21,22 128:8 129:21 141:1 144:19 192:1 199:20
**clandestinely** 88:17
**clarify** 9:15 190:15
**classified** 71:19 72:2,7 73:5,16 79:15
**classified/ unclassified** 106:3
**cleaned** 121:13
**cleaning** 122:13
**clear** 19:18 179:16 184:4 190:9
**clemency** 62:14
**client** 189:9
**clients** 135:7,9 163:21 185:8 190:10
**clip** 4:3
**close** 8:13 23:17 44:22 123:3 139:21 182:16 183:21
**closed** 122:22
**closes** 122:3
**closest** 103:11
**Cloudflare** 153:14 181:2
**co-founder** 75:9
**co-inventor** 187:8
**co-inventors** 135:11
**co-owned** 134:2
**code** 27:12 151:9
**coffee** 158:10
**coincidence** 172:18 177:12 179:5,6 182:11,12 183:14
**coincidental** 183:18
**COINTELPRO** 45:3
**collaborated** 94:19
**collaborating** 72:5
**collaboration** 71:5
**Collapses** 3:12
**colleagues** 139:21
**collection** 11:16 47:17 62:19
**college** 10:16 27:3 37:9 149:12
**columns** 32:6,17
**combat** 108:10 109:4
**comment** 74:9 143:1 170:9 190:7
**committed** 91:3 123:7
**Committee** 151:11 152:9
**committing** 86:4,5
**common** 18:17 24:10 31:6
**commonality** 193:9
**Commonwealth** 1:22
**communicate** 30:21
**communication** 33:5
**communications** 27:9 33:7 157:22
**communist** 20:3
**community** 24:11 65:14 85:10 88:6 93:1 109:9 110:4
**companies** 76:21 77:7,18 107:12 108:6 120:3 130:7 131:16 132:7 193:13 196:17 198:15 200:13 202:3
**company** 74:5 75:7,8 76:16,22 77:18 78:8,11,15,16 79:3 89:15 103:17 119:2,6,7,12 121:5, 6,9,12 122:10 123:16,18 124:3 127:16 128:14 130:19 131:2,18 132:2,3,4,13,15 133:12,17 134:1 136:4 141:4 145:14 146:3,15 162:3 163:17 168:13 174:10 184:12 194:21 196:8 197:9 198:4 199:21 200:2, 6 201:14 202:2,10, 11,12,13 203:10,15, 22 204:2,11,21
**compel** 205:6
**compensated** 32:17
**competitor** 89:16
**complaint** 64:3 160:15 167:19 168:4 173:10 175:21
**complaints** 164:3 165:1 171:1 176:12 179:7 181:13 185:22
**complete** 9:6
**completed** 10:15
**completely** 181:22 204:13
**complex** 121:12 122:15 124:18
**complicated** 202:20
**component** 22:7
**components** 88:3
**compromise** 136:15 137:3
**concede** 167:13
**concerned** 13:22 22:13 62:10 84:3 151:2
**concerns** 162:5
**conclude** 121:21 205:22
**concluded** 206:13
**conclusion** 34:13 78:1 125:8
**conclusions** 183:12
**condo** 121:12 122:15 124:18
**conduct** 22:21 94:7
**conducted** 1:20
**conference** 174:2, 3
**conferences** 27:6
**confident** 189:9
**confidential** 14:6 150:4,12,19 151:13 153:10
**confirmation** 87:12 175:17
**conflict** 25:4 55:15 64:18 110:8
**connection** 62:2 65:11 134:18 143:14 146:21 176:8 183:13
**connections** 144:12 180:19 181:11
**conscription** 118:4,6
**conservative** 28:17,22 29:8,16,20 33:17 34:2,9 36:3, 14 37:3 38:3 39:2, 12,18 40:7 41:22 44:18 51:2 61:15 114:16 115:1,12 116:21 117:3 147:7 195:12
**considered** 109:8 110:4 199:3
**consist** 39:20 87:18,21
**consistent** 51:1 64:15 117:16 161:20 178:6
**conspiracy** 185:9, 11,19
**Consult** 141:22
**consulting** 70:6,7
**consummated** 174:9
**contact** 130:2 145:22
**contacted** 184:1
**contention** 86:16, 18 125:6
**contentious** 143:3
**context** 22:3,16 111:20 175:16
**continents** 172:22
**continue** 89:20
**continues** 120:22
**contract** 50:2 67:17 103:17 187:11,22 188:19 189:13,14 190:9,10, 16
**contracting** 104:4 115:14
**contractors** 144:12
**contributed** 95:20
**contribution** 45:15
**control** 18:18 101:1 113:17
**controversial** 45:9,11 50:15 51:16 62:7
**controversy** 203:1
**conventions** 199:1 201:5

**conversation** 23:11 150:7 175:3 183:6 198:18

**convinced** 197:2

**cooperation** 70:21,22

**coordination** 176:22 185:1

**copies** 53:20

**corporate** 132:6 163:20

**corporation** 78:12 130:18 200:8

**corporations** 169:15

**corpus** 94:13

**correct** 28:9 36:8, 21 67:7 68:13 70:17 76:11 108:17 138:3 139:2 147:19 150:14 157:3 168:16 190:17 199:8 202:13

**correction** 148:1,5 167:14 189:5,6

**correctly** 191:18

**correspondence** 12:10

**corroborated** 196:18,20

**corroboration** 141:9,13,14

**corruption** 152:7

**costly** 65:2

**costs** 57:8 179:17

**counsel** 1:17 3:3 4:19 5:10 103:4 126:5 160:6 166:16 172:2 183:21 194:6 206:9

**counterinformantism** 15:12

**counterintelligence** 19:18

**counterproductive** 84:12

**countries** 184:5 201:16

**country** 20:3 47:18 101:10 109:6 201:17

**county** 143:8

**couple** 23:7,10 24:8,12 34:12 91:18 94:2 106:17 115:3 128:12 137:21 151:1 162:1 168:1 176:15 199:2

**courageous** 46:13

**courses** 27:8

**court** 1:1 4:6,15 5:3 6:8 53:16 64:21 67:17 82:12 97:5 160:19 161:2,13 173:12,16 176:5 183:1,8

**courtroom** 35:7

**cover** 61:11,12 63:1

**covered** 32:14 35:3 158:21

**covering** 61:16 64:16

**covers** 77:7

**create** 12:7

**crime** 58:17 123:7 162:9

**crimes** 57:18

**criminal** 57:13 58:4 64:4 164:2,3,22 165:1 169:11,12 171:1 175:20 176:2 197:18

**criminally** 173:12, 16 176:3

**critical** 162:13

**cross** 25:10

**crowds** 87:4

**Cuba** 19:22

**current** 7:7 51:15 173:15

**customer** 193:17

**Customs** 103:19 186:19

**cutout** 118:20

**cutouts** 117:14

**cyber** 111:1

**D**

**D.C.** 31:7,14 40:8, 10 44:11 150:6

**Daily** 28:15,16,19 29:13 30:1 31:15 33:15 36:12 37:2,13 38:11,19 39:9 40:6 65:9 163:12

**Dan** 54:16

**data** 67:3,7,13 72:20 192:13 198:13

**database** 141:4 199:17 201:2,10

**databases** 76:20 77:16

**date** 4:9 34:5 121:10 122:4 137:16 138:4 205:22

**dated** 119:14,15 173:3

**dates** 42:7

**day** 9:6 63:6 172:11,21 173:4 183:7,16 186:2

**daylight** 114:16,17

**days** 14:20 32:5 62:15 164:19

**Daytona** 57:14

**dead** 47:11

**deadline** 205:8

**deal** 35:9 41:6,16 52:5

**dealing** 114:22 144:11 204:10

**dealings** 124:21

**deals** 62:19

**December** 28:5 121:9

**decided** 42:3 59:17,21

**declining** 104:7

**deduce** 104:21 152:12

**deducing** 102:21

**deep** 164:20

**deeply** 75:3

**defamation** 34:17 56:18 59:14,16 64:1 65:8 111:20 112:16 173:4 176:1

**defamatory** 76:2 112:6,8 125:6,13 128:9 133:17 168:7 182:5

**defamed** 173:3

**defaming** 175:7

**defend** 57:4,5

**defendant** 1:11 2:11 58:2,5 155:14 162:8

**Defendant's** 162:5

**defending** 65:4

**defense** 70:8,15, 21,22 71:5,16 72:5 79:1 92:7 104:5 106:3,7 134:21 148:15 184:8

**define** 21:17 65:13 83:5 84:16

**defined** 65:16

**definition** 22:1 107:16 192:5

**definitive** 101:22 134:20

**degree** 12:1,5,7 13:4,5,8 19:10 20:20 22:8,14 23:4, 5 26:13 111:1

**degrees** 10:19,20 11:3 12:6 26:11

**Delaware** 200:13

**deliberate** 123:10

**deliberately** 163:4

**delta** 35:21

**democrats** 94:3

**demolishing** 121:11 122:14 124:17

**department** 26:5 70:14 71:16 103:18 106:3,7 187:22

**depending** 32:12

**depends** 107:1 109:20 110:11,16 140:21 141:2,10 148:2 203:22

**deposition** 1:15 4:3,13,21 5:18 6:10, 22 8:9 9:5,11 10:10 82:8 133:4 160:4 161:5 171:20 205:21 206:11,13

**depositions** 5:17 6:19

**deputy** 32:1

**derive** 91:6

**describe** 137:6

**describes** 102:14

**describing** 60:20 76:4,5,6

**description** 3:8 61:3

**desist** 62:1 63:20 64:1

**destabilize** 45:5

**destroy** 18:18

**detail** 55:8 157:16

**details** 110:17 151:1 152:8
**determine** 66:4,5 169:5
**develop** 47:3
**device** 193:22
**devices** 103:20 188:1 193:4
**DIA** 86:10
**died** 23:10
**difference** 52:19 79:21 106:6 107:18 112:16,19 193:20
**difficult** 51:22 69:17
**digital** 33:6 68:16
**diligence** 35:17 124:2 128:13 189:17 198:3 199:11
**direct** 56:6 160:9 194:2
**directing** 195:14
**direction** 44:16 93:20 113:13 176:16
**directly** 94:17
**director** 55:1 173:22 175:17 184:17 186:4
**dirty** 18:13
**disagreement** 114:20
**disappear** 15:18
**disappointed** 18:13
**disclose** 153:9,12
**disclosed** 153:20, 21
**disclosure** 48:6
**discoverability** 6:21
**discovery** 9:8 162:6
**discussed** 158:2
**discussing** 144:5
**dismissed** 65:1
**disparaging** 54:8
**dispute** 129:6 167:10
**disputed** 170:19
**disputing** 145:7
**disseminating** 97:9
**dissolved** 121:9
**distinction** 90:22
**distress** 60:18 61:1,4
**District** 1:1,2 4:6 173:2
**diverge** 114:19
**division** 1:3 4:7 107:12
**divisions** 106:13
**divulge** 111:16 112:1
**DM** 33:11
**document** 67:17 103:4,15 124:8 126:5 160:7 161:8 172:2 183:21 194:7 205:19
**documentary** 25:1,2
**documentation** 48:16
**documents** 8:8 9:7 10:8 66:8 101:7 152:14 199:21 201:4 204:7
**Dod** 70:11
**dog** 143:9,12,13 155:15
**dogs** 143:16
**dollars** 138:6 157:4
**domain** 184:9
**domestic** 23:14
**dozen** 159:4 201:18
**dozens** 95:17
**drama** 3:10 35:7 82:22
**drastic** 183:3
**draw** 180:20 181:9
**drawing** 58:11
**Drive** 1:19 4:14
**driving** 59:6,7 98:13 143:16
**drove** 87:10
**drug** 62:20
**dual** 12:5,7 27:22 126:13,16
**due** 35:16 124:1 128:13 189:17 198:3 199:11
**duties** 52:16
**duty** 92:7,8
**dynamic** 18:9

