IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

YAACOV APELBAUM, *et al.*,
      *Plaintiffs*,

   v.

JORDAN ARTHUR BLOOM.,
      *Defendant*.

No. 1:25-cv-00147-MSN-WBP

**ORDER**

This matter comes before the Court on *pro se* Defendant Jordan Arthur Bloom's First, Second, and Third Motions to Vacate Judgment (ECF 154, 155, 163), Defendant's Motion to Stay (ECF 167), and Carl Jonas Vesterberg's Motion for Leave to File Non-party Declaration (ECF 161). For the following reasons, the Court will DENY all of the motions, except to the extent that it will order Plaintiffs to, within fourteen (14) days, accept a remitted award of $75,000 in compensatory damages and $125,000 in punitive damages or submit to a new trial on damages.

## I.    Factual and Procedural Background

Plaintiffs Yaacov Apelbaum and XRVision Ltd., a cybersecurity and facial recognition technology expert and his company, filed suit against Defendant Jordan Arthur Bloom, a blogger and journalist, on January 28, 2025. ECF 1. In the original complaint, Plaintiffs alleged that Defendant had made certain defamatory statements about them in a January 29, 2024, Substack blog post (the "First Article") regarding Plaintiff Apelbaum being an "Israeli spy." ECF 1 ¶ 25. The First Article was purportedly republished in a November 23, 2024, Substack post (the "Second Article") by Defendant responding to Plaintiffs' cease and desist letter. *Id*. ¶ 40.

1

Defendant, proceeding *pro se*, appeared and moved to dismiss the original complaint on April 2, 2025, arguing that his statements were not defamatory *per se*, damages were not adequately alleged, Apelbaum was a limited purpose public figure to whom the actual malice standard applies, and that Defendant's article was protected speech under the Virginia Anti-SLAPP law and the First Amendment. ECF 13. At the same time, Defendant asserted a counterclaim for tortious barratry. *Id*. Plaintiffs opposed Defendant's motion to dismiss and themselves moved to dismiss Defendant's counterclaim. ECF 20, 23. On July 7, 2025, the Court denied Defendant's motion to dismiss and granted Plaintiffs' motion to dismiss, determining that Defendant's statements were defamatory *per se* because "allegations of close ties to a foreign intelligence agency could prejudice a cybersecurity professional and his firm," "Plaintiffs' allegations of Defendant's lack of due diligence and shoehorning of their actions into a preconceived narrative about Israelis and Jews are adequate to plead actual malice," and barratry was not a tort recognized under Virginia law. ECF 28.  Defendant then answered the original complaint and this matter proceeded to discovery. ECF 29, 30.

Part way through discovery, Defendant filed a "motion for summary judgment" asserting that Plaintiffs had not been forthcoming in their discovery responses, Defendant's statements were true, and that there was no evidence of harm or actual malice. ECF 33. The Court denied Defendant's motion, noting that the motion failed to comply with the Local Rules and Federal Rules of Civil Procedure, was "entirely argumentative and cites no discernable evidence of record whatsoever," and appeared to raise discovery disputes that would be appropriately brought to the magistrate judge. ECF 42.

Some time later, Plaintiffs sought leave to file an amended complaint, which the magistrate judge granted on November 12, 2025, over Defendant's objection and shortly before the close of

2

discovery. ECF 55, 61, 62. The amended complaint was largely the same as the original, but added additional allegedly defamatory statements from an October 1, 2025, Substack article (the "Third Article") that asserted that "the notorious Indian hacker Rajat Khare" had been added to the board of XRVision, "reporting of which still characterizes it as a Singaporean company[.]" ECF 62 ¶¶ 42, 43.

The Court held a final pretrial conference on November 20, 2025, at which time the Court ordered that summary judgment motions be filed by January 9, 2026. ECF 68. No summary judgment motions were filed by that deadline. Instead, on January 23, 2026, Defendant filed a "Motion for Sanctions and Declaratory Judgment," arguing that, based on representations made at the parties' settlement conference before the magistrate judge, Plaintiffs had made false statements during discovery, and that the Court should declare Plaintiff Apelbaum to be a limited purpose public figure. ECF 103. The magistrate judge denied Defendant's motion as to sanctions. ECF 106. The Court denied the remainder of Defendant's motion, construing it as an (untimely) summary judgment motion and determining that Defendant had failed to establish that Apelbaum was a public figure of any sort. ECF 109. In doing so, the Court held that this was particularly so because Defendant had failed to "offer competent <u>evidence</u> to support his positions as opposed to making sprawling argumentation and references to 'facts' without any citation." *Id*.

Also on January 23, 2026, the Court issued a trial order setting forth deadlines for the filing of motions in limine, jury instructions, voir dire, and a verdict form, and setting a pretrial conference on April 23, 2026. ECF 105. After the parties failed to comply with the trial order's instruction to "jointly file one set of agreed-upon jury instructions" after conferral, the Court set a status conference on April 15, 2026. ECF 122. At the April 15 status conference, the Court ordered the parties to submit briefs on jury instructions remaining in conflict and trial briefs outlining their

cases, "address[ing] the parties' positions on whether Plaintiffs are public figures, whether the statements in the 'third article' are defamatory per se, and the applicability of the Virginia anti-SLAPP law." ECF 132. The Court further directed Plaintiffs to "address how they intend to prove the falsity of each statement in question. ECF 132. The Court also ordered the parties to submit updated exhibit and witness lists and stated that "the Court will not permit argument or evidence at trial on any statement that was not specifically identified as defamatory in the Amended Complaint." *Id*. & n.1.

At the April 23, 2026, pretrial conference, the Court resolved the parties' motions in limine. ECF 150. The Court determined that the jury would be presented only select statements from the First and Third Articles and none from the Second Article.[1] And having received the parties' revised trial exhibit and witness lists, ECF 134, 135, 142, on which Defendants had indicated that they would seek to introduce dozens of Defendant's blog posts to show actual malice, the Court ordered Defendants to greatly narrow such exhibits and present only redacted versions of blog posts predating and closely tied to the defamatory statements. As the scope of the trial evidence was then clear, the Court also determined that Plaintiff Apelbaum was not a limited public figure and that the Virginia Anti-SLAPP law did not apply. On April 24, 2026, Plaintiffs filed an amendment to the exhibit list withdrawing almost all of their blog post actual malice exhibits and resubmitting one (Plaintiff's Exhibit 188) as redacted in accordance with the Court's instruction. ECF 148.

---

[1]     The statements were: (1)"Yaacov Apelbaum is an Israeli spy, and the sort of Israeli spy who would have good reasons to smear American facial recognition technology, because his company, XRVision, is a competitor;" (2) "So this is an Israeli spy who's deeply involved in shaping the Hunter Biden story;" and (3) "I have also informed the Court in my latest filing that to the board of XRVision was recently added the notorious Indian hacker Rajat Khare." Following the April 23, 2026, conference, the parties were provided jury instructions prepared by the Court for their review and objection, which included these statements.