**E**

**e-discovery** 162:6
**earlier** 21:10 192:16 198:9,10 205:18
**early** 42:8 94:18
**earn** 68:21
**earned** 68:20 138:5
**earning** 49:4
**earth** 177:7
**easier** 6:7
**easily** 12:16
**East** 101:14
**eastern** 1:2 4:6,11, 12 173:2
**easy** 196:16
**echoing** 196:21
**economic** 89:2
**economy** 13:19 15:16 17:15,22 18:5 24:6
**edge** 114:14
**editing** 49:1
**editor** 29:16 32:1 34:3 54:16 139:17 142:10
**Editorial** 29:9
**education** 19:3
**educational** 10:11 51:13 55:16
**effect** 168:21
**effective** 162:12
**effort** 84:4 194:18
**elaborate** 55:8 104:8 148:3
**election** 150:1
**electronic** 157:21
**eliminated** 134:10
**email** 30:16 33:2,3, 10 153:18,22
**emailed** 46:7
**emails** 33:3
**embroiled** 139:5
**employable** 12:16
**employed** 26:3 69:20 70:3 140:5
**employment** 12:19 13:2 49:22 54:11 138:2 140:8 198:16
**encouraging** 51:17
**end** 8:20 9:3,4 48:20 57:16 60:22 103:16 107:12 190:20
**endeavors** 116:18
**ended** 184:18
**enemy** 172:19 179:6
**enforce** 190:12
**enforced** 188:16
**enforcement** 14:10,15 15:1 26:4, 9 188:16,18 193:18
**engage** 15:12 157:5 185:9
**engaged** 86:3 87:2 91:17 185:8
**engaging** 19:4 81:9 85:16 87:1 89:18
**engineering** 22:18,19,20
**entered** 103:17 187:21
**entertainment** 26:21
**entire** 71:16
**entity** 50:12 132:6
**environment** 36:16
**ephemera** 23:12
**Ernie** 48:3
**error** 147:22 148:2
**espionage** 19:5,11 22:8 81:10 85:17 86:3 87:16 88:3,22
**ESQ** 2:4
**et al** 4:5
**ETF** 180:2
**Ethan** 154:1
**ethics** 27:9,12
**event** 123:5 174:21
**events** 51:15 122:22 134:19 183:18
**evidence** 94:10 104:3 105:17,18 117:11 127:7

177:18 185:7 187:10

**Evident** 2:20

**evince** 89:2

**exact** 137:16

**examination** 1:17 3:3 5:10

**examined** 5:8

**examples** 15:2 24:16 55:19 180:18

**exceedingly** 169:6

**exception** 32:7

**exchange** 54:4,7

**exchanged** 149:22

**exclusive** 73:8

**executive** 55:1

**exercise** 143:16

**exhibit** 3:21 82:8, 13,14 148:19 160:3, 4 161:1,4,5 171:9, 20 172:4,6 173:5 186:5,14 194:3

**EXHIBITS** 3:22

**exist** 134:15

**exists** 132:7

**expect** 31:3 46:22

**expectations** 18:11 192:13

**experience** 19:2

**expert** 107:3 132:22

**expertise** 97:19

**expires** 173:5

**explain** 92:17 162:12

**explicit** 88:5

**expressed** 23:17 150:5,7

**expressing** 104:12 114:13 185:2

**extant** 135:3

**extensive** 107:8

**extent** 17:1 93:16, 18 102:13 190:13

**extinct** 124:3

**extremism** 13:19 18:8,15 19:3 34:19 45:2 58:7,9

**extremist** 11:7,9 13:2,3 18:7,16 20:1 23:3,15 50:20 58:1 152:22

**extremists** 12:3 153:3

**eye** 8:13 13:10

**F**

**fabrications** 134:6

**face** 103:20 128:11 188:2 201:8

**faced** 66:13

**facial** 73:13 75:6,7 76:15 78:16 89:14, 19 132:19 192:6,11 193:12,16,20 194:13 195:17 202:19

**facing** 30:18 31:2,4 57:13 59:13 65:7

**fact** 9:4 52:2 71:7 78:8 104:15 128:2 142:3 147:16 168:11 176:14,17 181:20 185:2 198:4, 19 199:8 200:2 202:13

**fact-checker** 140:13

**fact-checking** 140:15,19 148:15

**factor** 57:10

**facts** 160:15 166:20

**factual** 76:6 141:1, 2 144:19

**fails** 126:9

**fair** 9:20 12:21,22 17:16,17 36:4,7 59:19 61:2,3 67:1, 14 71:17,20 72:2 77:14 78:18 84:13 85:18 88:18 92:9 94:10,13,16,21 98:12 105:20 110:9 126:20 128:17 129:2 136:5,18 137:5 186:15 199:3

**fairly** 14:20 55:11 57:6

**faked** 79:8

**false** 19:1 148:7 168:22 170:12 189:3 199:12

**falsehood** 199:9

**falsely** 197:11

**familiar** 27:11

**familiarity** 41:9

**family** 7:13 56:6 81:13 91:19 138:12

**famous** 183:5

**famously** 46:8,13 172:17

**fast-and-furious** 62:13

**father** 7:15 69:20 71:1,10,15 72:10, 11,16 79:13,14 84:22 85:6 91:22 92:14 118:5,8 120:2

**FBI** 17:8 20:12 45:5 150:4,13,17 152:6 153:6

**federal** 108:7 183:8

**feel** 29:11 57:3 131:11 186:12 189:9

**feeling** 46:10

**field** 25:18 132:14

**fight** 57:2 155:16 185:6

**fighter** 72:1

**fighting** 57:9 64:20

**fights** 184:13

**figure** 174:19

**figures** 24:21 105:13

**filed** 154:20 155:20 172:22 173:1 183:8 200:11

**files** 46:22 66:1 74:12 75:4 83:19 93:8,17 97:19,22 164:4

**filing** 160:20 161:2, 13

**filings** 97:5 170:15

**fill** 42:12

**final** 126:6,7 183:22

**finally** 153:7

**find** 16:9 24:13 69:17 145:17 159:16 199:20 200:8

**finding** 24:2 67:21

**findings** 43:10 94:15

**Fine** 203:19

**finger** 104:19

**firearms** 58:11

**fired** 31:9 153:7

**firm** 169:7 170:4

**firm's** 131:10 165:10

**five-minute** 125:15

**flag** 9:1 205:7

**flee** 19:22 20:3

**Fleming** 172:13,17

**flipped** 175:1

**Florida** 121:6,8 122:3,22 200:5

**fluctuated** 41:19

**fluent** 71:3

**Flynn** 113:14,18 114:9 115:2 135:20, 22 136:8,13 137:9 192:17

**FOIA** 47:1 48:4

**follow** 139:14

**folly** 52:22

**food** 138:10

**foolish** 52:18

**footage** 87:3

**for-profit** 31:21,22

**force** 92:7 117:8

**forces** 79:1

**foreign** 71:1 103:12 115:20 118:13 144:12 178:6 180:11

**formal** 14:3 26:11

**Fort** 158:7

**Forty** 117:21

**forward** 50:16 87:10 175:13

**found** 74:12 101:2

**foundation** 32:13

**founded** 194:10 195:15 196:2,6 197:20 198:5 200:16

**framed** 178:5

**frameworks** 50:17

**Francis** 25:11

**frankly** 130:20

**free** 32:16

**Freedom** 48:2

**french** 180:22

**fret** 67:9

**friendly** 152:4

**friends** 117:15 139:22 152:3

**front** 8:2 100:13 112:4 175:14

**frustration** 23:18 185:2
**full** 7:4 43:18 55:2 75:19 153:20 183:6
**full-time** 140:5
**function** 18:5,6 106:15,20
**functional** 22:22
**functions** 106:21 108:3
**funds** 188:13
**funny** 104:1
**future** 184:17 186:4

**G**

**Gabbard** 173:19, 21 174:14
**galaxy** 13:9
**game** 67:1
**Gannett** 189:12,19 201:7
**gap** 28:7 46:22
**gateway** 95:9,12, 16 147:1 178:16
**gather** 88:7,13 190:22
**gathered** 192:14
**gathering** 87:17
**gave** 151:10 170:20
**geared** 13:14
**general** 35:20 94:3 101:17 111:6,8,11 112:20 135:20 192:16
**generally** 14:9 66:18 146:19
**generation** 138:22
**Genius** 151:9
**geopolitical** 117:16 178:7
**German** 159:7
**Ghislaine** 151:2
**Giuliani** 97:3,7,12
**give** 39:4 45:2 55:4, 19 57:11 114:2 138:13 149:21
**giving** 6:11 57:21 147:4
**globalist** 177:21
**goals** 13:21 117:17 178:7
**God** 147:5
**gold** 201:14 202:11,16 204:1
**Goldberg** 126:14
**good** 21:19 30:6 32:17 36:17 41:6, 10,11,15,16 47:3 89:14 111:13 175:15 181:21 189:17 204:20
**goods** 188:20
**gosh** 27:2
**Gotcha** 25:6 27:4 41:2 45:20 158:11
**govern** 115:20
**government** 13:11 44:7 62:20 71:12 79:16 85:17 90:9 91:13 92:3,12 93:15 94:4 95:16 98:12, 18,20 99:3,12 102:12 104:4 108:8 112:10 115:17 117:2,12 120:6,7 144:8 169:17 178:19
**governments** 169:14 193:17 194:13 195:17
**grad** 39:3,10
**graduate** 10:18 25:21 27:18,21 29:21 44:22
**graduated** 10:13 27:3 28:10 31:10 33:14 38:13,17
**graduation** 28:8
**Granada** 110:7,8, 22
**grant** 32:8
**granted** 205:6
**granting** 32:12
**great** 25:3,12 60:14 205:2
**grey** 58:19 189:14
**grounds** 81:13 114:20 152:15
**group** 2:5 14:21 21:22 136:9 152:22
**groups** 11:8,9,21 13:20,22 15:16 18:16 23:15 50:20 115:18
**GRU-LINKED** 174:18
**guard** 126:13
**guess** 15:12 19:16 28:3 30:15 33:21 34:20 35:20 36:2 53:1 56:7 59:6 67:11,15 73:4 79:11 80:1 97:14,21 103:15 129:15 132:18 133:19 135:15 136:12 169:3 180:15 192:15 195:13 196:3 197:14 199:6 200:19,21 203:13 204:18
**guide** 26:21
**guilt-by-association** 52:4 174:17
**gun** 45:18
**guy** 19:21 20:1,8 23:10,16 24:18 63:6 64:8 74:14 75:9,13 76:9 98:8 99:4 100:1 101:13 111:4 116:9 123:13 127:12 134:2 137:2, 8 152:10,17 165:19, 22 170:13,14,22 174:6 177:13,14 203:8
**guy's** 63:5,12
**guys** 36:1 46:11 91:16