Prior to jury selection on the morning of April 27, 2026, Plaintiffs stated in open court that they would not call Steve Coughlin as a trial witness[2] and would only put on Plaintiff Apelbaum and Defendant as witnesses. Trial Tr. at 3:24-25. Plaintiffs then moved to dismiss their claims as to the Third Article, which Defendant had no objection to. *Id*. at 5:19-6:5. The Court then stated that it would distribute revised jury instructions and a special verdict form for the parties' review, and the parties confirmed that they otherwise had no objection to the instructions the Court distributed following the April 23 conference. *Id*. at 5:8-7:3, 10:14-19 (parties confirming no objection to revised special verdict form). A jury was then selected. *Id*. at 9:13.

The parties gave opening statements. *Id*. at 11:8-23:20. Plaintiffs then called Plaintiff Apelbaum as their first witness. *Id*. at 23:24. Apelbaum testified that he was born in Poland but moved to Israel as a child with his family. *Id*. at 24:5, 10-13. In his later youth, he performed compulsory service in the Israeli military, serving in the paratrooper brigade for seven years. *Id*. at 25:20-26:3. In the paratrooper brigade, Apelbaum served in a reconnaissance company "collecting field information like troop movement, troop strength, troop armament for the purpose of the brigade operation," but he provided "[i]t is not an intelligence officer capacity role. That's a different role." *Id*. at 26:6-10.

Apelbaum further stated that he met his wife around 1987 and followed her to the United States shortly after. *Id*. at 26:18-24. He became an American citizen in "roughly '85 or '86." *Id*. at 27:18-19. He denied having any contacts with the IDF or Israeli intelligence services after his military service ended in 1987. *Id*. at 29:1-3. Apelbaum embarked upon a career in cybersecurity and software development, working for various commercial entities in the following decades. *Id*.

---

[2]     At the April 23, 2026, pretrial conference, Plaintiffs explained that Coughlin would testify as to the effect of Defendant's statements on Plaintiffs' contracting with the U.S. government. Defendant objected to Coughin as an expert witness who was not properly disclosed.

5

at 29:23-41:1. Eventually, he renounced his Israeli citizenship in 2013 because doing so was a condition for receipt of security clearances required for his work. *Id*. at 39:7-10, 40:18-41:2, 41:21-22. Apelbaum refuted the notion that he "had anything to do with spyware, with the exception of hunting for it" and explained that associations with spyware were a "reputational destroyer," or "career-ender." *Id*. at 46:11-12, 15-19-47:6-11.

As for XRVision, Apelbaum testified that he founded the New York-based company (of which he was the sole owner) in 2015 or 2016 and that it provided image and video analytics solutions that used face recognition engines from commercial developers. *Id*. at 51:13-14, 18-52:4, 53:3-4, 14-16. He explained that XRVision never had contracts with U.S. Customs and Border Protection ("CBP") and that it's reputation in 2023 was "excellent," *Id*. at 54:13-15, 21:24.

Apelbaum then stated that he first learned of the First Article during a conversation with a friend and found it on Substack after performing a Google search. *Id*. at 55:3-14. The First Article was admitted into evidence, and Apelbaum testified that Defendant never contacted him regarding it despite having his contact information from past unrelated matters. *Id*. at 56:1-15. Apelbaum then denied various statements in the First Article, including that he was an "Israeli spy," that he had "good reasons to smear American facial recognition technology," that XRVision was a competitor of American facial recognition technology companies, and that XRVision has contracts with CBP. *Id*. at 56-57:21, 60:4-6. He stated that his professional reputation before the First Article was published as "excellent" but that afterwards, there was a "humongous cloud hovering over me right now" because of the spying accusations, which were "very difficult" to dispel. *Id*. at 61:1:12. Apelbaum asserted that "this is a death sentence" and that his family had been affected by terrible emotional suffering and feared being attacked. *Id*. at 61:17-62:13. Further, he testified that "[i]f

the issue is not resolved, then . . . the reputational damage is going to be such that it is going to be very, very difficult to pursue customers." *Id*. at 62:16-25.

On cross-examination by Defendant, Apelbaum stated that the IDF term of conscription was three years and that he served for longer than the standard period of service. *Id*. at 68:15-23. Defendant asked if his role in combat reconnaissance was the "same thing" as being an intelligence officer, which was how Apelbaum had described his work in discovery. *Id*. at 70:13-18. Apelbaum stated "[i]n some assignments it's intelligence related, others it's operational, depending on the assignment" and that his was a "mixture of different assignments." *Id*. at 70:19-23. Defendant then questioned Apelbaum on his work for "Mati Kochavi," which Apelbaum denied and stated that he merely worked for a company that Mati Kochavi was the CEO of and not directly for him. *Id*. 71:4-17. Apelbaum confirmed that he was listed as a co-inventor on a patent with Mati Kochavi but provided that it was because "I was the chief technology officer of the Safe City division. As part of the patent filings for that division, Kochavi was added to the list." *Id*. at 71:17-72:16. Despite this testimony, Defendant never adduced any evidence explaining who Mati Kochavi was or what significance he had to this case.

Plaintiffs then called Defendant as their second and final witness. Defendant acknowledged publishing the First Article on his Substack blog, which he noted had over two thousand readers. *Id*. at 75:10-77:18. He stated that he promoted the First Article by tweeting about it and that he had 19,000 followers on Twitter or X. *Id*. at 77:11-14, 78:13-16. Defendant testified that he had no particular knowledge about the Israeli army and did not know what function Apelbaum had in the Israeli army at the time of the publication of the First Article. *Id*.at 80:19-81:12. Defendant acknowledged that at the time of the publication of the First Article, he had no information on foreign governments "tasking" Apelbaum and did not consult government records about

Apelbaum (apart from some court documents regarding the Hunter Biden matter). *Id*. at 81:13-82:6, 87:15-23. Moreover, while he had Apelbaum's email address, he had not contacted Apelbaum regarding the First Article. *Id*. at 82:22-83:6. Defendant acknowledged that the First Article cited (but apparently disbelieved) an article published in the Arizona Republic that expressly stated that "[t]here's no evidence to suggest Apelbuam, 60, is a spy" and noted that the article also stated that some of "Apelbaum's close business associates have ties to foreign intelligence and military agencies, including the Israeli Defense Forces." *Id*. at 85:11-17. Defendant further acknowledged not having an editor or fact-checker for his Substack, that he was not a member of any professional journalism organization nor did he follow any style guide or code of ethics, and that journalists are obligated to verify information and seek comment before publication. *Id*. at 86:11-87:6

Lastly, Plaintiffs introduced into evidence a March 2023 article posted by Defendant on his Substack regarding Israeli influence in conservative political movements stating that "Benjamin Netanyahu is at the head of an industrial-scale hacking and blackmail operations the likes of which the world has never seen . . . [t]he spying has sociological implications: it changes the assumptions you have to make. You have to go from a presumption of trust to a presumption of distrust, and that's obviously bad for American Jews . . . . Get into bed with these people and sooner or later they'll have you trying to start a different war[.]"[3]  *Id*. at 88:4:21. Additionally, Plaintiffs presented a November 2023 tweet by Defendant stating "The lede: 'A cybersecurity operative with ties to foreign intelligence agencies.' . . . . Which ones, pray tell, might a guy named

---

[3]    Plaintiffs had redacted Exhibit 188 after the Court instructed them to remove superfluous material from their trial exhibits at the April 23, 2026. While testifying on direct, Defendant asserted that Plaintiff's counsel was mischaracterizing statements in Exhibit 188 and asked to admit the entire unredacted article. The Court stated that the issue could be addressed outside of the presence of the jury and that Defendant could later "deal with your portion of the case." Plaintiffs' counsel then moved on from Exhibit 188. Defendant did not raise Exhibit 188 in his case and neither party raised the matter of Exhibit 188 again.