**H**

**habit** 22:4
**hack** 163:18
**hack-for-hire** 163:17 165:3
**hacker** 160:16,21 161:22 163:1,2 164:7,17,22
**hacking** 164:11,16 169:14
**Hal** 179:20
**half** 28:4 29:3,17 31:18 33:16,19 142:10 201:18
**Hall-hoag** 47:17
**hand** 45:10,11 90:3 187:1
**handful** 6:12 47:18
**handle** 62:21
**handled** 52:10
**handler** 150:16 151:8,9 153:4 159:6
**handling** 73:5,16
**hands-off** 94:1
**happen** 16:10 33:11 63:10 146:22 175:15
**happened** 123:4 167:18 177:9 178:16 179:2 183:16
**happening** 177:8 182:13
**happenstance** 172:18 178:11,12, 15 179:5
**happy** 59:12
**hard** 128:8 202:17
**harm** 56:2 62:8 143:22 144:7 146:10 147:15
**harmful** 63:2,3 147:11 197:10
**Harris** 93:16
**hate** 14:22 24:13 57:17 58:17
**hazardous** 152:16
**head** 10:7 24:16 46:6 57:2 190:22
**heading** 114:7
**health** 152:16
**hear** 96:20 114:15 184:3
**heard** 108:11 111:10 166:21
**hearing** 175:17 203:7
**heat** 180:8
**held** 4:13 119:9
**hell** 118:9
**helped** 48:21
**helping** 29:10
**heroic** 48:6
**hey** 199:22
**hidden** 176:22
**hide** 196:16
**high** 10:12,13 123:15
**high-profile** 87:6 134:18
**highest** 98:21
**highlighted** 162:18 205:18
**highly** 161:20
**hire** 65:5 163:18
**histories** 44:6

**history** 44:6 89:1
**hit** 56:15 87:9 159:8 176:11 181:13 185:22
**Hoft** 95:16,21 117:4,9 133:10 176:19 177:18 178:15
**hold** 38:14 74:16 96:1,17 100:5 106:19 117:5 119:4 134:7 182:22
**holdings** 165:11 201:15
**hole** 45:12
**home** 7:17 20:11 43:22 49:6 158:15 190:22
**Homeland** 103:18 187:22
**homeless** 38:16 58:2
**honesty** 57:20
**hope** 14:22 24:13 72:8
**hopes** 18:10
**Horizon** 121:15,19 122:1
**Horizons** 124:15, 17 200:6
**horrible** 58:15
**hour** 60:4
**hours** 176:11 181:14
**house** 40:19,20,21, 22 41:17 63:11 159:3
**housekeeping** 6:2
**houses** 46:5
**Huckabee** 147:5
**human** 14:6 90:3 103:20 115:13 142:1 150:4,12,19 151:13 153:10 187:2 188:2
**hundred** 138:6 157:4
**Hunter** 3:10 74:11 75:4 78:14 82:22 83:19 87:7,8 93:8, 12,16,18 94:13,20 95:10,18 96:7,9,16 111:2 116:11 130:5
**hurt** 61:17 152:18
**Hyland** 1:18 179:19
**hypothetical** 110:6,15 201:11 203:21

**I**

**I.P.** 187:20 188:16, 17 190:12
**Ian** 172:13,17
**ice** 153:6
**ICR** 4:16,18
**idea** 67:9 96:6 129:12 146:3 167:13 181:21
**identification** 82:9 160:5 161:6 171:21
**identified** 146:20 151:8 197:18
**identify** 21:5
**identifying** 87:3
**identity** 73:3
**IDF** 69:16 74:15 75:10 80:7,16,20 81:1,4 83:14 91:14, 16 93:5 100:2 101:12 102:2,21 104:21 105:7,21 106:10,16,21 107:3, 5,9,21 108:2 109:3 112:12 116:14 117:15,19 129:9,13 198:14
**ignorance** 14:13
**illegal** 193:11
**illegally** 163:21
**images** 188:2
**images.'** 103:21
**imagine** 87:12 128:8
**immediately** 35:8
**immigrated** 103:7
**impact** 18:18
**impairment** 8:4
**implies** 122:5
**implying** 123:6
**important** 13:18 48:1 84:9 143:21
**importantly** 131:8
**impossible** 162:9
**impression** 50:3 51:20
**impressive** 48:4
**imprimatur** 67:18
**improvement** 188:17
**incident** 57:12,15, 16
**Incidentally** 179:21
**incidents** 34:21 58:1,14 87:6
**include** 120:18 160:16 168:7
**including** 52:13 75:15 201:17
**income** 38:7,20 138:22
**incontestably** 147:10
**incorporated** 128:3 198:19 200:13
**incorporates** 198:15
**incorporation** 124:5,7 199:21 204:7
**incorrect** 145:16 200:1
**increase** 115:1
**incur** 63:18
**independent** 13:15 68:10 79:5 141:8,13,14
**India** 162:13 163:9, 16
**Indian** 130:14 160:16,21 161:22 163:2 164:7 169:17
**indicia** 15:5
**individual** 119:11 154:17
**individuals** 87:4 182:19
**inductively** 181:12
**industry** 32:5 202:17
**infantry** 106:11
**inference** 35:10 99:1 102:15 105:6, 14 108:5
**inferred** 169:19
**infiltrated** 15:6 21:12
**infiltrates** 14:21
**infiltration** 15:3 18:14
**infiltrator** 21:13
**influence** 18:18 115:20 180:11
**influencers** 114:16 117:14
**influential** 150:2
**informant** 14:1 15:21 16:16,22 19:4 21:6 24:18 25:2 43:7 44:5 150:8 152:20
**informants** 11:7,9, 20 12:2 13:3,4,20 14:7,18 16:2 18:8,9 21:9 23:3 24:7,10 50:20 152:19
**information** 14:4 48:3 67:16 71:20 76:5,6 78:15 87:17 88:7 130:3 141:18 142:20 155:3 163:22 170:2 171:6 175:5 193:5,21
**informed** 53:10 54:17,20 160:19
**infringement** 187:20
**ing** 181:1
**inherent** 64:18
**inherently** 50:15
**initial** 57:15
**initially** 35:1,4 179:20
**innocent** 63:7
**Inserting** 18:22
**insider** 95:3 158:21
**instance** 34:17 73:13 87:8 88:6 90:1 186:22
**instances** 52:14 66:13 144:10
**Institute** 149:17
**institution** 51:2,13 52:4 57:6,17 67:19 92:22
**institutional** 50:16 55:16
**institutions** 65:15
**instrumental** 136:9
**integrity** 52:15
**intelligence** 48:8 65:14,19,22 66:4 69:16 73:11,15 78:22 80:7,16,20 81:1,4 83:8,12,15 85:10 88:6,13 91:15,16 92:1,19 93:1,3,5 98:4

101:12 102:2,21 103:12 104:5,21 105:11,22 106:8,12, 16,20 107:11,15,20 109:4,8,9 110:1,3,4 112:13 115:13 116:14,22 117:3,19 118:20 127:13 135:18 146:21 151:21 167:8 173:22 175:18 184:5,17 186:4 191:21 194:12 195:16 198:15
**intended** 23:21 43:1 123:9 179:17
**intending** 84:1
**intensions** 25:4
**intentions** 20:14
**Intercollegiate** 149:17
**interest** 12:20 35:21 57:20 58:21 144:14,15 166:19 174:11 175:19
**interested** 12:9 15:15 17:12,13 23:8
**interesting** 11:22 26:10 47:20 121:15, 18,22 122:8,11,17 123:1,2 124:14 162:16
**interests** 114:19 156:18
**interim** 93:21
**intermittently** 43:15
**intern** 29:14
**interned** 26:14 28:15,16
**Internet** 67:21
**internship** 28:18 37:1,13,14
**internships** 37:7 44:12 149:18
**interrogating** 58:19
**interrogatories** 8:12,17
**interrogatory** 160:10,12
**intervene** 47:4
**intervention** 35:15
**interview** 6:10
**interviewed** 159:6
**intrigues** 44:7
**introduce** 4:19
**introduced** 147:3 153:5
**invasive** 193:1
**investigates** 111:2
**investigation** 52:9 56:22 107:8 162:9 163:8,15 165:2 169:17
**investigations** 53:16 94:7
**investing** 197:9
**investment** 131:9 165:10 166:4 169:7 170:4
**investments** 156:15 157:1
**investor** 164:20 165:21 168:15 170:3 197:8 203:12
**investors** 194:22 196:10,15 204:14
**involved** 24:19 62:14 75:3,9 83:3, 15 86:14 93:7 97:9 121:2 131:5 132:16 136:14 153:2 174:9 180:3 185:13,20 202:21
**involvement** 131:9 197:2
**involves** 62:18 165:19,22
**IRA** 156:19,22 157:2
**irrespective** 79:12
**ISI** 55:1
**Island** 78:10 128:3
**Israel** 31:9 79:1 89:1 101:15 119:17 147:9
**Israeli** 78:18 83:2 86:14,21 89:13 90:8,9,13 91:9,13 92:7,12 93:15 94:4 95:16 98:11,18,19 99:3,12,19 100:2,6, 11 101:11 102:1,12 103:7 104:16 105:13 110:13 112:10 113:6 115:12,17 116:22 117:2,12,13,16 118:20 119:2,6,7 126:13,22 127:6,10, 14 129:7 133:21 135:4,13,17 136:4, 10,13,20 137:6 144:6 146:21 147:18 167:6 176:14 183:7 191:18,19 198:12
**Israelis** 69:11,14 89:22 90:20 93:9,12 97:12 113:17 127:11 137:3 147:15 186:21
**issue** 6:16 9:1 23:8 32:14 43:7 56:21 80:2 152:19
**issued** 103:8
**issues** 6:2 7:2 20:6 45:1,8 56:11 59:8, 10 186:2
**Italian** 175:21
**ivy-wrapped** 55:16

**J**

**jail** 58:16
**James** 172:14
**January** 73:18 76:13 82:20 87:5 92:11 173:3 183:7
**Japan** 72:6,17 120:3,12
**Japanese** 71:3,5 72:12 92:15 120:6, 11
**Jayhawks** 28:2
**Jeffrey** 126:14
**Jesus** 180:22
**jets** 72:1
**Jim** 95:16,21 110:21 111:2 117:4, 9 133:10 176:19 177:18 178:15
**job** 28:13 38:9 42:2 57:9 69:18 88:13
**jobs** 13:11
**John** 4:22
**john@burns-law-firm.com** 2:9
**Johnny** 54:21,22 55:3
**Johnson** 17:5 149:8 152:3 157:6, 9,11
**Johnson's** 179:21
**joint** 10:21
**joint-degree** 10:22 11:3
**Jon** 2:19 4:17
**Jonathan** 2:4 151:9
**Jones** 110:21 111:2 158:22
**Jordan** 1:10,16 2:12 3:2 4:4,5 5:6 7:6
**journalism** 26:12 27:6,8,15 28:12 31:2,7 66:19 69:10, 18 149:10,13
**journalist** 3:15 52:16 53:4 64:15,16 96:11 102:5 139:11 144:14 148:12,13 179:1,8 180:13
185:4 189:16 195:1
**journalistic** 44:14 66:22 67:6 86:8 139:13
**journalists** 22:5,6 27:12 142:13 148:10 163:11,15 164:9,10,15
**judge** 8:2 112:5 176:1
**judgment** 3:18 66:14 137:9 159:9 161:17
**Judiciary** 151:11 152:9
**jump** 186:5
**junior** 37:9 38:5
**jury** 8:2 17:22
**justice** 185:6
**juxtapose** 177:10
**juxtaposes** 125:2
**juxtaposing** 122:20
**juxtaposition** 123:10 125:7,12