Yaacov Apelbaum, whose company operates in Israel, Singapore, and the U.S., and collaborates with American Bibi ally Jim Hoft, might he have ties to?" *Id*. at 91:1-10. Defendant testified that that the "cybersecurity operative" referred to was Apelbaum and that the Arizona Republic mentioned that his business associates have ties to foreign intelligence agencies like the IDF. *Id*. at 91:12-19. Additionally, Defendant confirmed that he refused to retract the First Article. *Id*. at 96:11-13.

For Defendant's case, the Court permitted him to testify to the jury under oath in narrative form. *Id*. at 99:3-7. Defendant declined to raise any evidentiary issues, introduce any exhibit evidence, or call any witnesses. *Id*. at 99:8-11. Defendant told the jury that his statements were based on him receiving a different version of the Hunter Biden laptop hard drive than Apelbaum and public reporting of "Yahoo News Singapore," "Biometric Update," "Crunchbase," and venture capital tracking platforms.[4] *Id*. at 101:4-17, 102:3-12, 103:1-21. He asserted that his statements were reasonable when made and "the reasonableness of it since then has only been more proven." *Id*. at 104:1-3. Defendant then rested.

Following the close of all evidence, Plaintiffs moved for judgment as a matter of law under Rule 50. *Id*. at 105:15-17. The Court denied the motion. *Id*. at 105:18-21. The Court asked Defendant if he had any motions to make. *Id*. at 105:23-24. Defendant stated he did not. *Id*. at 105:25. The Court confirmed that the parties had no objection to the final version of the jury instructions that had been revised to remove any reference to the Third Article statements. *Id*. at 106:2-7, 107:6-16. The Court proceeded to read the complete jury instructions to the jury. *Id*. at

---

[4]    This appears to refer to some of the exhibits listed on Defendant's exhibit list, included in his trial brief. ECF 140 at PageID# 1831-32. Defendant never sought to introduce these exhibits into evidence at trial and submitted no exhibit evidence to the jury. The Court advised Defendant on April 23, 2026, that there were issues with the admissibility of his proposed exhibits and it is not clear how Defendant would have been able to admit his exhibits at trial even if he had attempted to do so. Additionally, the Court has reviewed Defendant's proposed exhibits and observes that they do not suggest that Apelbaum is an Israeli spy.

109-24:21. The parties made their closing arguments. *Id*. at 125:6-134:4. Plaintiffs' counsel specifically stated "we're asking you to award Mr. Apelbaum and his company $300,000 in compensatory damages, and we're also asking you to further award Mr. Apelbaum and his company $300,000 in punitive damages." *Id*. at 129:20-23. The jury then retired to deliberate. *Id*. at 134:19. Outside of the presence of the jury, the Court confirmed that the parties had approved the jury instructions and special verdict form once more and upon agreement of the parties, permitted the unredacted version of the First Article to be sent back to the jury. *Id*. at 134:20-136:17.

The jury returned a unanimous verdict against Defendant after about one and a half hours. As indicated on the special verdict form the jury found that Defendant had made the First Article statements with actual malice and awarded $75,000 compensatory damages and $125,000 punitive damages, as to each Defendant on each statement. [5] *Id*. at 137:18-140:3. Both parties declined to poll the jury. *Id*. at 140:4-11. The jury was then excused and the Court directed judgment to be entered against Defendant consistent with the verdict. *Id*. at 140:12-141:1.

## II.    First Motion to Vacate or Amend Judgment (ECF 154).

In his first motion, Defendant argues that the Court should vacate or amend the judgment pursuant to Rules 59 and 60. ECF 154. He asserts that: (1) the Court erred in failing to determine whether the statements in question were capable of defamatory meaning and that further, the statements were substantially true; (2) the Court should have determined that Yaacov Apelbaum was a limited purpose public figure and should have applied the Virginia Anti-SLAPP law; (3) the

---

[5]    The special verdict form directed the jury to consider the elements of defamation and compensatory and punitive damages as to each Plaintiff for each of two statements in the First Article. ECF 152. The statements were "Yaacov Apelbaum is an Israeli spy, and the sort of Israeli spy who would have good reasons to smear American facial recognition technology, because his company, XRVision, is a competitor" and "So this is an Israeli spy who's deeply involved in shaping the Hunter Biden story."

jury verdict was "tainted by surprise and misrepresentation" by Plaintiffs' conduct regarding the voluntarily dismissed Rajat Khare statements; (4) he was prevented from establishing a lack of actual malice and the trial evidence does not support a finding of malice; and (5) the jury's award of compensatory and punitive damages was excessive.

A court may alter or amend a judgment under Rule 59(e) if the movant shows "either (1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice." *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F. 3d 191, 197 (4th Cir. 2006). Rule 59(e), however, cannot be used to "raise arguments which could have been raised prior to the issuance of the judgment" nor can it be "used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Pac. Ins. Co. v. Am. Nat'l. Fire Ins. Co.*, 148 F. 3d 396, 403 (4th Cir. 1998) (collecting cases). Moreover, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Id*. (internal quotation marks omitted).

Additionally, Rule 60(b) permits a court to relieve a party from a final judgment on a "limited number of grounds." *Justus v. Clarke*, 78 F. 4th 97, 105 (4th Cir. 2023). A party must first demonstrate timeliness, a meritorious defense, a lack of unfair prejudice to the opposing party, and exceptional circumstances. *Id*. Then, they must show that they qualify for relief for one of six reasons, including "mistake inadvertence, surprise, or excusable neglect," Fed. R. Civ. P. 60(b)(1), "fraud . . ., misrepresentation, or misconduct by an opposing party," *Id*. 60(b)(3), or "any other reason that justifies relief," *id*. 60(b)(6), based on "extraordinary circumstances." *Justus*, 78 F. 4th at 106. Rule 60(b)(3) requires the moving party to have a meritorious claim or defense, demonstrate misconduct by clear and convincing evidence, and show that the misconduct prevented the moving party from fully presenting its case. *Morgan v. Tincher*, 90 F. 4th 172, 177

11

(4th Cir. 2024) (noting that after threshold showing is made, the court must consider factors in the totality of circumstances including the finality of judgments and justice being done). The Rule 60(b)(6) catch-all is further "mutually exclusive" with the other grounds for Rule 60(b) relief. *United States v. Williams*, 56 F. 4th 366, 373 (4th Cir. 2023) (holding that Rule 60(b)(6) cannot be used to escape one year limit for other grounds and is only available in "extraordinary circumstances").