**K**

**Kamala** 93:16
**Kansas** 10:19 11:13,17 12:8 27:22 28:1,2 31:11 33:15 38:10,14 47:10 51:21
**keeping** 8:13 13:14 189:12
**key** 19:19 81:11
**Khare** 131:8 160:16,21 161:22 162:11,21,22 163:2, 6 165:17,20 167:18, 19 168:4,8,10,14 169:11 170:2,15 196:17,21 203:9 204:16

**Khare's** 165:10 170:4 197:1

**kick** 184:10

**kill** 114:3

**kind** 5:15 13:14,19 15:17 16:17 18:13 20:13,22 21:4 23:20,22 31:3,8 32:4 33:5 34:12 35:6 39:4,22 42:15, 16 43:9 44:10,15 45:3 46:10,14,18 52:16 57:20 60:17 64:3 67:18 70:7 87:6 96:17 114:6 116:5 132:13,15 153:6 166:20 174:17 180:16 205:18

**Kirk** 1:21 4:15

**knew** 24:20 75:1 76:12 78:13 83:12 99:22 127:5,6,7 133:22

**knowing** 133:6 193:6

**knowledge** 73:22 74:18 75:13,20 76:18 79:6 80:6,11 83:17 90:19 99:17 112:22 113:1 134:11 143:5 146:8 151:22 160:14 164:21 165:8 171:6

**Kochavi** 74:14 91:17 100:8,12,15, 20 116:18 119:3,9, 11 127:9 187:8

**Kochavi's** 119:7

**Konstantin** 182:19

**L**

**L-A-Z-I-O** 176:4

**lack** 177:21 180:9

**Laird** 12:9

**Lambert** 179:20

**language** 167:16

**languages** 71:2

**laptop** 78:14 93:12 94:13,20 95:10,18 96:7,9 111:2 116:11

**laptops** 96:16

**large** 1:22 23:12 100:18

**largest** 47:11

**Larouche** 24:19

**lasted** 37:17

**late** 42:8,10 44:3 103:8

**latest** 160:19

**latitude** 6:19

**Laura** 116:2,9 117:4,9

**law** 1:18 2:5 14:10, 15 15:1 26:3,8 86:5 153:9 193:18

**lawfare** 31:4 139:4 183:4 185:1,9

**laws** 115:19

**lawsuit** 30:18,22 31:3 33:9 56:16 57:3,12 62:2 74:22 82:17 155:20 158:7 159:14,16 173:1 185:10

**lawsuits** 56:1 139:5

**lawyer** 65:5

**lawyers** 166:17

**lay** 166:18 193:14

**layman's** 18:2

**Layout** 49:1

**Lazar** 48:3

**Lazio** 176:4

**lead** 34:3

**leading** 102:19,20 104:17,20 183:11

**league** 24:19

**learn** 22:20

**learned** 148:7

**lease** 203:3

**leases** 204:4

**leave** 34:9 36:13 44:17 49:21 53:7 68:4 142:5 150:11 203:8 205:21

**leaving** 9:4

**led** 12:5

**left** 23:14 26:8 36:6, 12,20 39:17 41:21 50:12 56:15 121:11, 21 122:15 156:19, 22

**left-winger** 45:5

**leg** 21:5

**legal** 2:19 52:12 55:14 61:5 148:15 166:15 176:12 179:7 181:13 184:2, 8 186:3

**legitimate** 66:5

**length** 158:4

**letters** 23:13

**level** 98:21 115:13 164:2 169:4 171:6 176:22 185:1 198:3

**liability** 121:5 200:6

**library** 47:11

**lie** 169:1,15 170:16

**lied** 168:14

**life** 16:14 35:5 44:9 62:11 63:3,5 64:8 71:17 177:10

**light** 63:6

**likeness** 180:21

**likes** 164:19

**limbo** 153:6

**limit** 18:17,18

**limitations** 173:4

**limited** 121:4 200:5

**lines** 52:9

**link** 173:6

**linking** 124:8

**list** 58:1 121:4 173:20 174:1,4 184:18

**listed** 187:7

**lists** 57:17,22

**literally** 131:15

**live** 7:10,19 63:9 158:12

**lived** 40:11

**lives** 7:12

**living** 40:7,8 43:21 49:6 69:6,7

**LLC** 5:2 200:6 202:1

**loan** 138:13

**long** 28:18 29:2 31:16,17 33:18 35:12 37:10,20 41:22 44:19 46:9 48:6 59:21 78:10 115:2 128:3 165:2

**longer** 118:4,10 187:19 202:5

**looked** 128:15,16 195:7 199:20

**Loomer** 116:2,9 117:4,9

**losers** 126:12

**lot** 19:12 21:8 26:1 34:11,20 40:9 41:12,19,20 44:2 45:8,18 48:10 50:4 55:5 56:11 59:3 62:4 69:7 71:7 72:6 83:20 93:20 101:18 105:18 107:10 108:14 114:12 127:21 151:5 152:22 171:7 177:20 180:16 189:14 192:12 202:16,17

**lots** 123:3 165:14

**Louis** 2:7 177:15

**Louvrier** 173:10, 11,16 174:6,7,16 176:5,9,22 178:21 182:18 183:1 185:16 186:1,3

**loved** 47:15

**loyalists** 126:16

**lunch** 158:1,2

**Lyle** 46:7,13

**M**

**made** 79:4,5 133:7 144:19 146:12 167:1 168:7 173:10 174:19 199:5

**MAGA** 180:2

**magazine** 28:17 29:10 34:10 48:21 51:2

**magazines** 77:12

**main** 14:11 40:15 193:17

**maintained** 48:3

**major** 34:21,22 159:7 193:16

**make** 9:2,9 10:6 39:10 52:3 67:5 69:16 79:17 84:4 86:4 92:2 93:19 96:9 99:7 101:22 102:15 109:5 123:22 145:1,3,22 147:22 159:11 162:8 168:21 183:12 190:4,7 194:18 196:4 199:7

**makes** 6:7 14:15 79:2 122:8,11 123:2 150:6

**making** 38:4 39:12 66:21 90:6,21 100:17 101:17,18, 21 129:1 144:5 145:3 147:13 171:7

175:21 180:5,16 181:10 189:20 197:15,16
**malice** 190:3
**malicious** 155:20
**Malik** 179:22
**Malofeev** 182:19
**Malokeev** 182:21
**man** 11:16 58:10 62:10 110:6,9 126:15
**managed** 163:16
**manager** 168:13
**managing** 32:8
**manner** 18:13
**manufactured** 66:6
**manuscript** 42:21
**many-years-long** 62:9
**mapping** 184:10
**Marine** 109:19 110:7,22
**mark** 15:4 82:13 98:1 133:10
**marked** 82:9,12 160:5 161:6 171:21
**market** 46:14
**marketing** 195:10
**markets** 194:13,21 195:8,17
**Mary** 10:16,17 27:19
**Massachusetts** 103:9
**Master** 11:4,6
**Master's** 10:18,20 38:18
**matching** 103:20 188:2
**material** 97:10
**materials** 65:19,22 66:4 73:5,16 95:1 96:10
**Mati** 74:14 91:17 100:8,19 187:8
**Matkal** 108:17,19
**Mattathias** 95:2
**matter** 4:4 52:15,16 176:2
**matters** 89:5
**Maxwell** 151:2
**Mccarthy** 54:16
**meaning** 91:7
**means** 89:4 116:8
**mechanism** 174:17
**media** 27:9
**medical** 8:4
**medication** 8:5
**meet** 9:10 149:7 153:4
**meeting** 151:3 173:21
**meetings** 20:8
**member** 27:14 152:21 165:18 167:21 168:13 193:15
**members** 138:12
**Memorandum** 3:17
**mental** 60:18 61:1, 4
**mentioned** 8:16 17:11 33:2 39:1 41:15 47:21 52:6 56:10 59:3,7 61:6 63:19 76:12 100:19 139:10 174:15 186:8 205:3
**mentor** 11:13,14 13:13
**mere** 179:4
**meritless** 31:2 65:7 185:10
**mess** 56:5
**message** 33:12
**messaged** 33:8
**messages** 56:6 149:22
**met** 30:4 149:9
**methods** 161:21
**mid** 44:3
**middle** 93:5 101:14
**midst** 21:13
**Mike** 113:14 147:4
**military** 65:16 81:8 106:12 107:11 109:7,16 118:2,12, 13,16
**million** 56:18 159:9
**mind** 43:14 58:8
**mindful** 144:14
**minds** 45:4
**mine** 203:3
**mining** 201:14 202:11,16 203:1 204:2
**minute** 106:9 116:4 118:22 156:3 171:10
**minutes** 60:5 104:14
**mischaracterize** 133:2
**mischaracterizing** 131:8
**misquote** 154:10
**missed** 36:1
**missing** 36:3
**misspeak** 133:1 151:14
**misspeaking** 168:1
**misspoke** 42:22 183:20
**mistake** 133:7,8 145:3
**mistaken** 131:22 172:14
**mistakes** 190:4
**mister** 80:1
**mistook** 130:9 132:4
**MO** 2:7
**mob** 184:11
**Modern** 42:2,6 43:17 48:19 49:8 51:5 53:6 54:8,11, 14 59:9,17 60:22 61:20,21 68:4,12
**moment** 15:20 48:17 68:2 73:20 81:18 109:11 137:14 147:21 148:17 153:8 156:1 159:5 169:21 182:9 183:19
**money** 18:1,6 32:16 47:16 54:1 138:13 147:4 163:22
**monitor** 4:10
**month** 41:7
**monthly** 41:5
**months** 28:20 37:18 54:5 64:20
**moral** 31:5
**Mossad** 101:11
**mother** 7:15 158:22
**motion** 3:18 154:20 161:16 168:3 203:8 205:6
**motions** 8:10
**mouth** 58:15 60:20 154:4
**movement** 115:2, 12 116:21 117:3
147:7
**multiple** 61:15 165:5 185:12
**multiplier** 117:8
**murder** 35:5 58:18
**Murdoch** 87:10
**murky** 20:18
**Murrah** 121:13 122:14
**mythology** 45:4

## N

**named** 116:9
**names** 119:10 165:16 201:20
**narrow** 101:21
**narrower** 101:18
**nation** 90:4
**national** 120:11 141:3 173:22 175:17 184:17 186:4
**nationals** 135:4
**naval** 70:12,15 71:22
**Navy** 70:11 120:13
**Nazi** 20:9
**nearing** 190:20
**necessarily** 21:12, 19 49:22 88:4 122:6,7 124:19 143:5 166:18 190:2 193:12 204:8
**necklace** 25:7,9
**needed** 53:10 77:10
**Needless** 184:4
**nefarious** 122:5 178:2
**Negligible** 68:22
**Neo-nazi** 20:17