Applying the foregoing principles, Plaintiff's arguments largely do not succeed.

### A. Actionable Statements and Truth

Defendant first argues that the Court erred by failing to determine prior to trial that his calling Plaintiff Apelbaum an Israeli spy was not capable of defamatory meaning and further, substantially true.[6] ECF 154 at PageID# 1880-81. These contentions are unavailing.

To the former point, the Court previously determined in ruling on Defendant's motion to dismiss that the First Article statements ultimately presented to the jury were actionable as defamation *per se* because "allegations of close ties to a foreign intelligence agency could prejudice a cybersecurity professional and his firm." ECF 28 at 7.

To the latter, Plaintiff explains that the Court improvidently denied his motion for summary judgment and erroneously left the matter of the truthfulness of his statements to the jury. ECF 154 at PageID# 1881. However, Plaintiff's summary judgment motion did not clearly raise the issue of substantial truth on any clear record, and it was denied without prejudice to refile after the close of discovery as it was prematurely filed and procedurally defective. ECF 33, 42. Plaintiff never refiled his motion.

---

[6]    Plaintiff also asserts that his statements were made without malice. ECF 154 at PageID# 1881. This point is addressed below.

Additionally, while Plaintiff asserts that he was "penalize[d] [] for a distinction without a legal difference," the evidence presented at trial was sufficient to permit a jury to conclude that the 2024 First Article statements that Plaintiff Apelbaum "is an Israeli spy" were, in fact, false. Plaintiff Apelbaum testified that he was conscripted into the Israeli Defense Forces ("IDF") for seven years, served in a combat reconnaissance company in the paratrooper brigade collecting field information on troops, performed a mixture of operational and intelligence related assignments, was not an intelligence officer, finished his service in 1987, and has not had contacts with the Israeli government since that time. *PBM Prods., LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 400 (E.D. Va. 2009) (statements are not false if their content or imputation is "substantially" true, meaning that the statement is a "fair and accurate description of the event in question"). Indeed, the jury was specifically instructed (with no objection from Defendant) that "[a] statement is not false if it is substantially true, meaning that the statement is a fair and accurate description of the event in question. Minor inaccuracies do not make a statement false if the substance, gist, or sting of the statement is justified." Trial Tr. at 119:8-12. Plaintiff was further able to develop testimony on and argue the reasonableness of and truthfulness of his statements. Thus, a triable issue existed, the jury was properly instructed, and the jury simply rejected Plaintiff's arguments.

Plaintiff's arguments regarding the actionability of statements and their truth reveal no legal error and are unfounded.

### B. Public Figure and Anti-SLAPP Law

Plaintiff next contends that the Court improperly failed to designate Plaintiff Apelbaum a limited purpose public figure due to his involvement in the Hunter Biden laptop controversy and

13

also failed to apply the Virginia Anti-SLAPP law to Defendant's statements. ECF 154 at PageID# 1881-83.

The matter of public figure status and the applicability of the Virginia Anti-SLAPP law is pertinent insofar as they affect the requisite intent to be proven by Plaintiffs at trial. *Jones*, 370 F. 3d at 666; Va. Code Ann. § 8.01-223.2(B). As discussed below in Section II.D, because the jury properly determined that Defendant made the statements with actual malice, any error raised by Defendant here is necessarily harmless and does not warrant any relief.

In any case, Plaintiff Apelbaum was properly determined to be a private figure and the Anti-SLAPP law was properly deemed inapplicable at the pretrial hearing held on April 23, 2026.[7]

### 1. Plaintiff Apelbaum Is Not A Public Figure

A defamation defendant must prove the following five requirements for the Court to hold that the plaintiff is a limited purpose public figure for a certain issue: (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation. *Fitzgerald v. Penthouse Intern., Ltd.*, 691 F. 2d 666, 668 (4th Cir. 1982).

Additionally, "the defamatory statement must be germane to the plaintiff's participation in the controversy" because "an individual's prominence in one area of public life" does not "justify

---

[7]    Defendant argues that the Court's "failure to hold an Anti-SLAPP hearing on April 23 was a procedural violation that stripped Defendant of his statutory immunity, and denied Defendant due process." ECF 154 at PageID# 1882. This argument is unfounded. The Court resolved the issues of public figure status and Anti-SLAPP at the pretrial hearing because it is Defendant's burden to establish that Plaintiff Apelbaum is a public figure and the applicability of the Anti-SLAPP law, and it was apparent from the parties' trial exhibits that Defendant could not carry his burden. *See Foretich v. Capital Cities / ABC, Inc.*, 37 F. 3d 1541, 1553 (4th Cir. 1993) ("initial presumption" that defamation plaintiff is a private individual to be disproven by defendant, who carries the burden of proving public figure status); *Hale v. Cauzzort*, 2026 WL 739280, at *3 (Va. Cir. Ct. March 17, 2026) (defendant bears the burden of proving affirmative Virginia Anti-SLAPP immunity defense).

14

publishing negligent falsehoods about an unrelated aspect of the plaintiff's life." *Jankovic v. Int'l Crisis Grp.*, 822 F. 3d 576, 589 (D.C. Cir. 2016); *de Laire v. Voris*, 738 F. Supp. 3d 123, 137 (D. N.H. 2023) (collecting cases); *see also Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 869-70 (W.D. Va. 2016) ("The scope of the controversy thus becomes a threshold determination" to be evaluated in the context of the "[a]rticle in its entirety").

After the deadline for dispositive motions, Plaintiff filed a "motion for declaratory judgment" asserting that Plaintiff Apelbaum was a limited purpose public figure based on his "role in the Hunter Biden laptop controversy." ECF 103. The Court denied Defendant's motion because he failed to show with competent evidence that Apelbaum was a limited purpose public figure as Defendant had not established that the Hunter Biden laptop controversy or any controversy regarding Apelbaum's status as an Israeli spy were matters of public controversy. ECF 109 at 4. It was also notable that there was an inadequate showing as to the "voluntary assumption of special prominence" and "attempt to influence the controversy's outcome," the two issues did not appear to have anything to do with each other, and Defendant was attempting declare Plaintiffs public figures on the sole basis of the defamatory statements in question. *Id*.