24:21 25:3
**Netanyahu** 113:19 114:2,8
**network** 149:17 152:11
**networks** 180:11
**Newmont** 201:14, 21,22 202:1,10 203:14,17,20 204:1
**news** 14:20 26:18 75:17 87:9 127:20 131:7 142:12 165:12 170:4 174:13
**newspaper** 73:10 189:12 201:7
**NGO** 14:21 21:11 24:11,14
**NGOS** 13:9 15:2
**no-fly** 173:20 174:1,4 184:18
**nods** 10:7
**NOMA** 40:11,12
**nonprofit** 31:22 32:1 36:15 41:10 44:13 68:7,14,15 138:2
**normal** 44:11,21 143:7
**North** 2:13 7:9
**Northeast** 40:13
**Northern** 158:13
**nose** 47:4
**notary** 1:21 5:8
**notice** 1:18 10:10
**noticed** 25:6,16 114:9
**noticing** 4:21 180:10
**notorious** 21:17 22:2,6 160:16,21 161:22 162:22 163:1 164:7,9,13, 14,15,17
**November** 1:14 4:9 184:10
**NSO** 136:1,3,9 192:17 193:10
**number** 4:7 32:21 58:13 87:5 100:18 103:8 115:18 121:3 153:2 160:10 163:9 184:1,5 194:4
**NUMBERS** 3:21

**O**

**oath** 5:8 6:11 8:1
**object** 130:1
**objection** 160:11
**objectionable** 146:5
**Objections** 160:12
**objective** 22:13 23:2 24:8
**obligation** 142:14, 16,19,22 166:11
**obtain** 163:21
**obtained** 47:1
**Occasionally** 16:9
**occur** 146:2
**occurred** 183:6
**odds** 13:21
**off-the-record** 66:20
**offended** 129:12
**offensive** 120:9 153:1
**offer** 36:17 191:15, 16
**offered** 35:8 167:2 182:1 191:12,17,19
**office** 20:12 109:20
**officer** 69:16 73:15 80:7,17,20 81:1,4 83:8,12 91:15 92:19 93:5 101:13 102:2, 21 104:21 106:16, 21 107:21 110:1 112:13 117:19 135:18 198:15
**offices** 1:18 106:18
**official** 21:7 22:11 23:13 65:20
**officially** 92:22
**Oklahoma** 121:14
**older** 44:2
**Omeed** 179:22
**OMITTED** 3:21
**one's** 44:22 188:15
**One-hundred** 192:21
**ongoing** 33:5 89:2 119:16 166:15
**online** 72:22 128:13 170:1
**open** 9:5 88:17 123:3 172:13 205:21
**operate** 73:11 78:21 79:9 98:4 104:7 179:18
**operated** 15:21
**operating** 72:4 114:4 161:21
**operation** 62:13 81:12 91:18
**operations** 200:14
**operator** 4:17 112:20
**opinion** 26:19,22 29:16 32:2,3,6,15, 17,19,21 36:2 130:12 142:3,9,10 178:10 179:12
**opposition** 3:18 23:19 24:4
**order** 185:18
**Ordinarily** 16:8
**ordinary** 115:19 192:13 193:10
**organization** 15:6, 9 24:20 27:15 32:13 121:5
**origin** 96:13 141:3
**original** 46:17
**outfits** 44:14
**outlets** 77:12
**outrage** 34:22
**overly** 160:13
**overseas** 135:1
**Overstock** 113:15
**owned** 30:2 130:18,22 131:1 133:22 204:13
**owner** 56:19 168:12
**ownership** 204:21
**owns** 131:2 132:2 204:11

**P**

**p.m.** 1:20 125:20 149:1 156:9 171:14 191:5 206:12
**P.O.** 2:6
**paid** 32:1,3,6,15,19 37:14 41:11 178:17 184:7
**Palestinians** 114:3
**Panthers** 45:6
**paperwork** 200:10
**par** 93:1
**paragraph** 89:12 115:9,16 116:8,20 121:21 125:3 126:6, 7 161:19 172:20 180:6 184:1 186:20 189:2 195:22
**paragraphs** 104:13 105:7 182:16 199:2
**parallel** 162:7
**parents** 7:17
**parents'** 7:16
**park** 143:9,10,12, 13
**part** 13:18 17:13 19:10,13 20:20 21:11 24:3 46:16 47:2 48:7 54:2,12 62:19 65:16 87:2 93:22 109:8 110:4 111:10 112:7,9,17 136:10 140:2 142:11 149:16 154:2 174:5 190:3 198:11
**participated** 173:22
**participating** 20:1
**partners** 196:12
**party** 4:21 20:9
**passed** 48:1
**past** 68:18 79:16 116:17 138:22 153:1 204:18
**patent** 101:5,9 119:9,18
**patented** 135:13
**patenting** 108:7
**patents** 89:2 100:8, 16 101:6,13 119:3, 20 134:14 135:3
**path** 102:19,20 104:17,20
**Patrick** 113:15
**pattern** 163:14
**pause** 83:20
**pay** 32:9 138:10
**peace** 174:1,3
**pending** 10:3
**penetrate** 117:3
**penetrated** 115:12 116:22
**Pennsylvania** 11:20 20:11 24:21

**people** 13:20 14:22 18:22 21:8 23:18 25:18 32:16 41:10 46:1,3 48:14 49:21 55:14,17,19,22 58:8,11,15 61:16 62:4 63:11 85:8 92:1 114:6,22 117:8 126:10 143:9,12 147:3 150:5 153:2 160:14 166:18 169:14 177:7 185:12,19,20 190:4 192:10 196:12

**people's** 18:10,11 192:12 193:3

**percent** 192:21

**performance** 56:11,21 59:8,9

**performed** 106:16 108:3 109:4

**performing** 55:6 59:4

**period** 42:1 43:2,16 44:9,19 45:22 56:9 60:21 73:20 74:1 177:10

**permitted** 155:21

**persecuted** 185:4

**person** 63:17,18 66:2 83:9 85:22 87:13 91:1,2 93:2 116:1,16 137:10 152:5 155:22 190:8 193:10,11

**person's** 143:10 166:16

**personal** 16:6,13, 15,20 22:1 99:16 138:22

**personally** 16:5 189:8

**perspective** 13:13, 15 23:9 35:20 126:8 178:6

**persuaded** 145:18

**petition** 62:15

**phone** 157:22 193:6

**phones** 193:4

**photograph** 173:20

**phrase** 162:20 163:1,5

**phrasing** 181:5

**physical** 56:2 62:8

**picture** 57:21 174:15,18

**piece** 61:15 169:8 174:8 175:4,20 200:9

**pieces** 61:14 94:10

**Pierre** 173:10 174:6 185:16

**pig-faced** 180:1

**pinpoint** 39:5

**pitch** 44:22

**place** 17:14 23:22 40:15 45:13 49:7

**places** 75:18 127:21 146:4 150:9 164:13 165:5 192:14 199:5 201:9

**plain** 88:10 102:9

**plainly** 91:5,7,8

**plaintiff** 57:13 76:14 77:19 155:19 167:19 168:5 170:3

**plaintiff's** 161:20 168:6

**plaintiffs** 1:8,17 2:3 3:4 5:1,10 73:18 168:9 176:9 178:21 182:21

**plaintiffs'** 166:22 168:8

**Plaintiff's** 3:17

**planning** 11:5 12:2,14 39:22 42:17

**play** 111:22

**player** 84:19

**plays** 84:20

**Plaza** 1:19 4:14

**plea** 35:8

**pleadings** 168:6

**plenty** 200:12

**PLLC** 1:18

**podcasting** 36:16

**poetry** 51:7

**point** 15:2 37:5 57:19 73:19 97:21 109:1 114:7 120:8 122:18,20 129:14 133:3 146:7 166:9 180:5 181:10 190:12 199:6 200:21 202:4

**pointing** 182:10,12

**points** 71:20 72:21 96:13 186:9 195:21 198:13

**policy** 148:1 178:6

**political** 13:19 15:16 17:14,15,22 18:5 24:6 26:22 29:11 51:6 58:7,9

**politics** 18:11

**poorly** 126:13

**popping** 14:20

**population** 21:6

**portions** 94:12

**position** 38:5

**positions** 38:15

**possibility** 61:5

**possibly** 76:7 160:15 162:6 169:19

**post** 26:14,17,20 27:2 37:6 87:11 142:8 173:6

**post-formal** 198:16

**posts** 136:19

**potential** 143:22 146:10

**potentially** 63:3 109:20,22 147:17 163:21 199:14

**power** 18:1,6

**practice** 32:4

**practices** 107:8

**precipitated** 59:10

**prefer** 36:15 167:16

**preferred** 93:15

**preparation** 8:9

**prepare** 9:10

**prepared** 114:8

**presence** 206:9

**present** 2:18 51:3 59:22 158:6

**presently** 81:9

**president** 113:22 126:9,11,15

**presidents** 114:5

**pressure** 94:4

**presume** 67:10 155:18

**pretending** 25:2

**pretenses** 19:1

**pretty** 6:22 20:17 26:7 34:3 44:11,21 71:3 123:15 179:16

**prevail** 179:17

**prevent** 8:5

**previously** 198:8

**price** 135:16

**principles** 185:5

**print** 48:21 148:4 197:22

**printed** 111:9 198:1

**prior** 39:2 65:9

**prison** 62:11 126:13

**private** 169:14

**privilege** 6:16,17

**pro** 2:12 65:4

**pro-israel** 114:15

**pro-russian** 176:16

**problem** 13:15 24:5 171:4 182:15 196:14

**problems** 137:13

**procedure** 114:4

**proceeding** 166:15

**process** 62:9

**produce** 205:8

**produced** 66:7

**product** 193:10,16

**production** 8:12, 18 205:4,5,15,20

**productions** 8:19

**professional** 22:3 27:12,14 139:16

**professionals** 184:16

**professor** 11:14

**profile** 115:1

**profit** 147:2

**program** 10:22 11:3 12:6,8 19:11, 13 20:21 22:8,13, 14,19,20 23:6 25:22 27:22 32:2,3,16,20 36:17 46:16

**programs** 12:1 38:18 149:10,13

**project** 43:6

**projects** 106:3 196:12

**promise** 70:1

**prompted** 49:18

**propaganda** 23:22
**proper** 64:16 162:9
**properties** 87:11
**property** 58:12
**proposal** 42:20 46:2
**proposed** 167:1 183:1
**prosecutor** 35:4,8, 16 64:9
**prosecutors** 176:1
**protect** 62:12 111:18 112:2 113:17
**Protection** 103:19 186:19
**protective** 114:14
**proud** 32:21
**proven** 197:12,14
**provide** 5:16 9:7 21:4 22:16 55:7 88:14 103:18 184:9 188:1 206:1
**provided** 95:1
**Providence** 47:16
**PTE** 132:5
**public** 1:21 10:13 34:21,22 48:6 57:20,21 58:20 66:8 67:3,7,9,13,16,18 87:3,6 141:22 144:15 159:7 175:19 192:14 193:15
**publication** 17:20 23:13 46:5 75:22 114:11
**publications** 77:1, 13 141:5 163:10 177:21 199:16
**publicly** 101:6 170:19
**publish** 43:9 51:5 55:13 72:22 174:20 178:22 183:6
**published** 17:5 48:15 51:11 74:13, 18,20 82:19 83:13 94:15 98:3,9,16 115:21 142:11 144:16 148:6 150:22 151:11,19 152:14 174:22 175:5
**publisher** 45:21 46:9,14
**publishers** 45:18, 22 87:9 141:22 203:11
**publishes** 103:4 160:6 172:2 183:21 194:7
**publishing** 50:14, 19 140:16 141:18
**pull** 169:16 171:9 194:4
**pulled** 124:5,7 172:2
**pulling** 193:21
**punched** 58:14
**Pundit** 95:9,12,17 178:16
**pundits** 147:1
**pure** 134:6
**purport** 154:2
**purported** 134:11 189:16
**purpose** 22:22 88:10 150:20
**purposes** 6:21 133:3
**pursuant** 1:18 47:1 205:4
**pursuing** 12:20 52:8,20
**push** 50:15
**pushed** 36:9 50:7
**pushing** 18:12
**put** 12:17 18:2 33:20 53:15 57:2 60:19 84:16 96:4 122:19 143:8 154:3 168:18 173:19 174:1,4,5 206:3
**puts** 193:3
**putting** 51:14 104:19 178:20