However, on the verge of trial, the parties' trial briefs (ECF 138, 140) and Defendant's trial exhibits, which had no pertinence to any element of the public figure test with regard to the Hunter Biden laptop and Israeli spy controversies, left no doubt that Plaintiff Apelbaum was a private figure. The Court reaffirms its prior determinations on the public figure issue. The Court notes further that Defendant has provided essentially nothing that would shed light into what exactly Apelbaum was doing in the Hunter Biden laptop affair. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 326, 351 (1974) (civil plaintiff's counsel in suit against police officer also prosecuted for murder was not a public figure in defamation suit against publisher for statements that counsel was

15

an "architect of the 'frame-up'" and a communist, holding that public figure question must depend on "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation" and that counsel played minimal role in the matter). Additionally, by the time the allegedly defamatory First Article statements were made on January 29, 2024, it is doubtful that Apelbaum retained any public figure status regarding the Hunter Biden laptop affair given that the matter arose in October 2020 and the world had long moved on from the beginnings of the issue.[8] *See, e.g.*, *Hatfill v. N.Y. Times*, 532 F. 3d 312, 323 (4th Cir. 2008) (status retained where controversy in question "heightened" in months prior to allegedly defamatory statements by 2001 anthrax attacks and plaintiff's use of the attacks as a "platform from which to intensify his message about national unpreparedness"); *Reuber v. Food Chem. News*, 925 F. 2d 703, 710 (4th Cir. 1991) (status retained where defamatory statements published at the "height of the malathion controversy, several months before spraying of malathion began. Reuber's research was therefore still important to the outcome of the controversy"); *AdvanFort Co. v. Int'l Registries, Inc.*, 2015 WL 2238076, at *10 (E.D. Va. May 12, 2015) (status retained where controversy was "still ongoing months after the Article was published").

Defendant's argument as to public figure status fails.

### 2. Defendant's Statements Do Not Pertain to a Matter of Public Concern

Virginia's Anti-SLAPP law provides immunity from civil defamation claims "based solely on statements (i) regarding matters of public concern that would be protected under the First Amendment to the Constitution of the United States" unless made with actual malice. Va. Code § 8.01-223.2(A), (B). Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. *Grover Gaming, Inc. v. Rice*, 2023 WL 8936752, at *6

---

[8]    *See, e.g.*, Adam Goldman, *What We Know and Don't Know About Hunter Biden and a Laptop*, N.Y. TIMES (Oct. 22, 2020), https://www.nytimes.com/2020/10/22/us/politics/hunter-biden-laptop.html.

16

(W.D. Va. Dec. 27, 2023) (quoting *Carey v. Throwe*, 957 F. 3d 468, 475 (4th Cir. 2020)). But the public concern is not implicated by speech regarding a "purely personal" topic. *Carey*, 957 F. 3d at 475 ("[p]ersonal grievances . . . or expressions about other matters of personal interest do not constitute speech about matters of public concern"); *Grover Gaming*, 2023 WL 8936752, at *6 (creation of "concern out of whole cloth" does not qualify). "In deciding whether certain speech falls on the 'public concern' or 'purely personal' side of the line, we naturally look to the 'content, context, and form of the speech at issue in light of the entire record.'" *Carey*, 957 F. 3d at 475.

The Court determined at the April 23, 2026, pretrial conference that the Virginia Anti-SLAPP immunity did not apply to the First Article statements. The Court discerns no error in this ruling. Plaintiff claims that "covering the intrigues regarding Hunter Biden is within the scope of what journalism in the public interest is for." ECF 154 at PageID# 1882–83. But this description belies what the First Article was actually about. The First Article tangentially mentions the Hunter Biden laptop issue but meanders between topics such as "Dianna Pagano, one of the women who procured hookers for [Hunter Biden]," federal police reform efforts, Pagano's arrest by a Connecticut police officer indicating "Hunter Biden is getting his hookers from the locality most under the gun of the Obama DOJ," XRVision's technological capabilities ("it doesn't appear to be as good as Clearview, for instance"), Apelbaum's connections to conservative figures and publications, Apelbaum's own writings, and Apelbaum forming a Florida auto parts company that was dissolved on the same day that the Surfside condo complex was demolished (by the company that demolished the Murrah building after the Oklahoma City bombing) using an attorney who also represented Mac Isaac. *See* ECF 62-1. Viewed in their entirety, the First Article and its defamatory statements have little to do with the public's interest in Hunter Biden or any issue of

17

public concern but rather reflect Plaintiff's original and "purely personal" interests. *Carey*, 957 F. 3d at 475. The Virginia Anti-SLAPP law clearly does not apply.

Defendant's arguments as to the Anti-SLAPP statute fail.

### C. Rajat Khare and Singapore

Third, Defendant argues that under Rule 60(b), the jury verdict was "tainted by surprise and misrepresentation by the Plaintiffs" because Plaintiffs apparently asserted previously that Plaintiff XRVision was unrelated to a Singaporean entity ("Cynapse") that once possessed the same name and was affiliated with "notorious Indian hacker" Rajat Khare, but stated in their trial brief that there was at one time a licensing relationship between XRVision and the Singaporean company. ECF 154 at PageID# 1883-86. At the April 23, 2026, pretrial conference, Plaintiffs voluntarily dismissed their claims regarding the Third Article statements on Rajat Khare. Nevertheless, Defendant asserts that Plaintiffs' actions inflicted surprise and prejudice upon the trial such that relief from the judgment should be granted. *Id*. at 1886.

The Court does not agree. The issues complained of, if any, in no way impacted the statements, evidence, and arguments presented at trial, which had nothing to do with the Third Article. Plaintiff has not demonstrated misconduct by clear and convincing evidence, nor has he articulated how he was prejudiced at trial or in discovery, nor has he meaningfully explained how he was prevented from fully presenting his case at trial. *Tincher*, 90 F. 4th at 177. Relief under Rule 60(b)(3) is unwarranted on these grounds.

### D. Actual Malice

Defendant also contends that he was "prevented from establishing a lack of malice at trial because he wasn't permitted to argue the full context and reasonableness" of his statements and that "if [he] was unable to make [his] case [as articulated in his trial brief], the Court should have

informed him after the trial brief was submitted." ECF 154 at PageID# 1889-91. Somewhat separately, he also claims that the evidence presented at trial did not support actual malice and that instead it vindicated his lack of malice. *Id*. Both of these arguments are unfounded.

Regarding Plaintiff's case, the Court reminded Defendant at the close of the April 23, 2026, pretrial conference that the presentation of his exhibits would have to adhere to the applicable evidentiary and procedural law. Although Defendant proceeded *pro se* in this matter and the Court is bound to construe his submissions and arguments liberally, the Court is not Defendant's legal advisor and the rules apply equally to him as they would to any other party. In any event, Defendant did not seek to introduce any documentary evidence at trial when the time came for him to present his case.