**Q**

**qualified** 65:18
**quality** 91:1
**quash** 154:20 155:6
**question** 6:14 9:13,14,17 10:3,4 15:16 16:11 20:5 21:1 43:1,2 73:2 78:21 96:21,22 98:15 99:8 110:15 116:6 117:6 121:15, 18,22 122:9,12 124:14 136:12 145:10 151:8 160:22 169:3 181:8 182:3 185:7 195:19 198:20 203:13
**questions** 6:4 8:6 20:4 50:21 52:1 64:9 73:19 93:20 139:21
**quick** 17:10 22:12 33:1 125:15
**quiet** 60:2
**quit** 49:11,12
**quitted** 60:2
**quote** 79:7,9 128:22 129:16 172:13 186:7 187:16,17,20 194:9 198:22 199:2
**quoted** 73:9 78:20 103:10 189:3
**quotes** 134:5
**quoting** 103:2 126:11 194:16

**R**

**rackets** 90:3 187:2
**radio** 111:5 112:20
**raise** 179:17
**raised** 50:21
**raises** 20:4 93:20
**raising** 50:20
**Rajit** 131:8 160:16, 21 161:22 163:2 203:9 204:16
**ran** 32:1 46:8 95:17
**random** 67:21
**range** 39:14
**ranges** 106:21
**Rasson** 2:19 4:17
**rate** 133:16 143:15 171:8 181:7
**rationale** 106:4
**re-share** 126:4
**reach** 128:20 145:1
**reaching** 185:3
**read** 12:10 16:3 21:8 47:3 48:10 51:17 66:1 77:11 78:19 95:19,21 96:2 103:13 121:21 187:12 201:1 206:10
**reader** 84:2 88:1 90:10,15 102:10,19, 20 104:17,20 121:21 142:5 183:12
**readers** 124:13 142:2
**reading** 19:12 39:21 42:14 43:19 44:1 67:3 89:21 102:7,11 128:12
**ready** 49:20 156:10 191:6
**real** 17:10 20:14 22:12 33:1 48:2
**reality** 45:1
**realm** 73:6,12,14 99:1 101:15 144:13
**reason** 20:15 23:7 47:2 50:13 55:4 67:8 73:8 128:9 129:22 133:19 162:10 163:3 178:13 179:8
**reasonable** 63:17 73:6 81:13,16 83:9 86:9,11 89:7 91:1,2, 20 93:2 99:1 101:16 105:6,14,22 108:5 109:9 110:2,13 114:20 152:15
**reasons** 6:13 21:19 23:8 62:19 89:14 192:15 202:16
**recall** 42:7 46:6 149:9 186:10
**recalling** 191:17
**recap** 36:22
**receive** 61:22
**received** 20:21 21:3 205:19
**receiving** 188:13
**recent** 30:9
**recently** 48:2 57:22 115:20 158:14 160:20 179:22 180:1
**reckless** 72:22 155:20 181:11,22 182:4,7,8
**recklessness** 52:22
**recognition** 73:13 75:6,8 76:16 78:16 89:14,19 132:20 192:6,11 193:12,16, 21 194:13 195:17 202:19
**recognize** 82:14 159:21 161:8 172:6

**recollection** 186:13

**recon** 109:19 110:7,22

**reconnaissance** 108:10 109:5 111:7, 11 112:7

**reconstruction** 162:7

**record** 4:3 7:5 17:20 58:11 60:7, 11,13 66:20 81:19, 22 82:4,6 125:18 126:1 148:18,21 149:2,4 156:2,5,7, 12 171:10,12,16,18 191:3,8 206:6,8