Still, the argument Defendant presented and the examination he conducted of Plaintiff Apelbaum touched on the "five different elements" of his case that he claims were hindered.[9] After Plaintiffs rested, the Court permitted Defendant to testify freely under oath and Defendant, as part of his "reasonable basis . . . for making the[] assertions," stated to the jury that he believed that he had received a version of the Hunter Biden laptop files that was different from which Apelbaum received and that this was "relevant to publish." Plaintiff otherwise said little except that he had relied upon various online reporting (not admitted into evidence) and that his statements were reasonable. In cross-examining Plaintiff Apelbaum, Defendant developed testimony that established that Apelbaum had worked in a division of a company that Mati Kochavi was the CEO

---

[9]     Although Defendant asserts that the "full scope of his argument" was apparent in his trial brief, this is not in fact clear from the brief. ECF 138. Plaintiff contends that the "five elements" are "discrepancies in the Hunter Biden files which established different versions of them in circulation as well as his intervention which objectively aided the goals of the Israeli government," "previous assertion that Plaintiffs' business partners and close friends were tied to foreign intelligence agencies," "the assignation of patents to [Apelbaum] alongside a front for Israeli intelligence," "the seeking of irrelevant discovery into an FBI confidential human source informing on Jeffrey Epstein," and "[Apelbaum's] own admission that he was an IDF intelligence officer for seven years." ECF 154 at PageID# 1889. Plaintiff raised all of these topics at trial except for the Jeffery Epstein discovery issue, which bears no clear connection to this case whatsoever.

of and that Kochavi was listed on patent filings for the division, but Plaintiff never developed with admissible evidence who Kochavi was or what relevance he had to the case. Plaintiff Apelbaum also stated on direct and cross that he served in the IDF for seven years decades, although he denied being an intelligence officer. Defendant has had a full and fair opportunity to make his arguments within the confines of the law, including the points that are the subject of his arguments now. While the jury may not have credited or understood Defendant's position, that does not constitute any legal error.

Moreover, Defendant's sufficiency of the evidence argument as to actual malice fares no better. For starters, while Plaintiffs frame this as a "renewed Rule 50(b) challenge," that is not so. Plaintiffs, not Defendant, made a Rule 50(a) motion at the close of Defendant's case. The Court denied Plaintiffs' Motion and asked Defendant if he had any motions to make. Defendant stated that he did not. Defendant's argument is not cognizable under Rule 59(e) because that rule cannot be used to make sufficiency of evidence arguments. *E.g.*, *Elm Ridge Exploration Co., LLC v. Engle*, 721 F. 3d 1199, 1216 (10th Cir. 2013); *Brown v. Grass*, 544 F. App'x 81, 85 (3d Cir. 2013); *Velasquez v. Figueroa-Gomez*, 996 F. 2d 425, 427 n.1 (1st Cir. 1993); *Canalejo v. ADG, LLC*, 2015 WL 12915720, at *1 (M.D. Fla. Nov. 20, 2015) (collecting cases); *Williams v. Village of Dolton*, 2026 WL 622407, at *3 (N.D. Ill. March 5, 2026). Additionally, Defendant's argument is not ordinarily cognizable under Rule 50(b) because he failed to make a Rule 50(a) motion. *Canalejo*, 2015 WL 12915720, at *1; *Skye Orthobiologics, LLC v. CTM Biomedical, LLC*, 350 F.R.D. 641, 644-45 (C.D. Cal. 2025); *Boley v. Armor Corr. Health Servs., Inc.*, 2024 WL 5244555, at *4 (4th Cir. Dec. 30, 2024) (citing *Smith v. Univ. of N.C.*, 632 F. 2d 316, 338-39 (4th Cir. 1980)). This failure ordinarily constitutes waiver of the issue here. *Smith*, 632 F. 2d at 339; *Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 755 (E.D. Va. 2009) (collecting cases) (noting that Rule 50(a)

20

motion is "not a mere technicality" and that it "serves vitally important interest in the far conduct of litigation").

Even looking past Defendant's failure to move under Rule 50(a), his sufficiency argument still lacks merit. At trial, Defendant was examined by Plaintiffs and testified under oath that when he made the statements in question, he did not know what involvement Apelbaum had in the IDF and did not contact Apelbaum despite having done so in the past regarding unrelated matters. Defendant stated that he did not have a fact-checker for his Substack blog (on which the statements appeared), was not a member of any professional journalism organization and did not follow a journalistic code of ethics, and did not contact any governmental authorities to determine if Plaintiff was a spy. Further, Defendant agreed that he was a journalist and that a journalist had an obligation to verify information before publication and should seek comment from the subject of a contentious matter before publication.

Defendant also acknowledged that the First Article cited (but apparently disbelieved) an article published in the Arizona Republic that expressly stated that "[t]here's no evidence to suggest Apelbuam, 60, is a spy[.]" He noted that the article also stated that some of "Apelbaum's close business associates have ties to foreign intelligence and military agencies, including the Israeli Defense Forces." These portions of the Arizona Republic Article were reprinted in the First Article.[10]

Plaintiffs introduced into evidence a March 2023 article posted by Defendant on his Substack regarding Israeli influence in conservative political movements stating that "Benjamin Netanyahu is at the head of an industrial-scale hacking and blackmail operations the likes of which the world has never seen . . . [t]he spying has sociological implications: it changes the assumptions

---

[10]    The full Arizona Republic article was never introduced into evidence.

you have to make. You have to go from a presumption of trust to a presumption of distrust, and that's obviously bad for American Jews . . . . Get into bed with these people and sooner or later they'll have you trying to start a different war[.]"Additionally, Plaintiffs presented a November 2023 tweet by Defendant stating "The lede: 'A cybersecurity operative with ties to foreign intelligence agencies.' . . . . Which ones, pray tell, might a guy named Yaacov Apelbaum, whose company operates in Israel, Singapore, and the U.S., and collaborates with American Bibi ally Jim Hoft, might he have ties to?" Defendant testified that that the "cybersecurity operative" referred to was Apelbaum and that the Arizona Republic mentioned that his business associates have ties to foreign intelligence agencies like the IDF.

For his part, Defendant introduced no exhibit evidence and told the jury that his statements were based on him receiving a different version of the Hunter Biden laptop hard drive than Apelbaum and public reporting of "Yahoo News Singapore," "Biometric Update," "Crunchbase," and venture capital tracking platforms. He asserted that his statements were reasonable.

All of the foregoing parts of Plaintiffs' case provide more than an adequate basis for the jury to have determined by clear and convincing evidence that Defendant made the First Article statements with actual malice. A defendant acts with "actual malice" when they make a defamatory statement "'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Fairfax v. CBS Corp.*, 2 F. 4th 286, 292 (4th Cir. 2021) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). This is a subjective inquiry into the defendant's state of mind that is susceptible to proof through circumstantial evidence. *Harte-Hanks Commn'cns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). "Reckless disregard" means that the defendant "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Failure to investigate is relevant evidence but "does not in itself establish

22

bad faith." *Id*. at 733. So too is a departure from journalistic standards. *Reuber v. Food Chem. News, Inc.*, 925 F. 2d 703, 712 (4th Cir. 1991). But "failure to investigate before reporting a third party's allegations can be reckless 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports[,]'" as such is indicative of purposeful avoidance of the truth. *Fairfax*, 2 F. 4th at 293 (quoting *Harte-Hanks*, 491 U.S. at 688). Additionally, "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence." *Eramo v. Rolling Stone*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (quoting *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005)).