**records** 103:9 121:9 162:7

**recruited** 32:20

**red** 147:2

**Redding** 20:11

**reference** 79:2 161:1 174:19

**referenced** 3:21 82:16

**referred** 142:7

**referring** 163:5 179:18 196:7 202:12

**reflect** 143:17

**reflected** 152:8

**reflects** 17:19

**refresh** 186:13

**refuse** 6:13

**refused** 182:2

**regarded** 93:1

**regional** 189:11

**registered** 78:9 101:7 187:5 188:7

**registering** 100:15 101:13 188:14

**registration** 190:11

**Regnery** 46:1

**regularity** 150:3

**regularly** 55:11 61:9 75:15 127:9

**reincorporate** 200:18

**related** 12:2 23:14 47:12 56:12 70:8 152:7 202:5 205:5

**relates** 150:22

**relation** 155:13

**relationship** 16:16 18:7 74:14 89:3 116:2 119:16 127:8 135:6 147:9 169:19 187:18

**relationships** 16:18,21 20:13,17 91:16 127:6 180:12 182:18

**relevant** 50:10 69:22 112:11 118:1, 3 122:16 155:8,10 187:3,9 198:17 204:10,16

**relevantly** 116:5

**reliability** 206:2

**relied** 198:10

**rely** 41:13

**relying** 90:22

**remain** 119:20

**remaining** 151:7

**remains** 118:19 119:1 121:13 122:13

**remember** 37:22 74:17 100:21 137:16,17,18 154:7 187:12

**remit** 88:5,9 92:21

**Renewal** 32:20

**renounced** 118:17

**rent** 41:5

**rental** 41:15,16

**repeating** 199:8,12

**reply** 161:16

**report** 88:14

**reported** 75:15,16, 17,18,22 142:9 144:20

**reporter** 4:15 5:4 6:8 82:13

**reporters** 143:22 173:13 197:1

**reporting** 57:5 74:11,13 128:10 130:5 133:14 162:1, 13 166:12 196:18, 20 200:1 201:6

**reports** 150:21

**represent** 4:20 5:1 6:1 81:3 95:8,14 201:13

**representation** 184:2

**represented** 87:1 97:17 151:4 165:17, 20

**representing** 101:19 152:5 198:6 203:12

**represents** 115:11 116:21 123:14

**Repression** 3:15

**reprinted** 198:2

**Republic** 68:16 75:16 77:21 78:19 83:14 105:8 113:7 127:8,18 131:6 134:6 187:15 189:7 192:2 198:1,22 200:9

**Republic's** 79:9

**republicans** 94:5

**republishes** 126:5

**reputable** 75:22 77:1 141:5 203:11

**reputation** 57:4 143:18 146:10,11 147:8,11 197:11

**reputational** 57:7 146:6

**request** 154:13 205:20

**requested** 206:10

**requests** 8:12,16, 18 9:8 48:4 155:2,3 205:5,14

**require** 140:22 141:8,12

**required** 111:16

**research** 10:18 11:7,18 13:6 23:6, 20 24:4 44:2 45:12 46:17 48:8 51:16 148:15

**reserves** 120:18

**residence** 7:18

**residential** 7:8

**resigned** 34:10

**resources** 148:14 184:8 189:19

**respect** 52:2 73:11 78:21 98:4

**respond** 179:20 182:2

**response** 3:17 50:8 53:17 125:4 161:15 181:6 190:5 205:16

**responsibility** 148:10

**rest** 21:6

**Reston** 1:13,19 4:14

**restrict** 73:19

**retained** 179:18

**return** 54:11

**Reuters** 163:8 165:2 169:17

**review** 8:8

**reviewed** 94:12

**reviewing** 46:18 78:14

**reviews** 51:7 139:17

**revise** 19:16

**risk** 52:13,17,21 55:14 57:7

**risks** 63:13 192:11

**road** 40:20

**role** 3:9 31:20 64:15,16 82:22 88:12 121:11

**roll** 147:1

**Roman** 126:8 173:12,16 176:5

**Rome** 173:10

**Ron** 75:9,13 76:9 134:2 165:19,22

**room** 149:16 203:5 204:5

**roommate** 40:18

**roommates** 41:3, 18

**rooting** 30:19

**routinely** 127:5 192:10

**row** 40:19,21,22

**rub** 79:21

**Rudolph** 97:12

**Rudy** 97:3

**rule** 69:10

**rules** 166:17,18

**run** 7:2 48:6 87:14 126:15 201:11

**running** 165:2

**Rupert** 87:10

**Russia** 177:19

**Russian** 175:14 178:2 186:2 193:16

**Russian-aligned** 177:15
**Russian-israeli** 3:14
**Russians** 152:8 174:11 176:19 177:14 178:9,17 183:4

## S

**sabotage** 87:21
**sabotaging** 64:12
**sad** 126:14
**saga** 116:11
**Saint** 2:7 25:10
**salting** 18:16,20
**sanctioned** 182:18
**Satisfy** 140:17
**savings** 40:2,3 41:9,13 65:4 69:4,6,7,8 138:11,18,21
**Sayeret** 108:17,19
**scale** 104:19
**Scan** 159:19
**schedule** 178:22
**school** 10:12,13 29:21 39:3,10
**Schulman** 116:3,9
**Schwartz** 95:2
**science** 23:22
**scope** 6:20 105:14 108:5 180:12
**scotching** 64:4,6,11
**screen** 89:11 103:4 113:14 120:21 121:8 126:5
**scroll** 103:1 125:11
**scrutiny** 186:3
**search** 77:3
**Secretary** 77:4
**sector** 41:10 44:13
**security** 93:10 100:3 101:14 103:8,18 105:12 111:1 116:15 136:15 137:4 144:11 187:22 192:10
**sedate** 57:6
**seek** 13:1 54:11 142:22 189:4
**seeking** 18:17 31:5 35:5 155:6
**seize** 173:13,17 183:2
**selections** 162:17
**self-employed** 70:4
**sell** 90:2,5 116:15 187:1 192:22 193:3
**selling** 188:19
**sells** 101:14 187:7
**seminars** 27:5
**Senate** 151:10 152:9
**senators** 147:3
**send** 148:19 155:21 166:16 181:1
**senior** 37:9
**sense** 10:6 14:16 86:1,6 96:9 98:19 102:5 114:6 137:10 140:17 145:1 196:4
**sensitivity** 52:2,10 96:6,13
**sentence** 62:11 120:22 142:4
**separate** 19:8 49:13 65:17 172:22
**separation** 49:14,18
**September** 34:7
**series** 33:3 183:18
**serve** 109:15
**served** 73:14 92:7 107:5 108:10 109:3,18 110:7 118:4,8,9,13 129:9 153:13 158:6,8,9
**service** 81:8 118:2 120:18 188:20
**services** 184:5
**serving** 129:13
**set** 8:11 23:7 76:11 175:14 184:10 197:19 204:13
**seven-year** 91:14 103:17 187:21 198:14
**severance** 54:5,6,7
**shaded** 20:13
**shady** 169:6
**shamed** 184:9
**shape** 41:17
**shaping** 83:3 86:14
**share** 40:17
**shared** 72:21
**shares** 179:21
**shear** 52:22
**shelter** 38:16
**shooting** 57:14
**shortly** 56:15
**shotgun** 64:3
**show** 19:20 64:22 83:14 103:9 161:1,3
**showed** 164:4
**showing** 82:11
**shown** 201:8
**shut** 61:10
**shy** 45:19
**side** 26:18,19 31:22 32:1 76:11 128:22 145:2 166:22
**sides** 31:22 159:17
**sign** 35:11 50:2 206:10
**Signal** 33:12
**Signals** 107:11,15 109:4
**significance** 122:4 178:20 188:14
**significant** 158:21 178:19
**silencing** 162:13
**similar** 64:3 165:15
**similarly** 201:19 202:6
**simple** 145:9
**simplest** 18:2
**simply** 130:9
**simultaneously** 182:13
**sincere** 20:16
**Singapore** 75:8 76:16 78:16,17 132:7 194:11 195:15 196:3,6 197:21 198:4,5 200:16
**Singapore-based** 76:22 134:1
**Singaporean** 79:3 127:16 131:4 133:12,17 145:14 146:3,15 162:2 200:2
**single** 157:2
**sir** 111:17
**sit** 126:18
**site** 29:10 34:4 77:5 131:10 165:10 166:5
**sites** 76:20 195:12
**situation** 152:11 158:20 184:6
**skepticism** 26:8 104:12
**skills** 98:8 117:8
**slacked** 60:2
**slogan** 114:15
**slow** 48:5
**small** 21:22 39:14 46:13
**smear** 89:14 124:9
**smeared** 89:19 124:8
**smidgen** 159:16
**social** 103:8
**Society** 27:11
**software** 103:19 188:1 192:6 194:13 195:17
**sold** 202:4
**sole** 126:13 168:12,13 190:15
**somebody's** 193:22
**son** 22:17 126:10
**sort** 5:22 13:10,12 15:2,15 21:5 22:5 25:3,20 35:7 36:1,15 47:14,19 48:5 50:3 52:10 57:12,16,17 60:1 61:1 63:16 67:10 70:21 79:12 84:12 89:13 91:6 107:14 122:5 132:9 138:16 141:11,12 143:14 146:21 147:8 149:18 154:13 173:20 174:4,11,18,20 175:14 177:20 178:11 183:13 185:8 187:9 188:19,20
**sorts** 18:14 20:4,6 23:13 45:7 49:1 55:13,21 57:9 58:19 63:15 77:7 94:9 116:17 178:7
**sought** 189:6
**sounded** 202:14

**sounding** 165:15 201:20 202:6
**sounds** 51:8,9 178:2
**source** 14:6 46:21 66:14 111:13 112:3 113:2,3 141:15 150:4,13,19 151:13 153:10,11 201:3
**sourced** 126:13
**sources** 17:1 47:22 48:11 66:8,11,20 67:2 111:18 140:22 141:22 142:1 145:8, 13 152:13 184:2
**sovereign** 58:4
**speak** 6:5 46:20 47:22 48:13 71:1 143:13 157:20,21 163:13
**speaking** 8:15 146:19
**special** 83:17 158:20
**specialist** 2:19 194:12 195:16
**specialist's** 128:10
**specific** 24:16 44:4 46:5 56:8 73:15 112:17 116:5 129:21 137:1 195:13 196:12
**specifically** 11:19 43:8 89:4 97:7 105:10,11,12 123:12 165:18,21 166:1,2
**speculation** 180:17
**speculative** 182:20
**spend** 64:19 70:9 138:11
**Spending** 69:4
**spent** 59:21 69:5,7
**spies** 126:16
**spin-off** 202:3
**spinoff** 202:4
**spinoffs** 201:19
**SPLC** 24:17
**spoke** 30:11 46:1,7 47:21 157:8
**spoken** 30:13 152:13 154:17 157:11,14,17
**spy** 72:11,17 73:7 78:18 79:18 80:11 83:2,5,6,10,16 85:6, 13,22 86:10,14,21 88:13 89:13 90:7,8, 14 91:9 92:2,11 93:6 98:1,11,18 99:3,12,19 102:1,4 104:3,16 105:16,18, 20 106:1,4 107:16 109:5,19 110:10,13 111:3 113:6 133:21 135:17 136:13,20 137:6 144:6 147:14, 18 167:6 191:18 198:12
**spying** 86:18,21 90:9,19 91:12 92:14 102:12 112:10 120:7
**spyware** 136:4,10 167:6 191:20 192:3, 19,22 193:3
**squarely** 111:21
**St** 177:15
**stabbed** 58:3
**staff** 15:10 111:6,8, 11 112:20
**staid** 55:15
**standard** 4:11,12 26:8 32:4 50:4,6 66:18 114:4 118:9 147:6
**standards** 27:6 86:8 139:13
**standing** 185:5
**standpoint** 66:22 86:8 146:6
**staring** 59:14
**start** 36:16 42:5,19 113:12 137:15 147:4 176:20
**started** 28:3,6 29:14 35:7 68:7 121:3 122:22 150:2
**starting** 10:12 44:12 107:12 184:9
**starts** 44:11 111:1 122:2
**state** 4:20 7:4 22:9 24:16 27:22 31:8 81:10 122:3 162:11 191:19
**State's** 77:4
**state-sponsored** 79:18 80:11
**stated** 13:22 25:4 76:21 134:21 144:18 179:11
**statement** 67:18 146:15 147:13,16 151:10,19 152:9 168:21,22
**statements** 146:11 168:7 180:6 196:10 198:11
**states** 1:1 4:6 72:6 79:16 100:7,11 103:7 107:22 109:7 115:19 130:21 136:11 163:21
**stating** 105:18 195:22
**status** 127:4
**statute** 173:4
**steady** 48:5
**steal** 90:4
**steps** 141:20 203:16,20
**stick** 61:19 134:8
**stint** 31:17 36:12 37:2
**stints** 44:13
**stock** 156:20
**stolen** 162:8
**stop** 74:16 80:18, 22 100:5 115:7 116:19 151:12,15 167:22 177:17
**stopped** 81:4
**stores** 55:9
**stories** 21:8 35:20, 22 50:19,22 51:14 52:12 55:11,16,19 56:13 63:16 95:18, 19 163:9 164:10
**story** 15:17 34:18 35:1,7,12 44:11 45:6 47:3 62:8,10 64:17 74:10 77:21 78:19 93:18 94:21 95:10,17 105:8 121:10 126:12 127:8,19 128:22 143:6 158:22 173:19 178:5 187:15,19,20 203:2
**straight** 142:12
**strange** 44:16
**Street** 2:13 7:9
**stress** 22:21 55:6 56:11,12 59:4 63:18
**stretch** 190:22
**strike** 137:11
**strikes** 73:13
**struck** 45:12
**structure** 204:22
**structured** 32:11 108:2
**struggle** 159:15
**Stuart** 46:8,13
**Stubstack** 94:16
**students** 51:17
**studied** 22:8
**studies** 11:6 13:2, 3,5 18:7 23:3,5 24:8 25:22 43:9 44:5 45:16 46:18,19 149:17
**study** 19:11 23:22
**stuff** 61:12,13 72:7 87:8,9 123:15 184:16 188:19
**Sturges** 1:21 4:15
**subheader** 83:2 86:13
**subject** 47:12 53:16 74:21
**subjects** 19:17,19 143:1 144:1
**subpoena** 153:14, 17 154:8,21 155:3, 7,12,17,21 181:2
**subpoenaed** 139:9
**subpoenas** 155:22
**subscribers** 184:7
**subsequently** 54:12
**subsidiaries** 201:19
**subsidiary** 204:10, 12
**Substack** 83:22 137:15 173:14,17 183:2 184:8
**substantial** 148:4 193:20 200:14
**successfully** 163:7,16
**suckers** 126:12
**sudden** 44:15 63:11
**sued** 35:17 58:10 69:15 71:10 157:13, 18 158:5
**sufficient** 141:5,6 145:14

**sufficiently** 197:10
**suggest** 104:3 105:18 170:2
**suggested** 177:11
**suggesting** 124:16,20 179:3 184:22
**suing** 166:9
**suit** 56:18 59:14,16 111:20 173:6 179:16,21 183:8
**Suite** 1:19
**suits** 65:8 173:4
**summary** 3:18 161:17
**summer** 37:11
**sun** 155:22
**supplemental** 8:19 205:4
**support** 25:20 31:6 68:8 69:2
**supporters** 113:16
**suppose** 72:15 120:19 128:18 142:6
**supposed** 16:8 63:1,2 90:10,15 115:19 179:11
**suppositions** 144:22
**Surfside** 121:12 122:15 123:5 124:18
**surreptitiously** 193:21
**survive** 69:3
**suspicion** 81:13
**suspicious** 176:11
**suss** 68:1 158:18
**sustain** 40:1
**sustaining** 68:17 138:7
**swear** 5:4
**system** 175:21