This is a case in which "proof of all three" of "failure to adequately investigate, a departure from journalistic standards, [and] ill will or intent to injure," or at least a preconceived belief, provided sufficient evidence for the jury's finding of actual malice. *Id*. The jury could reasonably have determined that Defendant acted with reckless disregard in deeming Apelbaum an Israeli spy because it served his preconceived notion that Israeli spies were co-opting domestic affairs.[11] This is particularly so as Defendant failed to adhere to any journalistic practices at all or take any meaningful measures to ascertain the veracity of his statements. The jury could have reasonably believed so for the additional reason that Defendant insisted Apelbaum a spy while plainly rejecting the Arizona Republic article stating that there was no evidence of Apelbaum being such. *Eramo*, 209 F. Supp. 3d at 873-74 (citing *Zerangue v. TSP Newspapers, Inc.*, 814 F. 2d 1066, 1071 (5th Cir. 1987)) ("A verdict for the plaintiff has been upheld when a reporter's own notes showed

---

[11]    Indeed, the First Article alluded to "problems in the U.S.-Israel relationship [being] a clear threat to the American defense-industrial base," Plaintiffs' connections with conservative political figures and outlets, and stated that "[w]hat the case of Apelbaum actually represents is how badly the conservative movement has been penetrated by Israeli intelligence, at the level of human intelligence and technology contracting." ECF 62-1.

that she was aware of facts contradicting her story"). While the pertinent question is of the sufficiency of Plaintiffs' evidence and not Defendant's, it is notable that Plaintiffs' aforementioned evidence was essentially uncontroverted by Defendant, who was afforded a complete opportunity to make his case.

For all these reasons, there was a sufficient basis for the jury to conclude that Defendant made his statements with actual malice.[12]

### E. Excessive Damages

The final aspect of Defendant's First Motion asserts that the jury's damages award was excessive in several ways. Defendant argues that the compensatory damages award is unsupportable because there was no evidence of any actual damages presented by Plaintiffs ECF 154 at PageID# 1887. Additionally, he contends that "all damages" awarded to XRVision must be stricken because the second statement presented to the jury from the First Article ("So this is an Israeli spy who's deeply involved in shaping the Hunter Biden story") does not mention XRVision. *Id*. at 1888. And, he asserts that the $350,000 statutory punitive damages cap was exceeded and notes that the jury's $800,000 total judgment exceeded the amount argued for by Plaintiffs at trial. *Id*.

For the most part, Defendant's arguments fall flat. Virginia law presumes "compensatory damages for injury to reputation, humiliation, and embarrassment" for statements that are determined to be defamatory per se even absent proof. *Askew v. Collins*, 283 Va. 482, 486 (2012). Punitive damages may also be awarded for defamation per se even though actual damages are not

---

[12] At various times, Plaintiffs have suggested that Defendant's refusal to retract is indicative of actual malice. But while, the "readiness to retract tends to negate 'actual malice,'" "the failure to issue a correction cannot establish actual malice." *Blankenship v. NBCUniversal, LLC*, 60 F. 4th 744 (4th Cir. 2023); *Fairfax*, 2 F. 4th at 295 ("We have explained that a publisher's failure to retract a statement upon request generally 'is not probative of [the speaker's] state of mind at the time of publication.'"). The Court does not regard Defendant's refusal to retract as evidence of actual malice.

shown and compensatory damages are not awarded. *Poulston v. Rock*, 251 Va. 254, 264 (1996); *Swengler v. ITT Corp. Electro-Optical Prods. Div.*, 993 F. 2d 1063, 1071 (4th Cir. 1063). Additionally, the jury's award as to Plaintiff XRVision is permissible notwithstanding that the second statement did not expressly mention it because there is a "sufficient nexus between the allegedly defamatory nature of the statement and the business" as to make it "of and concerning" XRVision. *Schaecher v. Bouffault*, 290 Va. 83, 99 (2015) (citing *Life Printing & Publishing Co. v. Field*, 324 Ill. App. 254, 260 (1944) ("Words spoken or written of a stockholder or officer give no right of action to the corporation unless spoken or written in direct relation to the trade or business of the corporation. If they relate solely to the stockholder, officer, or employee in his private or personal capacity, only the individual can complain")). Indeed, read in context, the First Article's statements drew close connections between the Israeli spy allegations, Apelbaum, and his ownership of XRVision and the nature of its business. *See also* ECF 28 at 7 (determining First Article statements actionable as defamation *per se* because "allegations of close ties to a foreign intelligence agency could prejudice a cybersecurity professional and his firm."). A business may further be defamed per se. *JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 741 (E.D. Va. 2014). And, the statutory damages cap was not technically exceeded because it applies on a per-plaintiff basis and the jury awarded a total of $250,000 in punitive damages as to each Plaintiff. ECF 152; *Sines v. Hill*, 106 F. 4th 341, 352-55 (4th Cir. 2024).

However, there are still "situations in which the verdict in a *per se defamation* case does in fact 'shock the conscious[]'" such that remittitur, or the "order[ing] of a new trial unless the plaintiff accepts a reduction in an excessive jury award," is appropriate. *Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 763 (E.D. Va. 2009); *Hughston v. New Home Media*, 552 F. Supp. 2d 559, 564 (E.D. Va. 2008). "A trial court may set aside a verdict because it is excessive if the amount awarded

25

shocks the conscience of the court either because it indicates 'the jury has been motivated by passion, corruption, or prejudice" or 'has misconceived or misconstrued the facts or the law' or because it is so disproportionate 'to the injuries suffered as to suggest that it is not the product of a fair and impartial decision.'" *Gov't Micro Resources, Inc. v. Jackson*, 271 Va. 29, 44 (2006). In reviewing an award of punitive damages, a court also looks to the "reasonableness between the damages sustained and the amount of the award and the measurement of punishment required, whether the award will amount to a double recovery, the proportionality between the compensatory and punitive damages, and the ability of the defendant to pay." *Poulston*, 251 Va. at 263 (internal citations omitted). In addition, a trial court may remit a damages award for duplication "if the verdict amount is not within the range of evidence." *Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F. 3d 1063, 1079 (10th Cir. 2008).

Here, Plaintiff Apelbaum testified at trial that his reputation and that of XRVision were good prior to the publication of the First Article, but that the First Article had created a "humongous cloud" and taken an emotional toll, and he suggested that the First Article's reputational damage if "not resolved" would cause difficulty in pursuing customers (but did not state that Plaintiffs had lost any business). Plaintiffs did not present any evidence of actual damages suffered. And the jury awarded $75,000 compensatory damages and $125,000 punitive damages to each of the two plaintiffs for each of the two identified First Article statements, coming to a total of $800,000.