**T**

**table** 77:15 128:15, 17
**tables** 76:21 77:9
**tail** 60:21
**takes** 117:16
**taking** 24:1,5 78:2 87:3 94:1 199:12 204:1 206:12
**talk** 53:12 69:19 73:17,21 86:1,22 109:12 113:10 135:19 143:9 149:21 192:10 202:22
**talked** 24:17 30:8,9 74:10 130:4 150:16
**talking** 6:6 14:8 45:7,17 58:9 60:17 67:16 74:17 109:13 110:12 116:10 146:14 150:3 155:16 172:10 180:7 189:21 192:16 202:17 204:18 205:19
**tapped** 65:6 184:3
**targeting** 91:18
**tasked** 89:5
**tau** 25:10
**tea** 135:16
**teach** 26:1
**team** 41:20
**tech** 77:7 123:15 164:20 197:8
**technology** 70:8 73:13 89:15,19 90:1,5 93:9 100:3,6, 11 101:14 105:12 115:14 116:15,18 127:12 132:13,14, 17,22 134:1 136:15 186:22 187:7 194:12 195:2,16
**Ted** 56:19
**telco** 175:12
**telecom** 174:10
**televised** 25:1
**television** 14:16
**telling** 15:17 76:9 79:8 96:6 128:2 130:16 131:3 133:11 134:3 175:6, 9 197:12 203:7
**tend** 94:5
**tendency** 144:7
**term** 118:4 192:5
**terminated** 17:6,7 49:12,16 59:10 150:4 151:15,17 152:6
**terms** 18:3 30:6 35:21,22 50:9 84:17 96:8 178:5 202:20
**terribly** 59:12
**testified** 5:9
**testifying** 8:1
**tests** 22:21
**Texan** 180:1
**text** 102:9
**texts** 33:6
**theft** 87:19
**theory** 51:6
**thesis** 11:17 19:17, 20 24:5,17
**thing** 6:9 12:15 13:10,12 14:19 42:4 47:19 67:10 83:3 85:15 86:14 93:19 111:5,7 126:14 129:15 132:10 134:20 149:19 167:17 170:11 180:20 195:13 199:18,19 204:20
**things** 6:1 8:10 14:2 18:14 23:13,16 43:20 49:2 51:10 55:13 57:10 63:16 67:17,21 76:8 77:12 79:15 88:2,11 98:22 100:17 101:17 108:15 113:10 114:21 121:3 137:12 144:18 145:2,19,20 151:6 153:1 169:18 177:9 178:7 179:1 180:20 181:21 182:5,13 195:22 197:6
**thinking** 39:21 59:22
**thought** 24:1,5 46:12 63:4 99:13 128:17 150:7 164:19
**thoughts** 34:20 190:22
**threat** 61:7,21
**threaten** 55:15
**threatened** 55:10, 11 56:1 59:16
**threatening** 55:17, 20
**threats** 56:14 59:13 61:5,6,22
**threshold** 184:7
**throw** 114:8
**tied** 51:15
**tier** 32:5
**ties** 103:12 151:20
**tight-lipped** 104:6
**time** 4:10,11,12 9:22 16:4 20:9 26:22 29:11,22 30:11 33:18 34:10 37:5 40:9 41:19 42:3,9,13,16 43:2, 16,18 45:21 46:9 47:15 56:8 59:22 60:6,12,21,22 61:19 63:5 73:20 74:1,3, 18,20 80:14 81:21 82:5 95:4 98:9,16 99:10,19 105:1,4 114:5 115:2 123:4 125:17,22 126:18 127:2 128:5 135:12 148:20 149:3,9 150:1 156:6,11 157:8 171:11,17 176:13 177:5,10 184:13,14 191:2,7 195:9 203:7 206:7
**times** 26:15,18,22 37:6 94:20 118:10 158:18 159:2 172:18 173:13,19 174:5,19 175:5 179:6 183:3
**timing** 122:17 123:1 176:10 177:5
**Timothy** 179:19
**tiny** 204:10
**title** 82:21
**toast** 180:22
**today** 8:1,6,19 10:9 114:12 191:1
**Today's** 4:9
**told** 30:17 35:2 51:12 53:9 61:9,11 62:8 108:9 111:14 113:5 130:6 154:8 179:22 189:1,2
**tomorrow** 205:12, 17
**top** 24:16 32:5 46:6 199:4
**topic** 17:12 150:6
**topped** 180:1
**Torshin** 182:20,21
**totally** 92:16 132:8 202:4 204:13
**touch** 46:11 62:22 202:18,19
**touches** 6:16,17
**tour** 81:8 92:7 118:9

**tours** 92:8
**town** 143:16
**track** 76:20
**tracking** 77:15
**tracks** 57:17 77:9
**trade** 146:11
**trademark** 131:17 132:2 187:5 188:7, 12,15 190:11
**traditional** 148:10
**trafficking** 90:3 187:2
**training** 20:21 21:3 26:12
**trainings** 107:9
**TRANSCRIPT** 3:22
**transferred** 10:17
**transfers** 136:15
**transgressive** 46:8
**transnational** 3:14 135:5,9
**treat** 147:2
**tree** 47:11
**trending** 176:15
**trial** 6:20 64:4
**tricks** 18:14
**trip** 47:14
**trouble** 61:1,12
**troubling** 174:8
**true** 41:14 76:7 77:13 78:3 80:1,3,4, 6 111:12 134:3 140:18 143:4 147:10,20 169:1,5 184:15 188:4,9 193:12 200:20
**Trump** 62:16 93:15,17 113:15,18, 22
**trust** 66:14 67:10 138:16
**truth** 52:20 169:1 185:6 197:13
**truthful** 142:14
**truthfully** 8:6
**Tucker** 30:2,4,22 33:2 65:10,11
**Tuesday** 1:14 4:9
**Tulsi** 173:19,21 174:14
**Turks** 137:13
**turned** 113:18
**tweet** 56:3
**two-step** 104:11, 12
**type** 85:22 132:6 183:4
**types** 14:17 51:4 67:12 132:16
**typically** 25:19

**U**

**U.S.** 62:20 103:19 107:12 118:7,12 133:11 134:19 135:4 200:12,18
**Uh-huh** 50:8 53:17 125:4 181:6 190:5
**ultimately** 53:9,18
**Umbra** 179:21
**uncontested** 112:12
**undergrad** 27:19 28:7,10,14 37:1
**undergraduate** 27:3
**undermine** 199:19
**understand** 7:22 9:14 44:9 47:11 50:11 59:11 84:10 88:2 92:4 132:6 194:17,22
**understanding** 5:16 136:3,6 190:16
**understood** 9:19 84:2
**undertaking** 122:5
**unduly** 160:13
**unemployed** 42:10 43:17
**unfortunate** 159:12
**unhappy** 35:14 62:5
**unilaterally** 36:20
**unit** 108:19,22 111:7,11 112:7,17
**United** 1:1 4:5 72:6 79:16 100:7,11 103:7 107:22 109:7 115:18 130:21 136:11
**university** 10:17, 19 11:13,16 12:8 28:1,2 31:10 33:14 47:9
**unlike** 183:4
**unobjected** 192:1
**unpaid** 37:16
**unreasonable** 137:7
**untenable** 115:3
**unusual** 42:15 44:10 177:4,16 179:13 183:17
**Update** 75:17 77:7 127:17 131:6 165:13 168:17 170:5
**upset** 55:22
**Upstate** 35:4
**urban** 11:5 12:2,14
**US-BASED** 163:10
**user** 193:6
**utterly** 64:15

**V**

**VA** 2:14
**validate** 48:11
**validity** 159:13,17
**variety** 14:2
**Vatican** 174:2,3
**VC** 77:15 141:4 199:16 201:2,10
**VC-BACKED** 76:21 196:17
**venerable** 51:1
**veracity** 194:19
**verbally** 30:13
**verification** 66:17 169:4
**verified** 48:16 145:17
**verify** 66:8 77:17 96:9 141:17 142:19 166:11 194:19 196:5 197:6 202:11
**verifying** 66:3 203:15
**version** 83:18 134:17
**versus** 4:5 73:3 91:2 112:20 142:3
**veteran** 74:15 83:14 105:7 116:14
**victim** 35:13
**video** 2:19 4:3,10, 17 132:19
**Videography** 2:20
**violates** 192:12
**Virginia** 1:2,13,19, 22 4:7,14 10:14 40:7 158:13 173:2,5 183:9
**visit** 47:13
**Volkswagen** 56:19
**voluntarily** 36:6

**W**

**wait** 6:4 106:9 116:4 118:22
**waiting** 184:2
**walk** 20:12
**wanted** 43:6 44:17 53:10 60:16 64:10 95:5 123:11
**was/is** 46:10
**Washington** 10:17 26:14,15,17,18 37:6 142:8
**watch** 126:14
**water** 176:18 178:4,9,16
**watermark** 195:11
**ways** 18:17 19:8 32:12,18 47:5 100:3 168:1 178:4
**weak** 35:11 126:10
**wearable** 103:20 188:1
**wearing** 25:7
**web** 29:10 34:4 76:20 77:4 131:10 165:10 166:4 195:12
**week** 8:21 179:2,8
**weeks** 157:10 205:6 206:2
**weigh** 143:22 145:19
**weird** 121:3 170:11
**well-known** 100:12
**West** 183:5
**whereabouts** 40:10
**White** 63:11
**wicked** 90:4

**wide** 6:19 73:10

**widely** 21:21

**widespread** 192:11

**widow** 46:7

**Wilcox** 11:16

**wild** 180:16

**William** 10:16 27:19

**wing** 11:20 23:14

**wingers** 45:8

**wished** 23:20

**wishes** 114:4

**wizard** 48:2

**won** 34:17

**word** 21:17 177:21 180:9

**wording** 167:16 191:18

**words** 59:15 60:19 154:3 191:22 194:15,16 198:7

**work** 11:19 15:3,16 18:1,6,12 28:17 29:9,12 32:10 34:13,14 41:11 44:22 48:6,19 49:20 50:17 57:5,8 58:12 59:13 63:10 68:10 69:12 71:8 78:22 85:9 89:1 93:2,3 95:11 97:12 105:11 111:19 133:10,11 139:18,22 140:2,3 144:7 187:9 198:16

**worked** 26:15,20 28:12 29:16 31:21 38:2,9,16,18 45:5 47:10 49:8 70:14 79:15,16 86:7,9,10 91:22 99:5 106:2 107:15 114:22 116:17 120:12 195:1

**working** 8:11 40:4, 6 42:5 43:15,19 44:12 49:4 51:21 59:9 65:9 69:9 71:4, 15 73:12 88:21 92:22 93:8 95:9,15 97:8 98:20 99:3 100:2 101:10,11 105:11 107:20 111:1 112:19 117:1, 12,14 120:6 127:11 137:3 140:5 151:12 152:7 177:13,14 179:1 185:15,21 196:12

**works** 115:17 123:13 163:20

**world** 73:11 78:21 79:10 98:4 147:1 201:15

**world,'** 104:7

**worldwide** 194:14 195:18

**Worth** 158:7

**worthy** 58:17

**write** 32:17 181:18, 21

**writers** 32:21

**writing** 17:19 29:9, 11 32:9 39:21 42:17,19 43:3 50:14 62:5 67:6 83:21 84:5 116:8 143:1 144:1 158:19 159:1

**writings** 61:2

**written** 45:14 91:5, 7,8 102:9 142:4 185:17 196:9

**wrong** 67:4 72:18 131:6,7 145:19 197:1

**wrongdoing** 133:18

**wrote** 59:15 74:3 83:11 95:4 99:11,20 105:2,5 115:15 127:2 128:5 129:5 160:1 172:17 195:9

X

**XRVISION** 1:7 5:2 73:22 75:2,14 76:10,14,15 77:5 79:2 80:3 87:2 89:15 116:11 127:16 128:21 130:7,14,15 131:4 132:3,5 133:10 134:15 160:20 161:21 165:5,6,21 177:1 185:15 187:4 194:10 195:10,14 196:2,6,7,8 198:19 200:8 203:18

**XRVision's** 3:11 146:11 160:17

Y

**Yaacov** 1:5 3:9,11 4:4 5:1 82:22 89:12 90:13 91:8 92:18 102:8,11 165:19,22 166:2 173:1 177:1 183:7

**Yahoo** 75:17 127:20 131:7 165:12 170:4

**year** 27:18 29:3 31:18 33:16,19 34:18 37:9 42:3 44:19 49:5,9 69:5 137:18

**years** 23:10 24:12 26:16 27:1 28:4 29:17 30:9,14 31:5 34:12 43:15 45:17 48:5 62:11 65:8 68:18 79:17 80:8 91:18 92:1 94:2 102:22 104:22 105:22 107:21 110:6 115:4 117:20, 21 119:21 129:10 133:13 139:1,7 142:11 146:19 149:11,12 162:1 176:15 203:10

**yesterday** 205:9

**York** 35:4 56:16 57:15 78:11 87:11 94:20 130:17,18 173:13,18 174:5,19 175:5 183:2 194:1

Z

**Zionist** 115:18