The Court would not doubt the validity of a singular jury award of $75,000 compensatory and $120,000 punitive damages in case, given the Supreme Court of Virginia's emphasis that a "substantial" compensatory recovery may be had in a defamation case absent proof of injury and that a sizable punitive damages award may be appropriate punishment for "egregious conduct"

26

without actual damages as well. *Poulston*, 251 Va. at 261, 264; *see, e.g.*, *Thomas v. Psimas*, 101 Va. Cir. 455, *5-8 (Va. Cir. Ct. Jan. 17, 2019) (remitting compensatory damages from $350,000 to $75,000 and punitive damages from $425,000 to $75,000 where defamation plaintiff "presented no evidence of any particular loss that he suffered as a result of Defendant's statement" and only "unremarkable" testimony regarding the effect of the defamation on him), *remitted judgment accepted and entered* 2019 WL 1509956 (Va. Cir. Ct. Feb. 13, 2019).

But the jury award here of $800,000 is manifestly excessive and bears no relation or proportion to the evidence presented at trial and the nature of this case. *See Cretella*, 640 F. Supp. 2d at 757 (jury may not "simply 'conjure up' an appropriate verdict without some rational relationship to the underlying facts and circumstances of the case"). And the Court discerns that it was spurred by an unusual sort of duplication created by Plaintiffs. The special verdict form provided to the jury was based on a form jointly submitted by the parties and originally drafted by Plaintiffs. The form provided eight separate spaces for the jury to separately indicate the amount of compensatory damages and punitive damages awarded to each plaintiff for each of two statements in the First Article. In spite of such, in closing (the only instance in which Plaintiffs' counsel addressed damages figures), Plaintiffs' counsel made no such delineations. Counsel rather asked the jury to simply "award Mr. Apelbaum and his company $300,000 in compensatory damages, and we're also asking you to further award Mr. Apelbuam and his company $300,000 in punitive damages." Trial Tr. at 129:21-23. Plaintiffs' counsel never explained how the jury was to break down damages between the plaintiffs and the statements and never attributed distinct harms or effects to each plaintiff and statement at any time at trial. Moreover, the amounts awarded, when summed up, far exceed what Plaintiffs' counsel even asked for at trial and the jury awarded the same $75,000 / $125,000 split over each plaintiff and statement. Based on all of this, the Court

27

concludes that, in accord with Plaintiffs' counsel's one-compensatory figure, one-punitive-figure argument, the jury intended to award Plaintiffs a singular, total amount of $75,000 in compensatory damages and $125,000 in punitive damages, for a total of $200,000.

Accordingly, the Court remits the damages award to $75,000 in compensatory damages and $125,000 in punitive damages and will order Plaintiffs to, within fourteen days, accept this remitted award or submit to a new trial on the issues of damages only.

Defendant's First Motion will otherwise be denied.

### III.     Second Motion to Vacate (ECF 155)

Defendant's Second Motion to Vacate contends that he recently discovered that "from at least July 2025 to the present, Plaintiff's counsel used an individual, Carl Jonas Vesterberg, to act as a surreptitious agent." ECF 155 at PageID# 1893; ECF 156. Defendant claims that Vesterberg "established a relationship with the Defendant under the guise of conducting business" and that he "obtained privileged communications which were subsequently funneled to Plaintiff's counsel." *Id*. at 1893-94. Defendant states that Vesterberg "himself emailed Defendant on February 17 to Defendant 'I'm giving Burns and Apelbaum all the good stuff on you'" but that "receipt of this material by Mr. Burns was not, however, confirmed until April 29." *Id*. at 1894. Defendant thus asserts that Plaintiffs committed fraud upon the Court and violations of the ethics and discovery rules. *Id*. He claims that this prejudiced him because he would have otherwise suppressed the evidence gathered by Vesterberg, the judgment has been made inequitable, and that these actions prove that the statement that Apelbaum is indeed a spy. *Id*. at 1894-95.

Plaintiffs deny the allegations and submit a declaration of Plaintiffs' counsel stating that Vesterberg contacted Apelbaum in January 2026 on his own initiative and that Vesterburg told Plaintiff's counsel he believed he had legal claims of his own and that he would be willing to

testify at trial in this matter. ECF 158 at 9-12; ECF 158-1. Plaintiffs' counsel attests that beyond evaluating and declining to represent Vesterberg, neither he nor Plaintiffs have had anything to do with Vesterberg. *Id*.

Defendant's Second Motion to Vacate is meritless. The Court discerns no misconduct and no prejudice whatsoever to Defendant. The substance of the trial in this matter had nothing to do with the issues raised Defendant's Second Motion. Accordingly, the Court will deny the Second Motion.[13]

## IV.    Third Motion to Vacate (ECF 163)

In his Third Motion to Vacate, Defendant claims that Plaintiff's case was "prosecuted as part of a deliberate coordinated scheme between Plaintiff Yaacov Apelbaum and [Nash] Rosenblatt to financially exhaust and coerce Defendant Bloom." ECF 163 at PageID# 2051. Rosenblatt had unsuccessfully sued Defendant in state court in 2022 for defamation (and paid fees to Defendant) and on May 25, 2026, sent Defendant an email stating "[s]o glad my pro se action depleted your meager resources so you have to defend against Yaacov." *Id*. at 2052; ECF 165-1. Plaintiffs deny any connection with Rosenblatt and argue that that there was no fraud, misconduct, or prejudice suffered by Defendant. ECF 165.

As with Defendant's Second Motion, the Court finds that Defendant's Third Motion is meritless. The Court again no misconduct, no coordination, and no prejudice whatsoever to Defendant. Accordingly, the Court will deny Third Second Motion

## V.    Motion to Stay (ECF 167)

Lastly, Defendant seeks to stay enforcement of the judgment against him pending resolution of his post-trial motions. ECF 167. He also asks the Court to enjoin Plaintiffs from suing

---

[13]    Vesterberg's motion for Leave to File a Non-Party Declaration (ECF 161) will also be denied.

him again for refusing Plaintiffs' demands that he remove the statements underlying this action. *Id*. The Court denies Defendant's motion as it has now resolved Plaintiff's post-trial motions and the requested injunction is beyond the scope of the matters currently before the Court.[14]

## VI.    CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Plaintiff's First Motion to Vacate (ECF 154) is GRANTED IN PART and DENIED IN PART; and it is further

ORDERED that Plaintiff's Second Motion to Vacate (ECF 155), Third Motion to Vacate (ECF 163), and Motion to Stay (ECF 167) are DENIED; and it is further

ORDERED that Carl Jonas Vesterberg's Motion for Leave to File Non-Party Declaration (ECF 161) is DENIED; and it is further

ORDERED that, within fourteen (14) days of the entry of this Order, Plaintiffs will accept a remitted total award of $75,000 in compensatory damages and $125,000 in punitive damages, or submit to a new trial on the issue of damages only.

**IT IS SO ORDERED.**

The Clerk of Court is directed to forward a copy of this Order to counsel of record and Plaintiff *pro se*.

                                                                    /s/
                                                    Hon. Michael S. Nachmanoff
                                                    United States District Judge

August 7, 2026
Alexandria, Virginia

---

[14]    The Court does not reach the issue of the actionability of statements outside of the First Article but warns Plaintiffs to tread very carefully, as they did not seek an injunction and the doctrine of claim preclusion may apply to future actions.

30